# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

## CASE NO. 25-11887

---

COURTNEY MORGAN, M.D.,
*Plaintiff-Appellant/Cross-Appellee*

v.

WALGREEN CO.,
*Defendant-Appellee/Cross-Appellant.*

---

On Appeal from the
U.S. District Court of the Southern District of Florida
DISTRICT COURT DOCKET NO. 0:24-cv-61442-RS

---

## PLAINTIFF-APPELLANT/CROSS-APPELLEE
## COURTNEY MORGAN, M.D.'S APPENDIX

## VOLUME 1

---

Andrew L. Schlafly, Esq.
LAW OFFICE OF ANDREW L. SCHLAFLY
939 Old Chester Road
Far Hills, NJ 07931
Tel: (908) 719-8608
Fax: (908) 934-9207
Email: aschlafly@aol.com

Erica Chaplin, Esq.
ANDERSON & WELCH, LLC
500 S. Australian Ave., 6th Flr
West Palm Beach, FL 33401
Tel: (561) 832-3386
Fax: (561) 820-4867
Email: chaplinlaw@gmail.com
andewelch@andersonandwelch.com

*Counsel for Plaintiff-Appellant/Cross-Appellee, Courtney Morgan, M.D.*

***Courtney Morgan, M.D. v. Walgreen Co.***
<u>**Case No. 25-11887**</u>

**CERTIFICATE OF INTERESTED PERSONS**
**AND**
<u>**CORPORATE DISCLOSURE STATEMENT**</u>

Plaintiff-Appellant/Cross-Appellee, COURTNEY MORGAN, M.D., respectfully submits the following list, which includes the trial judge, and all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this review:

1.      The Honorable Rodney Smith, *U.S. District Court Judge*

***Plaintiff-Appellant/Cross-Appellee***

2.      Courtney Morgan, M.D., *Plaintiff-Appellant/Cross-Appellee*

***Counsel for Plaintiff-Appellant/Cross-Appellee***

3.      Anderson & Welch, LLC, *Attorneys for Plaintiff- Appellant /Cross-Appellee*

4.      Anderson, Esq., Kevin R., *Attorney for Plaintiff- Appellant /Cross-Appellee*

5.      Chaplin, Esq., Erica, *Attorney for Plaintiff- Appellant /Cross-Appellee*

6.      Schlafly, Esq., Andrew L., *Attorney for Plaintiff- Appellant /Cross-Appellee*

***Defendant-Appellee/Cross-Appellant***

7.      Walgreens Co. (WAG), *Defendant-Appellee/Cross-Appellant*

***Counsel for Defendant-Appellee/Cross-Appellant***

8.      *Akerman, LLP, *Attorneys for Defendant-Appellee/Cross-Appellant*

9.      Daniel, W. Aaron, Esq., *Attorney for Defendant- Appellee /Cross-Appellant*

10.     Kula & Associates, P.A., *Attorneys for Defendant- Appellee/Cross-Appellant*

11.     Kula, Esq., Elliot B., *Attorney for Defendant- Appellee/Cross-Appellant*

12.   *Malvin, Tamara S., Esq., *Attorney for Defendant- Appellee/Cross-Appellant*

13.   Quintairos Prieto Wood & Boyer, PA, *Attorneys for Defendant-Appellee/ Cross-Appellant*

14.   Tarlow, Esq., David Michael, *Attorney for Defendant-Appellee/Cross-Appellant*

***Other Interested Parties***

15.   Florida Board of Medicine

16.   Florida Board of Pharmacy

17.   Florida Department of Health

18.   Walgreens Boots Alliance (Defendant-Appellee/Cross-Appellant's Parent Company)

*\* - no longer involved in representation*

Pursuant to Federal Rule of Appellate Procedures 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, I hereby certify that there are no publicly traded corporations, stock, equities, debts or corporate disclosures for Plaintiff-Appellant/Cross-Appellee, Courtney Morgan, M.D.

/s/ Andrew L. Schlafly
Andrew L. Schlafly, Esq.

/s/ Erica Chaplin
Erica Chaplin, Esq.

# INDEX OF APPENDIX

**Tab/Docket #**                                                                   **Page**

## <u>VOLUME 1</u>

**TAB DS** – District Court Docket Sheet ....................................................... 1

**TAB 1** – Verified Complaint, filed August 7, 2024 ................................. 12

**TAB 4** –First Amended Verified Complaint, filed August 8, 2024 ......................... 41

    **TAB 4-1** – Exhibits to First Amended Complaint,
                filed August 8, 2024 ................................................. 72

    Exh. 1 - Florida Department of Health Inspection Results,
            Inspection Date: May 31, 2024 ..................................... 74
    Exh. 2 - Letter from Walgreens: June 18, 2024 .......................... 79
    Exh. 3 - Letter from Dr. Morgan: June 20, 2024 ........................ 81
    Exh. 4 - Letter from Walgreens: June 25, 2024 .......................... 84
    Exh. 5 - Letter from Dr. Morgan: July 4, 2024 .......................... 86
    Exh. 6 - Letter from Walgreens: July 16, 2024 .......................... 88
    Exh. 7 - Letter from Walgreens to Patients: June 19, 2024 ......................... 90

**TAB 10** – Expedited Motion for Temporary Restraining Order and
             Preliminary Injunction, filed August 13, 2024 ....................................... 92

**TAB 11** – Order Setting Hearing on Plaintiff's Expedited Motion for Issuance
             of a Temporary Restraining Order, filed August 14, 2024 .................. 114

**TAB 14** – Order Granting Motion for Temporary Restraining Order,
             entered August 15, 2024 ........................................................ 116

**TAB 19** – Plaintiff's Reply to Defendant's Response in Opposition to Plaintiff's
             Motion for Preliminary Injunction, filed August 21, 2024 .................. 119

**TAB 19-1** – Exhibit list and exhibits to Plaintiff's Reply..........................135

    Exh. 1 - Letter to Dr. Morgan (June 18, 2024) and Letter to Patients
          (June 19, 2024), Regarding Blocking Dr. Morgan's
          Prescriptions for Controlled Substances....................................137
    Exh. 2 - Walgreens Co, Website/Press Release Regarding
          Settlement with Florida .............................................................140
    Exh. 3 - Settlement Agreement Excerpts....................................................143
    Exh. 4 - Letter to Dr. Morgan: July 16, 2024 ............................................153
    Exh. 5 - Florida Department of Health May 31, 2024,
          Inspection Results......................................................................155
    Exh. 6 - Chronological Correspondence Between Dr. Morgan
          and Walgreens...........................................................................160

**TAB 21** – Corrected Transcript and Notice of Correction on Hearing on
        Expedited Motion for Temporary Restraining Order..........................167
        *(Title of Transcript Corrected from Joint Motion to Dismiss*
        *Amended Complaint to Hearing on Expedited Motion for*
        *Temporary Restraining Order)*

**TAB 22** – Plaintiff's Motion for Judicial Notice, filed August 22, 2024.............199

**TAB 25** – Order Granting Motion for Preliminary Injunction,
        filed August 26, 2024 ..........................................................................206

**TAB 29** – Notice of Interlocutory Appeal, entered September 20, 2024.............217

## **VOLUME 2**

**TAB 50** – Defendant's Motion to Dismiss, filed October 16, 2024......................231

**TAB 61** – Plaintiff's Response in Opposition to Defendant's Motion to
        Dismiss Amended Complaint, filed November 6, 2024 ......................254

**TAB 69** – Order Granting Motion to Dismiss, entered February 20, 2025 .........273

**TAB 70** – Plaintiff's Motion for Reconsideration, filed March 20, 2025.............286

    **TAB 70-1** – Proposed Second Amended Complaint...................................301

**TAB 71** – Defendant's Response in Opposition to Plaintiff's Motion for Reconsideration, filed April 4, 2025 ....................................................335

    **TAB 71-1** – Information Filed ....................................................348
    **TAB 71-2** – Civil Complaint........................................................350
    **TAB 71-3** – Social Media Images...............................................376

**TAB 72** – Plaintiff's Reply in Support of Motion for Reconsideration ...............380

    **TAB 72-1**– Social Media Images...............................................392

**TAB 73** – Order Denying Motion for Reconsideration, entered May 5, 2025 .....396

**TAB 74** – Notice of Appeal, filed June 3, 2025 ....................................................401

**TAB CS** – Certificate of Service..........................................................404

TAB DS

APPEAL,CLOSED,MEDREQ,PMH,REF_PTN

# U.S. District Court
## Southern District of Florida (Ft Lauderdale)
## CIVIL DOCKET FOR CASE #: 0:24-cv-61442-RS

Morgan v. Walgreen Co.                                        Date Filed: 08/07/2024
Assigned to: Judge Rodney Smith                              Date Terminated: 02/19/2025
Referred to: Magistrate Judge Patrick M. Hunt               Jury Demand: Plaintiff
Case in other court: USCA, 24-13087-A                       Nature of Suit: 360 P.I.: Other
         USCA, 25-11887-A          Jurisdiction: Diversity
         USCA, 25-11887-A
Cause: 28:1332 Diversity

**Plaintiff**

**Courtney Morgan**                    represented by    **Erica Faith Chaplin**
                                                         10380 SW Village Center Drive
                                                         Suite #156
                                                         Port St. Lucie, FL 34987
                                                         561-832-3386
                                                         Fax: 877-572-7087
                                                         Email: chaplinlaw@gmail.com
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Kevin Ramon Anderson**
                                                         Kevin R. Anderson
                                                         500 South Australian Avenue
                                                         Sixth Floor
                                                         West Palm Beach, FL 33401
                                                         561-832-3386
                                                         Fax: (561) 820-4867
                                                         Email:
                                                         andewelch@andersonandwelch.com
                                                         *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Walgreen Co.**                       represented by    **David Michael Tarlow**
                                                         Quintairos, Prieto, Wood & Boyer, P.A.
                                                         One East Broward Blvd.
                                                         Suite 1400
                                                         Ft. Lauderdale, FL 33301

954-523-7008
Fax: 954-523-7009
Email: dtarlow@qpwblaw.com
*ATTORNEY TO BE NOTICED*

**Elliot Burt Kula**
Kula & Associates, P.A.
11900 Biscayne Blvd., Suite 310
Miami, FL 33181
305-354-3858-
Fax: 305-354-3822
Email: elliot@kulalegal.com
*ATTORNEY TO BE NOTICED*

**Tamara Savin Malvin**
Akerman LLP
201 East Las Olas Boulevard
Suite 1800
Fort Lauderdale, FL 33301
954-759-8960
Fax: 954-463-2224
Email: tamara.malvin@akerman.com
*TERMINATED: 10/17/2024*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/07/2024 | 1 | COMPLAINT against Walgreen Co.. Filing fees $ 405.00 receipt number AFLSDC-17740985, filed by Courtney Morgan. (Attachments: # 1 Exhibit 1-7, # 2 Civil Cover Sheet, # 3 Summon(s))(Chaplin, Erica) (Entered: 08/07/2024) |
| 08/07/2024 | 2 | Clerks Notice of Judge Assignment to Judge David S. Leibowitz.<br><br>Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Panayotta Augustin-Birch is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent. (ar24) (Entered: 08/08/2024) |
| 08/08/2024 | 3 | Summons Issued as to Walgreen Co.. (ar24) (Entered: 08/08/2024) |
| 08/08/2024 | 4 | First AMENDED COMPLAINT against Walgreen Co., filed by Courtney Morgan. (Attachments: # 1 Exhibit 1-7, # 2 Summon(s))(Chaplin, Erica) (Entered: 08/08/2024) |
| 08/09/2024 | 5 | NOTICE of Filing Proposed Summons(es) by Courtney Morgan re 4 Amended Complaint/Amended Notice of Removal filed by Courtney Morgan (Chaplin, Erica) (Entered: 08/09/2024) |
| 08/12/2024 | 6 | Summons Issued as to Walgreen Co. (pcs) (Entered: 08/12/2024) |

| 08/12/2024 | 7 | ORDER OF RECUSAL. Judge David S. Leibowitz recused. Case reassigned to Judge Rodney Smith for all further proceedings. Signed by Judge David S. Leibowitz on 8/9/2024. *See attached document for full details*. (yar) (Entered: 08/12/2024) |
|---|---|---|
| 08/12/2024 | 8 | SUMMONS (Affidavit) Returned Executed on 4 Amended Complaint/Amended Notice of Removal with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Courtney Morgan. Walgreen Co. served on 8/12/2024, response/answer due 9/3/2024. (Chaplin, Erica) (Entered: 08/12/2024) |
| 08/12/2024 | 9 | ORDER REQUIRING JOINT SCHEDULING REPORT, CERTIFICATES OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENTS. Joint Scheduling Report due by 9/9/2024 Signed by Judge Rodney Smith on 8/12/2024. *See attached document for full details*. (ebz) (Entered: 08/13/2024) |
| 08/13/2024 | 10 | Plaintiff's EXPEDITED MOTION Issuance of Temporary Restraining Order by Courtney Morgan. (Attachments: # 1 Exhibit 1-Letter dated June 18, 2024, # 2 Exhibit 2-Letter dated July 16, 2024, # 3 Exhibit 3-Florida Department of Health Inspection Report, # 4 Exhibit 4-Letter dated June 19, 2024, # 5 Exhibit 5-Affidavit in Support of Motion, # 6 Exhibit 6-Proposed Order Granting TRO, # 7 Exhibit 7-Proposed Order Setting Hearing)(Chaplin, Erica) (Entered: 08/13/2024) |
| 08/14/2024 | 11 | ORDER SETTING HEARING on Motion 10 Plaintiff's EXPEDITED MOTION Issuance of Temporary Restraining Order : Motion Hearing set for 8/15/2024 09:30 AM in Fort Lauderdale Division before Judge Rodney Smith. Signed by Judge Rodney Smith on 8/14/2024. *See attached document for full details*. (ebz) (Entered: 08/14/2024) |
| 08/14/2024 | 12 | NOTICE of Compliance by Courtney Morgan re 11 Order Setting Hearing on Motion, (Attachments: # 1 Exhibit 1 & 2 - Proof of Service; Emails Re Service) (Chaplin, Erica) (Entered: 08/14/2024) |
| 08/15/2024 | 13 | PAPERLESS Minute Entry for proceedings held before Judge Rodney Smith: Motion Hearing held on 8/15/2024, 9:30-10:10am re 10 Plaintiff's EXPEDITED MOTION Issuance of Temporary Restraining Order filed by Courtney Morgan. After hearing from the parties, the Court found plaintiff met its burden, TRO to be entered, Preliminary Injunction Hearing set for 8/22/24 at 1:30PM. Defense response due 8/19/24 12pm, reply due 8/20/24. Attorney Appearance(s): Erica Faith Chaplin, (Plaintiff's Counsel), Tamara Malvin (Defense Counsel) Court Reporter: Glenda Powers, 305-523-5022 / Glenda_Powers@flsd.uscourts.gov. (pm) (Entered: 08/15/2024) |
| 08/15/2024 | 14 | ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER re 10 Expedited Motion. Responses due by 8/19/2024. Replies due by 8/20/2024. Motion Hearing set for 8/22/2024 01:30 PM in Fort Lauderdale Division before Judge Rodney Smith. Signed by Judge Rodney Smith on 8/15/2024. *See attached document for full details*. (ebz) (Entered: 08/15/2024) |
| 08/15/2024 | 23 | Surety Bond BOND in the amount of $100.00 receipt # 18864 posted by Courtney Morgan Approved by Judge Rodney Smith. (Per Order DE#14) (drz) (Entered: 08/22/2024) |
| 08/16/2024 | 15 | NOTICE of Attorney Appearance by Tamara Savin Malvin on behalf of Walgreen Co.. |

| | | |
|---|---|---|
| | | Attorney Tamara Savin Malvin added to party Walgreen Co.(pty:dft). (Malvin, Tamara) (Entered: 08/16/2024) |
| 08/19/2024 | 16 | RESPONSE in Opposition re 10 Plaintiff's EXPEDITED MOTION Issuance of Temporary Restraining Order filed by Walgreen Co.. Replies due by 8/26/2024. (Attachments: # 1 Exhibit 1 - Declaration)(Malvin, Tamara) (Entered: 08/19/2024) |
| 08/20/2024 | 17 | Unopposed MOTION for Extension of Time to File Reply to Defendant's Response in Opposition to Plaintiff's Motion for Preliminary Injunction by Courtney Morgan. Responses due by 9/3/2024. (Attachments: # 1 Exhibit 1-August 15, 2024, Hearing Excerpt)(Chaplin, Erica) (Entered: 08/20/2024) |
| 08/20/2024 | 18 | PAPERLESS ORDER granting 17 Plaintiff's Unopposed Motion for Extension of Time to Reply to Defendant's Response in Opposition to Plaintiff's Motion for Preliminary Injunction. Plaintiff shall file his reply by **August 21, 2024 at noon**. Signed by Judge Rodney Smith on 8/20/2024. (cbn) (Entered: 08/20/2024) |
| 08/21/2024 | 19 | Plaintiff's REPLY to Response to Motion re 10 Plaintiff's EXPEDITED MOTION Issuance of Temporary Restraining Order filed by Courtney Morgan. (Attachments: # 1 Exhibit 1-6)(Chaplin, Erica) (Entered: 08/21/2024) |
| 08/22/2024 | 20 | TRANSCRIPT of Joint Motion to Dismiss Amended Complaint held on August 15, 2024 before Judge Rodney Smith, 1 - 31 pages, Court Reporter: Glenda Powers, 305-523-5022 / Glenda_Powers@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/12/2024. Redacted Transcript Deadline set for 9/23/2024. Release of Transcript Restriction set for 11/20/2024. (gps) (Entered: 08/22/2024) |
| 08/22/2024 | 21 | Corrected Transcript and Notice of Correction of HEARING ON EXPEDITED MOTION FOR TEMPORARY RESTRAINING ORDER held on August 15, 2024 before Judge Rodney Smith, 1 - 31 pages, re: 20 Transcript,, Court Reporter: Glenda Powers, 305-523-5022 / Glenda_Powers@flsd.uscourts.gov. (gps) (Entered: 08/22/2024) |
| 08/22/2024 | 22 | Plaintiff's MOTION Motion for Judicial Notice by Courtney Morgan. (Chaplin, Erica) (Entered: 08/22/2024) |
| 08/22/2024 | 24 | PAPERLESS Minute Entry for proceedings held before Judge Rodney Smith: **Evidentiary** Motion Hearing held on 8/22/2024, 1:30-2:30pm/3-3:15pm. The Court heard testimony from plaintiff witnesses, Mitchell Epstein, Christopher Roberts, Courtney Morgan, and argument from counsel, thereafter the Court found plaintiff had met its burden, and the preliminary injunction to be issued, counsel for plaintiff to submit proposed order. Attorney Appearance(s): Erica Faith Chaplin, Tamara Savin Malvin, Court Reporter: Ellen Rassie, 954-769-5448 / ellen_rassie@flsd.uscourts.gov. (pm) (Entered: 08/22/2024) |
| 08/23/2024 | 25 | ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION re DE 10 Motion. Signed by Judge Rodney Smith on 8/23/2024. *See attached document for full details*. (ebz) (Entered: 08/26/2024) |

| | | |
|---|---|---|
| 08/28/2024 | 26 | Unopposed MOTION for Extension of Time to Respond to Plaintiff's Amended Complaint re 4 Amended Complaint/Amended Notice of Removal by Walgreen Co.. Responses due by 9/11/2024. (Attachments: # 1 Text of Proposed Order)(Malvin, Tamara) (Entered: 08/28/2024) |
| 08/29/2024 | 27 | PAPERLESS ORDER granting 26 Defendant's Unopposed Motion for Extension of Time to Respond to Plaintiff's Amended Complaint. Defendant shall file its response by **October 4, 2024**. No further extensions will be granted absent extraordinary circumstances. Signed by Judge Rodney Smith on 8/29/2024. (cbn) (Entered: 08/29/2024) |
| 08/29/2024 | | Set/Reset Response/Answer Due Deadline: Walgreen Co. response/answer due 10/4/2024. Per DE 27 Order (ebz) (Entered: 08/29/2024) |
| 09/16/2024 | 28 | ORDER REQUIRING JOINT SCHEDULING REPORT. Joint Scheduling Report due by 9/23/2024 Signed by Judge Rodney Smith on 9/16/2024. *See attached document for full details.* (ebz) (Entered: 09/16/2024) |
| 09/20/2024 | 29 | Notice of Interlocutory Appeal *pursuant to 28 U.S.C § 1292(a)(1)* as to 25 Preliminary Injunction by Walgreen Co.. Filing fee $ 605.00 receipt number AFLSDC-17849953. Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under All Forms and look for Transcript Order Form www.flsd.uscourts.gov/forms/all-forms. (Attachments: # 1 Exhibit)(Kula, Elliot) (Entered: 09/20/2024) |
| 09/20/2024 | 30 | NOTICE of Attorney Appearance by Elliot Burt Kula on behalf of Walgreen Co.. Attorney Elliot Burt Kula added to party Walgreen Co.(pty:dft). (Kula, Elliot) (Entered: 09/20/2024) |
| 09/20/2024 | | Transmission of Notice of Appeal, Preliminary Injunction under appeal, and Docket Sheet to US Court of Appeals re 29 Notice of Interlocutory Appeal, Notice has been electronically mailed. (apz) (Entered: 09/20/2024) |
| 09/20/2024 | 31 | STIPULATION *For Substitution of Counsel* by Walgreen Co. (Tarlow, David) (Entered: 09/20/2024) |
| 09/24/2024 | 32 | Acknowledgment of Receipt of NOA from USCA re 29 Notice of Interlocutory Appeal, filed by Walgreen Co. Date received by USCA: 9/20/2024. USCA Case Number: 24-13087-A. (apz) (Entered: 09/24/2024) |
| 09/27/2024 | 33 | Defendant's Corporate Disclosure Statement by Walgreen Co. (Tarlow, David) (Entered: 09/27/2024) |
| 09/27/2024 | 34 | Clerk's Notice to Filer re 33 Certificate of Other Affiliates/Corporate Disclosure Statement. **Other Affiliates/Corporate Parents Not Entered**; ERROR - The Filer failed to enter all Other Affiliates/Corporate Parents from the Certificate of Other Affiliates/Corporate Disclosure Statement. Filer is instructed to refile their Certificate of Other Affiliates/Corporate Disclosure Statement and enter the missing Other Affiliates/Corp Parents. Note - Other Affiliates/Corporate Parents do not appear on the |

| | | docket sheet. (ebz) (Entered: 09/27/2024) |
|---|---|---|
| 09/27/2024 | 35 | Defendant's Certificate of Other Affiliates/Corporate Disclosure Statement by Walgreen Co. identifying Corporate Parent Walgreen Boots Alliance, Other Affiliate State of Florida - Attorney General's Office - Florida Board Pharmacy- Florida Department of Health for Walgreen Co. (Tarlow, David) (Entered: 09/27/2024) |
| 10/01/2024 | 36 | VACATED. ORDER OF DISMISSAL WITHOUT PREJUDICE. Closing Case. *(Without Prejudice)* Motions terminated: 22 Plaintiff's MOTION Motion for Judicial Notice filed by Courtney Morgan. Signed by Judge Rodney Smith on 10/1/2024. *See attached document for full details.* (amb) Modified per DE 48 Order on 10/16/2024 (ebz). (Entered: 10/01/2024) |
| 10/08/2024 | 37 | NOTICE of Change of Email; by Erica Faith Chaplin (Chaplin, Erica) (Entered: 10/08/2024) |
| 10/09/2024 | 38 | Plaintiff's Certificate of Other Affiliates *Interested Parties and Corporate Disclosures* by Courtney Morgan (Chaplin, Erica) (Entered: 10/09/2024) |
| 10/09/2024 | 39 | Clerk's Notice to Filer re 38 Certificate of Other Affiliates/Corporate Disclosure Statement. **Other Affiliates/Corporate Parents Not Entered**; ERROR - The Filer failed to enter all Other Affiliates/Corporate Parents from the Certificate of Other Affiliates/Corporate Disclosure Statement. Filer is instructed to refile their Certificate of Other Affiliates/Corporate Disclosure Statement and enter the missing Other Affiliates/Corp Parents. Note - Other Affiliates/Corporate Parents do not appear on the docket sheet. (ebz) (Entered: 10/09/2024) |
| 10/10/2024 | 40 | Plaintiff's Certificate of Other Affiliates/Corporate Disclosure Statement by Courtney Morgan (Chaplin, Erica) (Entered: 10/10/2024) |
| 10/10/2024 | 41 | Plaintiff's EMERGENCY MOTION with Certification of Emergency included by Courtney Morgan. Responses due by 10/24/2024. (Attachments: # 1 Exhibit 1, 2 and 3 (DE 38, Ltr to Dr. Morgan from Walgreens, DE 37))(Chaplin, Erica) (Entered: 10/10/2024) |
| 10/11/2024 | 42 | Plaintiff's NOTICE *of Filing Proposed Order* by Courtney Morgan re 41 Plaintiff's EMERGENCY MOTION with Certification of Emergency included (Attachments: # 1 Text of Proposed Order Granting Plaintiff's Emergency Motion to Vacate Order of Dismissal) (Chaplin, Erica) (Entered: 10/11/2024) |
| 10/11/2024 | 43 | ORDER SETTING HEARING on Motion re 41 Plaintiff's EMERGENCY MOTION with Certification of Emergency included :( Motion Hearing set for 10/15/2024 11:30 AM in Fort Lauderdale Division before Judge Rodney Smith.), ( Responses due by 10/14/2024.) Signed by Judge Rodney Smith on 10/11/2024. *See attached document for full details.* (ebz) (Entered: 10/11/2024) |
| 10/14/2024 | 44 | RESPONSE in Opposition re 41 Plaintiff's EMERGENCY MOTION with Certification of Emergency included filed by Walgreen Co.. Replies due by 10/21/2024. (Attachments: # 1 Exhibit Walgreens Multistate Agreement)(Tarlow, David) (Entered: 10/14/2024) |

| | | |
|---|---|---|
| 10/14/2024 | 45 | NOTICE of Attorney Appearance by Kevin Ramon Anderson on behalf of Courtney Morgan. Attorney Kevin Ramon Anderson added to party Courtney Morgan(pty:pla). (Anderson, Kevin) (Entered: 10/14/2024) |
| 10/15/2024 | 46 | ORDER REQUIRING JOINT SCHEDULING REPORT, CERTIFICATES OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENTS. Joint Scheduling Report due by 10/31/2024. Signed by Judge Rodney Smith on 10/15/2024. *See attached document for full details*. (ebz) (Entered: 10/15/2024) |
| 10/15/2024 | 47 | PAPERLESS Minute Entry for proceedings held before Judge Rodney Smith: Motion Hearing held on 10/15/2024, 11:30-12pm re 41 Plaintiff's EMERGENCY MOTION with Certification of Emergency included filed by Courtney Morgan. After hearing from the parties, the Court granted the motion. Order to follow. Attorney Appearance(s): Kevin Ramon Anderson, Erica Faith Chaplin, Robert Cousins Court Reporter: Ellen Rassie, 954-769-5448 / ellen_rassie@flsd.uscourts.gov. (pm) (Entered: 10/15/2024) |
| 10/16/2024 | 48 | ORDER GRANTING PLAINTIFF'S EMERGENCY MOTION TO VACATE ORDER OF DISMISSAL re 41 Plaintiff's EMERGENCY MOTION to Vacate Order of Dismissal filed by Courtney Morgan. The Court's Order of Dismissal without Prejudice DE 36 is VACATED. The Clerk is directed to REOPEN this case. Signed by Judge Rodney Smith on 10/16/2024. *See attached document for full details*. (ebz) (Entered: 10/16/2024) |
| 10/16/2024 | 49 | TRANSCRIPT ORDER FORM filed by Walgreen Co. re 29 Notice of Interlocutory Appeal,, filed by Walgreen Co.. No Transcript Requested. (Kula, Elliot) (Entered: 10/16/2024) |
| 10/16/2024 | 50 | Defendant's MOTION to Dismiss with Prejudice 4 Amended Complaint/Amended Notice of Removal by Walgreen Co.. Responses due by 10/30/2024. (Attachments: # 1 Exhibit Walgreens Multistate Agreement)(Tarlow, David) (Entered: 10/16/2024) |
| 10/16/2024 | 51 | Unopposed MOTION to Withdraw as Attorney by Tamara S. Malvin for / by Walgreen Co.. Responses due by 10/30/2024. (Attachments: # 1 Text of Proposed Order)(Malvin, Tamara) (Entered: 10/16/2024) |
| 10/17/2024 | 52 | ORDER GRANTING DEFENDANT'S UNOPPOSED MOTION TO WITHDRAW AS COUNSEL re 51 Motion to Withdraw as Attorney. Tamara Savin Malvin representing Walgreen Co. (Defendant) withdrawn from case. Signed by Judge Rodney Smith on 10/17/2024. *See attached document for full details*. (ebz) (Entered: 10/17/2024) |
| 10/27/2024 | 53 | STRICKEN. Joint SCHEDULING REPORT - **Rule 26(f)** by Courtney Morgan (Chaplin, Erica) Modified per DE 58 Notice of Striking on 10/29/2024 (ebz). (Entered: 10/27/2024) |
| 10/27/2024 | 54 | NOTICE *of Filing Proposed Scheduling Order* by Courtney Morgan re 46 Order Requiring Joint Scheduling Report, (Attachments: # 1 Text of Proposed Order) (Chaplin, Erica) (Entered: 10/27/2024) |
| 10/27/2024 | 55 | Joint SCHEDULING REPORT - **Rule 26(f)** by Courtney Morgan (Chaplin, Erica) (Entered: 10/27/2024) |

| 10/28/2024 | 56 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 50 Defendant's MOTION to Dismiss with Prejudice 4 Amended Complaint/Amended Notice of Removal by Courtney Morgan. (Attachments: # 1 Text of Proposed Order) (Chaplin, Erica) (Entered: 10/28/2024) |
| 10/28/2024 | 57 | PAPERLESS ORDER granting 56 Plaintiff's Unopposed Motion to Extend Time to Respond to Defendant's Motion to Dismiss Amended Complaint. Plaintiff shall file his response by **November 6, 2024**. Signed by Judge Rodney Smith on 10/28/2024. (cbn) (Entered: 10/28/2024) |
| 10/29/2024 | 58 | NOTICE of Striking 53 SCHEDULING REPORT - Rule 26(f)/16.1 filed by Courtney Morgan by Courtney Morgan (Chaplin, Erica) (Entered: 10/29/2024) |
| 11/01/2024 | 59 | ORDER SETTING CIVIL TRIAL DATE, PRETRIAL DEADLINES, AND REFERRAL TO MAGISTRATE JUDGE: ( Jury Trial set for 1/12/2026 09:00 AM in Fort Lauderdale Division before Judge Rodney Smith, Calendar Call set for 1/6/2026 09:00 AM in Fort Lauderdale Division before Judge Rodney Smith, Amended Pleadings due by 12/2/2024, Expert Discovery due by 6/30/2025, Fact Discovery due by 7/8/2025, Joinder of Parties due by 12/2/2024, In Limine Motions due by 12/5/2025, Dispositive Motions due by 8/4/2025, Motions due by 12/5/2025, Pretrial Stipulation due by 12/5/2025.), ORDER REFERRING CASE to Mediation. Mediation Deadline 7/18/2025. Signed by Judge Rodney Smith on 11/1/2024. *See attached document for full details*. (ebz)

**Pattern Jury Instruction Builder -** To access the latest, up to date changes to the 11th Circuit Pattern Jury Instructions go to https://pji.ca11.uscourts.gov or click here. Modified date filed on 11/4/2024 (ebz). (Entered: 11/04/2024) |
| 11/01/2024 | 60 | ORDER REFERRING CASE TO MEDIATION. Mediation Deadline 7/18/2025. Signed by Judge Rodney Smith on 11/1/2024. *See attached document for full details*. (ebz) (Entered: 11/04/2024) |
| 11/01/2024 | | Magistrate Judge Patrick M. Hunt added. Per DE 59 Order. (ebz) (Entered: 11/05/2024) |
| 11/06/2024 | 61 | RESPONSE to Motion re 50 Defendant's MOTION to Dismiss with Prejudice 4 Amended Complaint/Amended Notice of Removal filed by Courtney Morgan. Replies due by 11/13/2024. (Chaplin, Erica) (Entered: 11/06/2024) |
| 11/13/2024 | 62 | GENERAL ORDER ON DISCOVERY OBJECTIONS AND PROCEDURES. Signed by Magistrate Judge Patrick M. Hunt on 11/13/2024. *See attached document for full details*. (mhr) (Entered: 11/13/2024) |
| 11/13/2024 | 63 | Defendant's REPLY to Response to Motion re 50 Defendant's MOTION to Dismiss with Prejudice 4 Amended Complaint/Amended Notice of Removal filed by Walgreen Co.. (Tarlow, David) (Entered: 11/13/2024) |
| 12/02/2024 | 64 | TRANSCRIPT of hearing held on 08/22/2024 before Judge Rodney Smith, 1-51 pages, Court Reporter: Ellen Rassie, 954-769-5448 / ellen_rassie@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/23/2024. |

| | | Redacted Transcript Deadline set for 1/2/2025. Release of Transcript Restriction set for 3/3/2025. (Rassie, Ellen) (Entered: 12/02/2024) |
|---|---|---|
| 12/16/2024 | 65 | Joint NOTICE *of Selection of Mediator* by Courtney Morgan re 60 Order Referring Case to Mediation (Chaplin, Erica) (Entered: 12/16/2024) |
| 12/16/2024 | 66 | Clerk's Notice to Filer re 65 Notice (Other). **Parties/Mediator Not Added**; ERROR - The Filer failed to add all parties from the complaint/petition/removal, etc. or the mediator. Filer is instructed to file a Notice of Entry of Parties Listed into CM/ECF and add the additional parties/mediator. **Wrong Event Selected**; ERROR - The Filer selected the wrong event. (ebz) (Entered: 12/16/2024) |
| 12/17/2024 | 67 | Notice of Entry of Parties Listed on 66 Clerk's Notice of Docket Correction and Instruction to Filer - Attorney, into CM/ECF. NOTE: New Filer(s) will appear twice, since they are also a new party in the case. New Filer(s)/Party(s): Glenn J. Waldman. (Chaplin, Erica) (Entered: 12/17/2024) |
| 01/21/2025 | 68 | Pursuant to 11th Cir. R. 11-2 and 11th Cir. R. 11-3, the Clerk of the District Court for the Southern District of Florida certifies that the record is complete for purposes of this appeal re: 29 Notice of Interlocutory Appeal, Appeal No. 24-13087-AA. The entire record on appeal is available electronically. (apz) (Entered: 01/21/2025) |
| 02/19/2025 | 69 | ORDER GRANTING MOTION TO DISMISS re 50 Motion to Dismiss. All pending motions are DENIED as moot. This case is CLOSED. Signed by Judge Rodney Smith on 2/19/2025. *See attached document for full details*. (ebz) (Entered: 02/20/2025) |
| 03/20/2025 | 70 | Plaintiff's MOTION for Reconsideration re 69 Order on Motion to Dismiss by Courtney Morgan. (Attachments: # 1 Exhibit A - Proposed Second Amended Complaint, # 2 Text of Proposed Order)(Chaplin, Erica) (Entered: 03/20/2025) |
| 04/04/2025 | 71 | RESPONSE in Opposition re 70 Plaintiff's MOTION for Reconsideration re 69 Order on Motion to Dismiss filed by Walgreen Co.. Replies due by 4/11/2025. (Attachments: # 1 Exhibit A - Criminal Charge, # 2 Exhibit B - Civil Lawsuit, # 3 Exhibit C- Music Videos)(Tarlow, David) (Entered: 04/04/2025) |
| 04/11/2025 | 72 | Plaintiff's REPLY in Support of Motion re 70 Plaintiff's MOTION for Reconsideration re 69 Order on Motion to Dismiss . filed by Courtney Morgan. (Attachments: # 1 Exhibit 1 - Images)(Chaplin, Erica) (Entered: 04/11/2025) |
| 05/05/2025 | 73 | ORDER denying 70 Motion for Reconsideration. Signed by Judge Rodney Smith on 5/5/2025. *See attached document for full details*. (amb) (Entered: 05/05/2025) |
| 06/03/2025 | 74 | Notice of Appeal as to 73 Order on Motion for Reconsideration, 69 Order on Motion to Dismiss by Courtney Morgan. Filing fee $ 605.00 receipt number AFLSDC-18501144. Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under All Forms and look for Transcript Order Form www.flsd.uscourts.gov/forms/all-forms. (Chaplin, Erica) (Entered: 06/03/2025) |

| | | |
|---|---|---|
| 06/04/2025 | | Transmission of Notice of Appeal, Orders under appeal, and Docket Sheet to US Court of Appeals re 74 Notice of Appeal, Notice has been electronically mailed. (apz) (Entered: 06/04/2025) |
| 06/04/2025 | 75 | Notice of Cross Appeal *by Walgreen Co*. as to 73 Order on Motion for Reconsideration, 69 Order on Motion to Dismiss by Walgreen Co.. Filing fee $ 605.00 receipt number AFLSDC-18505312. Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under All Forms and look for Transcript Order Form www.flsd.uscourts.gov/forms/all-forms. (Kula, Elliot) (Entered: 06/04/2025) |
| 06/04/2025 | | Transmission of Notice of Cross Appeal, Orders under appeal, and Docket Sheet to US Court of Appeals re 75 Notice of Cross Appeal, Notice has been electronically mailed. (apz) (Entered: 06/04/2025) |
| 06/04/2025 | 76 | Acknowledgment of Receipt of NOA from USCA re 74 Notice of Appeal, filed by Courtney Morgan. Date received by USCA: 6/4/2025. USCA Case Number: 25-11887-A. (apz) (Entered: 06/04/2025) |
| 06/05/2025 | 77 | Acknowledgment of Receipt of NOA from USCA re 75 Notice of Cross Appeal, filed by Walgreen Co.. Date received by USCA: 06/04/2025. USCA Case Number: 25-11887-A. (jgo) (Entered: 06/05/2025) |
| 07/01/2025 | 78 | TRANSCRIPT ORDER FORM filed by Courtney Morgan re 74 Notice of Appeal,, filed by Courtney Morgan. No Transcript Requested. (Chaplin, Erica) (Entered: 07/01/2025) |
| 07/01/2025 | 79 | ORDER of DISMISSAL from USCA. Appellant's motion to voluntarily dismiss this appeal as moot is GRANTED. This appeal is DISMISSED re 29 Notice of Interlocutory Appeal, filed by Walgreen Co. USCA #24-13087-AA. (apz) Modified text on 7/1/2025 (apz). (Entered: 07/01/2025) |
| 07/01/2025 | 80 | TRANSCRIPT ORDER FORM filed by Walgreen Co. re 75 Notice of Cross Appeal,, filed by Walgreen Co.. No Transcript Requested. (Kula, Elliot) (Entered: 07/01/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/01/2025 14:42:39 | | |
| **PACER Login:** | echaplin1 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 0:24-cv-61442-RS |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

# TAB 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION

| | | |
|---|---|---|
| **Courtney Morgan, M.D.,** | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Case No.: 0:24cv61442 |
| **Walgreen Co.,** | § | |
| *Defendant.* / | | JURY |

---

### VERIFIED COMPLAINT

---

**COMES NOW**, Plaintiff, Courtney Morgan, M.D., by and through his undersigned counsel, and files his *Verified Complaint* seeking monetary damages in excess of $500,000, exclusive of costs, interest an attorneys' fees, and a *Temporary Restraining Order, Preliminary Injunction* and *Permanent Injunction* against Defendant, Walgreen Co., and alleges and states:

### JURISDICTIONAL ALLEGATIONS

1. This Court has jurisdiction over this matter because of diversity of citizenship between the parties, the amount in controversy, exclusive of interest and costs, exceeds seventy-five thousand dollars ($75,000), and jurisdiction is therefore proper pursuant to 28 U.S.C. §1332.

2. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a), because it is the Judicial District in which substantial events that have given rise to this *Verified Complaint* occurred.

### PARTIES

3. Courtney Morgan, M.D. [hereinafter Dr. Morgan or Plaintiff] is a resident of the State of Florida, domiciled in Palm Beach County, Florida. At all times relevant herein, Dr. Morgan is and has been authorized to transact business and licensed to provide medical services within the State of Florida, individually as a physician as well as in association with his medical practice, Hop Medical Services, PLLC, which is located within Broward County, Florida.

1

4. At all times relevant herein, Walgreen Co., [hereinafter Walgreens] is and has been an Illinois corporation whose principal place of business is located in Deerfield, Illinois. Walgreens has stores and pharmacies throughout the state of Florida and the United States of America.

**GENERAL ALLEGATIONS AND FACTS COMMON TO ALL COUNTS**

5. Dr. Morgan is licensed physician within the State of Florida. He obtained a resident's license on June 24, 2004, and his full unrestricted physician's medical license on June 20, 2006.

6. On or about August 16, 2006, Dr. Morgan established his medical practice, Hop Medical Services, PLLC [hereinafter Hop Medical], as a Family Medicine Clinic. He has always been the sole owner and operator of this practice.

7. Dr. Morgan trained in the Family Medicine & Community Health residency program at the University of Miami/Jackson Memorial Medical Center. This training encompassed extensive exposure to pain management, which was an essential medical need for patients with various comorbidities, such as sickle cell crises, traumatic injuries, cancer, neuropathies, HIV/AIDS, uncontrolled diabetic neuropathies, peripheral vascular diseases, back and joint pain, migraines, fibromyalgia, post-surgical pain, and various neurological conditions.

8. Although renewal of a Florida medical license requires 40 hours of Continuing Medical Education (CME) every 2 years, Dr. Morgan has completed a total of 171 credits in courses related to prescribing controlled substances within the past 18 months, 98 of which are directly related to chronic pain management.

9. On July 2, 2020, Hop Medical was issued its pain management clinic license from the Florida Department of Health. Dr. Morgan is and has been the sole practitioner, Designated Doctor, and Medical Director for Hop Medical.

10. Dr. Morgan is qualified to own, operate, and prescribe controlled substances in a pain management clinic, pursuant to Florida's laws and administrative rules. Dr. Morgan's Florida medical license and DEA license for prescribing of controlled substances are both current, unrestricted, and active.

**Medical Practice and Patient Population**

11. All Hop Medical patients are treated for chronic (non-acute) pain.  In certain situations, a few patients are also treated for primary care issues.  For example, if a patient does not have or cannot afford regular visits with a primary care physician (PCP), Dr. Morgan will often serve as their PCP until they can establish a PCP.  In addition, Dr. Morgan provides primary care services temporarily if a patient's established PCP is unreachable, or appointments are too far out for the PCP to attend to an urgent situation such as uncontrolled hypertension (HTN), temporary increased anxiety (where patients are usually also being managed by Psychiatry), exacerbated chronic obstructive pulmonary disease (COPD), asthma, congestive heart failure (CHF), and other co-morbid ailments.

12. The clinic's patients are generally referred from other health care providers who recommend continued management of chronic pain for patients with multiple co-morbidities, complex medical problems, failed surgeries and or failed interventional treatments.  In other words, these patients have been in pain management for treatment of chronic pain by either their PCP, specialist or hospital provider, prior to presenting to Dr. Morgan for continuity of medical care.

13. Dr. Morgan's patients are often treated for chronic pain related to long-term medical issues, such as various cancers (prostate, breast, colon, colorectal, metastatic and stage 4 in nature), sickle cell disease, HIV neuropathy, diabetic neuropathy, vertebral degenerative disease (with bulging/herniated discs, fusion, compression, bone spurs, facet narrowing, central canal

narrowing), amputees, rheumatoid arthritis, arterial vasculitis with peripheral vascular disease of lower extremities, traumatic debilitations (resulting from gunshot wound injuries, crushing from heavy objects in accidents, falling from roof/building/ladder/bridge, motor vehicle accidents, sport injuries, bone fractures, etc.). Also, some of his patients have been diagnosed with a terminal illness and are treated for chronic pain within the scope of palliative medicine.

14. All patients who have been accepted into Hop Medical for the management of chronic pain have either received and or are receiving other treatment modalities for interventional pain management. These various interventions include one or a combination of the following: surgeries, paraspinal steroidal injections, radiofrequency ablations, total hip replacement, total knee replacements, discectomy, intramuscular injections (knee, spine, shoulder), rhizotomy, epidurals, chiropractic treatments (spinal manipulation, electrical muscle stimulation, etc.), acupuncture, physical therapy, TENS (transcutaneous electrical nerve stimulation), traction, home care treatments (water exercise, low impact exercises, stretching), heat/cold treatments, braces and stabilizers for knees, back, and wrists, as well as over the county (OTC) medications and topical creams.

**Practice Procedures and Patient Care**

15. Prior to the scheduling a new patient appointment with Dr. Morgan, patient screening is performed where medical and non-medical background information is obtained for the staff and Dr. Morgan's review. Specifically, criminal background searches are conducted, as certain drug-related charges would preclude a patient's admission into the clinic. Relevant medical records are obtained, and preliminary intake forms are also filled out by the patient.

16. At the first appointment, additional patient information and medical history are collected, along with any additional medical records requested by the staff. The patient completes a

comprehensive questionnaire regarding past medical, surgical and family history, including but not necessarily limited to previous providers, failed conservative measures (i.e., physical therapy, chiropractic care, etc.), current medications, failed medications, causative factors for pain, and assessments of how chronic pain affects the patient mentally and socially (i.e., depression, anxiety, mood, sleep, etc.). The patient's controlled substance prescription history is also retrieved from E-Forcse, the state-maintained database of prescribed controlled substances. All of the foregoing is reviewed prior to the patient being seen by Dr. Morgan.

17. When presenting to Dr. Morgan, the patient undergoes a physical examination conducted only by Dr. Morgan, who also obtains a full history of the patient. Additional diagnostic studies or other tests may be ordered by Dr. Morgan. Using this information, a treatment plan is formulated that may include, rehabilitative therapies (i.e., physical/occupational therapy,) laboratory testing, medication management, specialist referrals (i.e., orthopedists, vascular surgeons, neurologists, nephrologists, podiatrists, therapists, chiropractors, psychiatric and other behavioral health consultations and therapies, etc.), and considerations of non-opioid alternatives (i.e., home care exercises/therapies, adjunctive therapies, interventional treatments, invasive and surgical interventions, etc.). Both short and long-term treatment goals are set. These weekly/monthly goals are reviewed at each medical visit for progress and achievement. Every patient is given informational materials regarding non-opioid alternatives.

18. When devising and formulating a treatment plan for a patient, any decision to prescribe controlled substances as part of the treatment plan is based on many different factors that may include the following: information from the referring physician, diagnostic studies and testing, E-Forcse reports, previously prescribed medications including controlled substances, other medications that the patient is prescribed by other specialists, patient opioid risk level, patient

history, age, allergies and various other co-morbidities and conditions as well as the patient's functional history. Treatment plans are generally created with the goal of controlling patient's pain, where the benefit outweighs the risks.

19. After consultation, Dr. Morgan makes a preliminary decision whether to accept the patient and whether to either continue controlled substances therapy as part of a treatment plan and or recommend another or additional avenues for treatment of chronic pain. The patient is educated and counselled about the risks and benefits of the use of opioids and controlled substances and the options for non-opioid alternatives. Patient then has a follow-up appointment in a timeframe as determined by Dr. Morgan, no greater than 28 days, to reassess the patient and effectiveness of treatment.

20. Dr. Morgan has established a rigorous compliance policy where each individual patient's compliance is closely monitored.  Patients are asked to give informed consent to treatment and are required to execute a Treatment Agreement. They are given a summary of the clinic's policies for random urine drug screening and advised of the expectations of compliance with the clinic's policies, the doctor's orders, and cooperation with clinic's compliance officer. "Doctor shopping" is explained as well as the importance of maintaining strict compliance with the Treatment Agreement and the security of their prescribed medications.

**Safeguards Against Diversion and Misuse of Controlled Substances**

21. Safeguards against diversion and misuse of controlled substances implemented by Dr. Morgan includes in part, the following:

   A. <u>Review by Compliance Officer:</u> A thorough criminal background check is conducted by the compliance officer on each new patient, screening for drug related criminal history. Medical records are obtained directly from medical providers for verification and clarification of the patient's medical history as well as review for consistency and

authenticity. A patient may be interviewed by the compliance officer to obtain additional information or clarification. All of the foregoing information is reviewed for the purpose assessing the legitimacy of the patient from a non-medical perspective.

B. <u>E-Forcse (Florida's PDMP System)</u>
The e-Forcse system is checked prior to prescribing any controlled substance. A rigorous and methodical review of the E-Forcse report detects whether the patient has engaged, or is engaging in "doctor shopping," whether the patient is taking the medication as prescribed or medication that is not prescribed, and whether diversion is apparent, among other things.

C. <u>Random Drug Test (RDT):</u>  Prominent office postings state that patients must submit to random drug tests for usage of their prescribed medication and illicit drugs. It is also stated that failure to submit to a RDT, adulteration of a specimen, or testing positive for illicit drugs or medications not prescribed may be grounds for immediate discharge from the clinic.  Patients are subjected to random drug tests no less than once every three months, even if the patient is assessed as low or moderate risk for misuse.

D. <u>Treatment Agreement:</u>  All patients enter into a Treatment Agreement, and a summary of same is provided to the patient.  The Treatment Agreement addresses misuse and diversion of medication, and states causes for discharge, which include:

- Patient gives, sells, or misuses the pain medication
- Incarceration due to drug related offense
- Patient attempts to obtain pain medication sooner than next office visit from any other physician, emergency room, or any other source in the absence of a true emergency
- Patient provides false information / false medical records
- Patient fails to keep appointments
- Patient does not subject him or herself to a random urine analysis
- Unsatisfactory test result (i.e., RDT) or failure to obtain recommended/ordered tests
- Allegations, suspicious information or investigation initiated by anyone regarding potential violations of this agreement which is brought to the attention of clinic staff

E. <u>Chart Review & Staff Meetings</u>: Chart reviews are performed quarterly, where if any irregularities are observed, inquiries are made to the patient. For example, if a patient has missed appointments and cannot be reached, the compliance officer may investigate whether a patient has been hospitalized or arrested.[1] Staff meetings are held every month, where any issues with prospective, new or return patients can be raised and addressed. All of the foregoing also provides useful information to prevent medication errors and potentially dangerous drug interactions.

F. <u>Communication with Pharmacists:</u> Dr. Morgan has an 'open door' policy when communicating with pharmacists about the medical care of mutual patients. This open communication not only allows for discussion of the patient's treatment and their clinical

---

[1] Of note, any drug related arrests are required to be disclosed by the patient pursuant to their Treatment Agreement.

stability, but also allows for exchange of information when either the physician or the pharmacist suspects diversion, misuse or doctor/pharmacy shopping.

G. <u>Strict No Refill Policy</u>
Refill authorizations are never given for pain medications. Patients must appear in person for their medical visit for reevaluation every 28 days. Prescriptions are not resent to the pharmacy if medications have been stolen, lost or misplaced.

22. If a patient has failed one of Dr. Morgan's routine compliance surveillance tools, then a decision is made regarding appropriate measures for that individual patient. These measures may include counselling, treatment with other medications, discharging the patient from the practice and or referral to appropriate providers for additional care, counseling, or treatment.

**Florida Department of Health's Random Annual Inspection & Audit Results**

23. Florida Department of Health (DOH) performs a mandatory annual random inspection and audit on all licensed pain management clinics.  The audits consist of a comprehensive review of the medical practice, with visual inspection of the entire facility, current licensures, certificates and permits, daily patient panels, office policies, staff meeting minutes, and random review of medical charts.

24. The clinic has passed every annual DOH inspection and audit since issuance of its pain management clinic license. ***After review of the clinic's medical charts by the DOH during its most recent random inspection and audit on May 31, 2024, positive findings, in part included*** (See Exh. 1, Florida Department of Health Inspection Results):

- Complete medical history and physician examination, including history of drug abuse and dependence.
- Complete physical exam is performed by the physician on the same day that the physician prescribes a controlled substance.
- Documentation in the patient's record of the reason for prescribing more than 72-hour supply of controlled substances for the treatment of chronic non-malignant pain.
- Clear and complete medical justification for continued treatment with controlled substances

8

- Steps to ensure medically appropriate use of controlled substances is documented clearly and completely when continuing controlled substance prescribing while waiting on consultant's report on patients showing signs or symptoms of substance abuse.

- Written individualized treatment plan has been developed for each patient with objectives used to determine treatment success. The physician adjusts drug therapy to the individual needs of each patient. Other treatment modalities are considered. Interdisciplinary nature of treatment plan is documented.

- Patients are referred as necessary for additional evaluation and treatment in order to achieve treatment objectives with special attention given to those patients at risk for misuse of medications and those in living arrangements that pose a risk for medication misuse or diversion.

- Patients with signs or symptoms of substance abuse are immediately referred to a board-certified pain management physician, addiction medicine specialist, or a mental health addiction facility unless the physician is board-certified or board-eligible in pain management.

- Quality assurance program that includes the following components: the identification, investigation and analysis of the frequency and causes of adverse incidents to patients; the identification of trends or patterns of incidents; measures to correct, reduce, minimize, or eliminate the risk of adverse incidents to patients; the documentation of these functions; and periodic review at least quarterly of such information by the designated physician.

25. To date, Dr. Morgan has never had any patient overdose on the controlled substances that he has prescribed during his twenty (20) years of practice. He has maintained a strict medical practice with prescribing standards in compliance with all state and federal regulatory agencies, rarely even implementing telehealth services during the pandemic. **In fact, in past inspections and audits conducted by the DOH, the auditor redacted and photocopied certain records maintained by Dr. Morgan, for the purpose of utilizing them as an example and gold standard for other pain management clinics to emulate.**

<u>Communications with Walgreen Co.</u>

26. On or about June 20, 2024, Dr. Morgan received his first letter from Walgreens via FedEx stating that information about his prescribing practices was requested, and based on a failure to respond, Walgreens would discontinue dispensing controlled substance prescribed by him

starting August 16, 2024.  (See Exh. 2, Walgreens Letter dated June 18, 2024)  The letter

further stated that:

> "**Team members at your local pharmacy had no role in making this decision and cannot make exceptions to this decision.**" *(emphasis added)*

> "If your prescribing changes materially after the period of at least one year from the block effective date, contact us [ ] to request a review."

27. Dr. Morgan immediately contacted Walgreens via phone and email, advising that he has never

received any previous communication from Walgreens requesting information. (See Exh. 3,

Dr. Morgan's Letter dated June 20, 2024.)

28. In response, Walgreens sent a letter on or about June 25, 2024, to Dr. Morgan stating in part

the following:

> "[O]ur nation faces an epidemic of prescription misuse, addiction, and diversion. While this issue concerns practicing providers who prescribe controlled substances, pharmacists have a corresponding responsibility to dispense controlled substances only in situations where there is a legitimate medical need."

> "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."

This letter also requested information about Dr. Morgan and his medical practice. It was further

stated that if no response was received by July 9, 2024, then Walgreens "may discontinue

dispensing controlled substances" prescribed by Dr. Morgan as of August 16, 2024, and that

this restriction would not affect the dispensing of non-controlled substances.  (See Exh. 4,

Walgreens Letter dated June 25, 2024)

29. On July 4, 2024, Dr. Morgan provided his 56-page response inclusive of exhibits, which in

part consisted of the information contained in this very pleading, in paragraphs 5-25.  (Exh. 5,

Dr. Morgan's Letter dated July 4, 2024, including exhibits)

30. On or about July 16, 2024, Walgreens sent a letter to Dr. Morgan stating the following:

> "We have reviewed the materials you provided.  At this time, Walgreens has decided not to deviate from the dispensing decision as outlined in our letter dated June 18, 2024."

> "If your prescribing changes materially, please contact us after August 16, 2025 [ ] to request review."

> (See Exh. 6, Walgreens Letter dated July 16, 2024)

Walgreens affirmed that it would block Dr. Morgan's prescriptions for all controlled substances beginning August 16, 2024, for one full year, before he can request "review."

31. All correspondence to Dr. Morgan and his patients were signed by Walgreen Co.

**Usurpation of Pharmacists' Independent Judgment by Defendant Walgreens; and Prohibition of Pharmacist Compliance with Florida Board of Pharmacy's Professional Standards of Practice**

32. The Florida Board of Pharmacy regulates the professional conduct of pharmacists. Accordingly, standards of practice have been established specifically for the filling of controlled substance prescriptions. Pursuant to Florida Administrative Code 64B16-27.831:

> **"The Board of Pharmacy recognizes that it is important for the patients of the State of Florida to be able to fill valid prescriptions for controlled substances. In filling these prescriptions, the Board does not expect pharmacists to take any specific action beyond exercising sound professional judgment."**

33. Pharmacists are required to fill valid prescriptions. Therefore, the pharmacist's obligation is to exercise sound professional judgment in determining the validity of a prescription. **"A prescription is valid when it is based on a practitioner-patient relationship and when it has been issued for a legitimate medical purpose."** *Id.*

34. "Every patient's situation is unique and prescriptions for controlled substances shall be reviewed with each patient's unique situation in mind." *Id.* **"When validating a prescription, neither a person nor a licensee shall interfere with the exercise of the pharmacist's independent professional judgment."** *Id.*

35. Neither in conversation, nor in written communication, did Walgreens ever notify or inform Dr. Morgan of any specific patient prescription being in question or suspected of not being medically necessary, illegitimate, or otherwise problematic. Moreover, at no time has any individual pharmacist employed by or affiliated with Defendant Walgreens contacted, notified or otherwise questioned Dr. Morgan regarding the medical necessity and appropriateness of any prescriptions for controlled substances which he has prescribed for his patients. To the best of Dr. Morgan's knowledge, every prescription he has issued to Walgreens has been filled by Walgreens pharmacists. None of Dr. Morgan's prescriptions have been rejected by any Walgreens pharmacists as illegitimate, medically unnecessary, or otherwise questioned.

36. The prescriptions issued by Dr. Morgan are supported by medical necessity and fully adhere to all applicable state and federal legal guidelines and regulations regarding the prescribing of controlled substances, and Walgreens has produced nothing to suggest otherwise.

37. No pharmacist with Walgreens, or any other pharmacy, has contacted Dr. Morgan or the Hop Medical staff to question the medical necessity of the prescriptions, or otherwise question the compliance of his prescriptions with all applicable federal and state legal guidelines and clinical guidelines regarding the prescribing of controlled substances.

38. Defendant Walgreens has not provided any specific grounds or reasons for its actions of blocking its pharmacists from filling Dr. Morgan's prescriptions for controlled substances.

39. Despite these facts, Defendant Walgreens sent Dr. Morgan the July 11, 2024, letter, reaffirming its decision to block the filling of Dr. Morgan's prescriptions for controlled substances as of August 16, 2024. This was a corporate decision, where local pharmacists "cannot make exceptions." This means that as of August 16, 2024, Dr. Morgan is **blocked** in the Walgreens

electronic medical system thereby preventing any Walgreens pharmacists from being able to exercise independent judgment in filling his prescriptions.

**Injury and Harm to Current and Prospective Patients**

40. The action of Walgreens forces Dr. Morgan's patients to either continue under the care of a physician the patient has known for years and attempt to find a satisfactory alternative to Walgreens; or to continue as a patient of Walgreens and leave Dr. Morgan, the medical provider they have chosen to manage their chronic pain.

41. According to the 2022 U.S. Census Bureau, the populations of Palm Beach, Broward and Miami-Dade County are 1.518 million, 1.947 million and 2.674 million, respectively. According to the Florida DOH, Palm Beach, Broward and Miami-Dade County have 12, 17, and 17 licensed pain management clinics, respectively, excluding Hop Medical.  With a total of 46 licensed pain management clinics to service a total population of 6.139 million in the tri-county area, it is foreseeable that Dr. Morgan's patients will have difficulty obtaining timely care from another licensed pain management facility.

42. Furthermore, the Center for Disease Control (CDC) and Food and Drug Administration (FDA) warn against abrupt discontinuation of opioid medication, which can result in uncontrolled pain or withdrawal symptoms. Therefore, if a patient is unable to obtain another pain management healthcare provider prior to the depletion of their controlled substance medications, the patient will be in distress with foreseeable health liabilities. As a result, the patient may require urgent or emergency medical care.

43. Although Walgreens' communications indicated a general concern regarding the "epidemic of prescription misuse, addiction, and diversion," associated with opioids, Walgreens intends to block *all* of Dr. Morgan's controlled substance prescriptions, ***including non-opioid controlled***

*substances* as of August 16, 2024. Therefore, Dr. Morgan's patients who are treated with prescriptions for *non-opioid controlled substances* for other chronic medical issues such as epilepsy, androgen deficiency, chronic obstructive pulmonary disease (COPD), congestive heart failure (CHF), HIV/AIDS, obesity and other illness, are faced with the same dilemma of either finding another provider to manage their care or finding another pharmacy to fill their prescriptions for the non-opioid controlled substances.

44. In the event new patients present with issues requiring treatment with a non-opioid controlled substance, those patients, too, will also be forced to either seek medical consultation with another provider or find another pharmacy to fill their prescription for the non-opioid controlled substance. **This block on filling Dr. Morgan's non-opioid controlled substances will prevent patients from being treated for urgent medical conditions and or continuity of medical care requiring such treatment, which may be detrimental to patient health.**

45. Walgreens' actions unfairly, improperly and needlessly create a conundrum and a real and serious health risk for these patients.

46. The relationship between physician and patient is vital, but so too is that between a pharmacist and patient. It is even more important when a patient is taking opioid pain medications. Termination of that relationship places a harsh stigma on pain patients who may be labeled as "pharmacy shoppers" for switching pharmacies as a result of Walgreens' actions, and thereafter, treated with suspicion.[2]

47. As a result of Walgreens' action, significant stigma will be attached to Dr. Morgan's patients who must now face an inquiry as to why they switched pharmacies and or doctors, which may lead to undue profiling of the patient. Other pharmacies and or doctors will reject legitimate

---

[2] This concept was established by the DEA in its administrative proceedings to indicate a patient who has gone to more than one pharmacy in order to get a prescription filled.

pain patients due to this stigma, which will leave patients in distress when untreated for their chronic illnesses.

48. Walgreens' actions unfairly, improperly and needlessly cause a vulnerable population of legitimate pain patients to suffer unnecessarily.

49. Dr. Morgan currently treats over 100 patients who regularly fill their medications at Walgreens locations. Dr. Morgan also accepts new patients, in his discretion, who may choose to fill their medications at Walgreens often based on preference or insurance coverage.  These patients will be harmed as a result of Walgreens' unjustifiable action against Dr. Morgan.

**<u>Damage to Dr. Morgan's Medical Practice and Reputation</u>**

50. The Walgreens June 19, 2024, letter sent to all of Dr. Morgan's patients stated that, "Based on an internal review, Walgreens has decided to no longer dispense controlled substance prescriptions from your prescriber Courtney Morgan, M.D."  (See Exh. 7, Letter to Patients dated July 19, 2024[3]) The letter then informs patients that as of August 16, 2024, Walgreens would no longer fill Dr. Morgan's prescriptions for controlled substances.  The contents of this letter necessarily imply a judgment or conclusion of Dr. Morgan prescribing controlled substances in a manner that is illegitimate, improper, illegal or otherwise not in keeping with standards of care, which is damaging to his professional reputation, medical practice and standing in the community.

51. Patients who are bound to Walgreens through their healthcare insurance will try to find another healthcare provider to manage their chronic pain and other medical issues.  They are forced to leave Dr. Morgan, which otherwise would not occur but for Walgreens' action.

---

[3] Note that the letter referencing "internal review" was issued prior to Dr. Morgan's July 4, 2024, response, and therefore based on what can only consist of their database of prescriptions absent any application to a medical condition.

52. Walgreens' denial of care to Dr. Morgan's patients will have a domino effect and a substantial impact on his patients and his practice. Local pharmacies and large chain retailers will learn of Walgreens' decision and take similar action. Dr. Morgan's prescriptions will be refused at local pharmacies because of the stigma attached to Dr. Morgan and his practice as a result of Walgreens' decision to deny this type of care to his patients. Therefore, even patients who do not fill their medications at Walgreens will be impacted by the collateral effects of Walgreens' decision once local pharmacies learn of this action.

53. Dr. Morgan's practice has been largely built based on physician referrals, (i.e., PCPs, orthopedic/spine surgeons, neurosurgeons, etc.). Informing providers or new patients that Walgreens will not fill his prescriptions for *all controlled substances*, in and of itself implies a judgment or conclusion of Dr. Morgan prescribing controlled substances in a manner that is illegitimate, improper, illegal or otherwise not in keeping with standards of care, which is damaging to his professional reputation, medical practice, and standing in the medical community. Provider referrals will inevitably cease, and some prospective patients will not become patients if they cannot have their prescriptions filled at Walgreens.

54. Dr. Morgan has developed respectable, amicable and professional relationships with the Walgreens' pharmacists and is known for working together with them as a team, for the patient's medical care. The Walgreens electronic medical system has noted that Dr. Morgan's controlled substances will be blocked as of August 16, 2024, but non-controlled substances are not affected. Even the Walgreens pharmacists who Dr. Morgan have communicated with about mutual patients were surprised by his status in their system.  Nonetheless, this implies a judgment or conclusion of Dr. Morgan prescribing controlled substances in a manner that is

illegitimate, improper, illegal or otherwise not in keeping with standards of care, which is damaging to his professional reputation and standing in the medical community.

**Walgreens' Action is Unjustified and Results in the Improper Regulation of the Practice of Medicine**

55. Walgreens has a long and sordid history of settlements and judgments against it for its role in the Opioid Epidemic. To state a few, in 2013, Walgreens entered into a settlement with the DEA and agreed to pay $80 million in civil penalties, which was the largest settlement in DEA history at that time. In the 2022 *National Opioid Settlement*, Walgreens agreed to pay over $5.2 billion over 15 years.  In 2022, Walgreens also entered into an agreement with the State of Florida to pay $620 million over 18 years.

56. In order to stem its unlawful and non-compliant actions which resulted in the aforementioned settlements, Walgreens created its "Target Drug Good Faith Dispensing Policy" (TD GFD) around 2013. This policy targets three medications for mandatory review by pharmacists, to determine the validity of the prescription, to wit: whether a physician-patient relationship exists, and whether the prescription was issued for a legitimate medical purpose).

57. The procedures outlined in the TD GFD policies have been criticized by the American Medical Association (AMA), as the policies direct pharmacists to assess beyond the legitimacy of a prescription and into the realm medical management, which pharmacists are not qualified to do.  According to the AMA, pharmacists, "*under no circumstances should be required to confirm the appropriateness of a prescription; the decision is purely a medical one, completely in the purview of the treating physician*."[4]

58. Nonetheless, Dr. Morgan's communications with Walgreens pharmacists *pursuant their TD GFD review*, along with his submission of patient medical records, has always resulted in the

---

[4] https://www.thefdalawblog.com/2013/06/ama-tells-pharmacists-dont-call-us-well-call-you-/

dispensing of the same prescriptions by Walgreens pharmacists that the corporate office has now chosen to block. **This further indicates that pharmacists' professional judgment is being superseded and redefined by Walgreens' unjustified corporate actions.**

59. Additionally, the July 11, 2024, Walgreens letter to Dr. Morgan stated that in order for this block to be removed, Dr. Morgan's would need to materially change his prescribing. **This is an indisputable attempt by Walgreens' corporate office to medically manage patients, which is a direct violation of Florida's Administrative Rules for the practice of pharmacy.** Medical management of patient is performed by physicians, not pharmacists, much less a pharmacy's corporate office.

60. Furthermore, the June 19, 2024, letter to Dr. Morgan's patients, it was indicated that although Dr. Morgan's prescriptions for controlled substances would not be accepted starting August 16, 2024, and *all other prescriptions submitted by the patient's other providers would continue to be accepted.* Therefore, if these patients are prescribed the same medications by another provider for continuity of care, those prescriptions for controlled substances will be filled. Clearly, Walgreens has not, and cannot make a determination that the prescriptions issued by Dr. Morgan were not for a legitimate medical purpose. Hence, there is no justification for Walgreens' action of blocking Dr. Morgan's prescriptions for controlled substances.

61. Walgreens intends to fill the same prescription for controlled substances for the same patient when issued by one physician, but not the other. This is tantamount to imposing a restriction on a Dr. Morgan's medical and prescribing licenses.

62. Walgreens is one of the largest drugstore chains in the United States. [5] In 2023, Walgreens filled approximately 800 million prescriptions.[6] It is tied to numerous major health insurance policies. Therefore, the effect of this block by Walgreens is far-reaching. If Walgreens is permitted to block Dr. Morgan's prescriptions, then his over 100 patients will not be able to receive adequate medical care, plus any prospective patient who has Walgreens as their pharmacy, for at least one full year. This is tantamount to imposing a restriction on Dr. Morgan's medical and prescribing licenses.

63. Moreover, if Dr. Morgan was to seek employment for a position as a primary care/family medicine physician, he would be an unemployable candidate with the inability to have prescriptions for **both opioid and non-opioid controlled substances** honored by Walgreens. **This restriction holds not only in the state of Florida, but throughout the nation.** Dr. Morgan is licensed in three (3) other U.S. jurisdictions, where he would also be unemployable because of Walgreens' action. This is tantamount to imposing a restriction on Dr. Morgan's medical and prescribing licenses.

64. Walgreens is not a federal, state, or local regulatory agency for the practice of medicine. It is not authorized to issue, restrict, impose discipline upon, or revoke medical licenses or DEA licenses. Dr. Morgan's medical and DEA licenses are current, unencumbered and not the subject of any disciplinary action. For the reasons described above, blocking Dr. Morgan's prescriptions for controlled substances is tantamount to imposing a restriction on his medical and prescribing licenses.

---

[5] https://www.walgreensbootsalliance.com/our-business/us-retail-pharmacy-segment, U.S. Retail Pharmacy Segment, August 31, 2023.
[6] *Id.*

## COUNT 1
## TORTIOUS INTERFERANCE WITH A BUSINESS RELATIONSHIP

For Plaintiff's cause of action against Defendant, Plaintiff re-alleges and adopts, as if fully set forth, the allegations contained in paragraphs 1-64, and would further state:

### *Physician-Patient Relationship*

65. According to the American Medical Association ("AMA") Code of Ethics, an implied contract exists between patients and their physicians, which gives rise to physicians' ethical responsibility to place patients' welfare above the physician's own self-interest or obligations to others, and to use sound medical judgment on patients' behalf, and to advocate for their patients' welfare.

66. Defendant, a large national pharmacy chain, has knowledge of the sanctity of the relationship between a physician and patient and a pharmacist and patient.

### *Current Pain Management Patients*

67. Defendant deliberately, intentionally, and improperly interfered with this relationship between Dr. Morgan and his patients by prohibiting its pharmacists from exercising their professional duty and discretion as pharmacists and instituting a corporate block to prohibit the filling of Dr. Morgan's valid prescriptions for all controlled substances.

68. Defendant deliberately, intentionally, and improperly interfered with Dr. Morgan's patient's ability to receive adequate treatment from him by prohibiting pharmacists from filling their valid prescriptions for all controlled substances issued by Dr. Morgan.

69. Defendant deliberately, intentionally, and improperly interfered with the relationship between Dr. Morgan and his patients who fill prescriptions at Walgreens and caused a breach of that relationship by refusing to honor his valid prescriptions issued for legitimate medical purposes.

70. Defendant's actions of blocking all of Dr. Morgan's prescriptions for controlled substances is unjustified. The same prescriptions blocked when issued by Dr. Morgan, can be filled when issued by another provider for the same patients at the same Walgreens pharmacy locations.

*Prospective Pain Management Patients*

71. Defendant has knowledge of and understands the fact physicians and medical practices often accept new patients continually.

72. Defendant deliberately, intentionally, and improperly interfered with anticipated relationships between Dr. Morgan and prospective patients by prohibiting its pharmacists from exercising their professional duty and discretion as pharmacists and instituting a corporate block to prohibit the filling of Dr. Morgan's prescriptions for all controlled substances.

73. Defendant deliberately, intentionally, and improperly interfered with Dr. Morgan's prospective patient's ability to receive adequate treatment from him by prohibiting pharmacists from filling their valid prescriptions for all controlled substances issued by Dr. Morgan.

74. Defendant deliberately, intentionally, and improperly interfered with the relationship between Dr. Morgan and his prospective patients who choose to fill prescriptions at Walgreens by preventing the establishment and development of that relationship by refusing to honor his valid prescriptions issued for a legitimate medical purpose.

75. Defendant's actions of blocking all of Dr. Morgan's prescriptions for controlled substances is unjustified. The same prescriptions blocked when issued by Dr. Morgan, can be filled when issued by another provider for the same patients at the same Walgreens pharmacy location.

*Primary Care Patients and Ability to Practice Medicine*

76. Defendant knows that Dr. Morgan is qualified to treat patients within the scope of family medicine. Defendant knows that the practice of family and primary care medicine encompasses,

in part, the prescribing of *non-opioid controlled substances*.

77. Defendant deliberately, intentionally, and improperly interfered with anticipated relationships between Dr. Morgan and prospective primary care patients by prohibiting its pharmacists from exercising their professional duty and discretion as pharmacists and instituting a corporate block to prohibit the filling of Dr. Morgan's prescriptions for *all controlled substances*.

78. Defendant deliberately, intentionally, and improperly interfered with Dr. Morgan's prospective primary care patient's ability to receive adequate treatment by prohibiting pharmacists from filling their valid prescriptions for *all controlled substances* issued by Dr. Morgan.

79. Defendant deliberately, intentionally, and improperly interfered with the relationship between Dr. Morgan and his prospective primary care patients who choose to fill prescriptions at Walgreens and thereby interfered with the establishment and development of that relationship by refusing valid prescriptions issued for a legitimate medical purpose.

80. Dr. Morgan is unemployable for any position as a family medicine or primary care physician (*i.e., urgent care centers, community health centers, family medicine physician groups, etc.*) as a physician whose prescriptions for controlled substances will not be honored by Walgreens. Medical facilities will not accommodate the logistics necessary to redirect patients to another provider or another pharmacy.

***Walgreens' Action is Unjustified***

81. Many of the patients affected by Walgreens' decision have been patients of Walgreens for an extended period of time, ranging from a few years, to upwards of 20 years.  During this time, these patients have been prescribed the same or substantially same medication, which was filled by the Walgreens pharmacist.  These patients will attest to the fact that they have been placed in this exact same predicament before, where a pharmacy stopped honoring their

physician's prescriptions. They were then forced to find another provider, where they undergo the same medical management and receive the same prescriptions for the same medication which was filled at their same pharmacy location.

82. Regardless of the foregoing, Defendant's actions imply that Dr. Morgan did something unlawful or improper, by Walgreens' refusal to honor his valid for all controlled substances.

83. In taking this action against Dr. Morgan, Defendant breached its own policies and violated Florida's Board of Pharmacy Rules by usurping the professional judgment of its own pharmacists and engaging in the unauthorized practice of pharmacy.

84. As a direct and proximate result of the Defendant's actions, Dr. Morgan and his clinic will suffer, as patients who choose to stay with Walgreens pharmacy will leave his practice; and other local pharmacies that follow suit and mirror Walgreens' action, will also cause additional patients to leave the practice.  The departure of patients from Dr. Morgan's practice and the limitations of accepting new patients who are not with Walgreens will contribute to the decline of Dr. Morgan's medical practice.

85. The Defendant's actions directly impact Dr. Morgan's reputation with his patients, prospective patients, medical providers in the community, local pharmacies, and regulatory agencies.  The reputation of Dr. Morgan and his clinic will be tarnished and damaged beyond repair.

86. As a direct and proximate result of Defendant's conduct, Dr. Morgan and his clinic will have suffered injuries, actual financial loss, and reputation damages in an amount that exceeds the jurisdictional minimum of this Court.

## COUNT 2
### INJUNCTIVE RELIEF

For Plaintiff's cause of action against Defendant, Plaintiff re-alleges and adopts, as if fully set forth, the allegations contained in paragraphs 1-86, and would further state:

87. Defendant intentionally engaged in the unlicensed practice of pharmacy by making a corporate decision to block Dr. Morgan's prescriptions for controlled substances, thereby prohibiting pharmacists from exercising their professional judgment in determining the validity of an individual prescription.  By doing so, Walgreens, without justification, has blocked the filling of Dr. Morgan's valid and legitimate patient prescriptions issued to treat medical conditions.

88. Walgreens recognizes that it is one of the nation's largest pharmacy chains, and accordingly, its decisions carry weight in the pharmacy community.

89. Walgreen's action to block Dr. Morgan's prescriptions for all controlled substances will become known to other pharmacies, medical professionals, regulatory agencies, and current and prospective patients.  Smaller pharmacies are certain to mirror Walgreen's decision due to stigmatization and fear of regulatory scrutiny.  Hence, those pharmacies will begin to refuse Dr. Morgan's legitimate prescriptions issued to its legitimate patient population based solely on Walgreens' unjustified decision to block all of Dr. Morgan's controlled substance prescriptions, absent a determination of issuance of an invalid prescription for any patient.

90. As a result, Dr. Morgan's patients will begin to have their prescriptions refused by local pharmacies regardless of their medical need.

91. Dr. Morgan's patients cannot simply go to another pharmacy. As a result of Defendant's unlawful and unjustified actions, his patients will be labeled as "pharmacy shoppers" and treated with suspicion. This concept was established by the DEA in its administrative proceedings, and it takes aggressive action up to and including registration suspension against

a pharmacy that fills prescriptions for patients who use multiple pharmacies or received prescriptions from physicians who are "red flagged."[7]

92. Stigma associated with pain patients and pain management providers in the United States is a real concern. In 2019, the United States Department of Health and Human Services (HHS) issued a report addressing the stigma that pain management patients face. HHS determined that "reducing barriers to care that exist as a consequence of stigmatization is crucial for patient engagement and treatment effectiveness." Walgreen's unjustified actions are directly contrary to HHS's direction to increase patient engagement and retard stigmatization.

93. Dr. Morgan, his clinic and his patients will carry stigma because of Walgreens' decision.  Real patients with very serious medical issues will be denied treatment if Walgreens is permitted to continue to make corporate medical decisions that will impact patients suffering from pain.

94. Dr. Morgan will be successful on the merits of this action, as Walgreens' action was unjustified.  Walgreens did not review a single patient medical record before summarily determining that Dr. Morgan's prescriptions did not serve a legitimate medical purpose. It did not speak with a single patient, nor isolate a single prescription as invalid.

95. Furthermore, many of the patients affected by Walgreens' decision have been patients of Walgreens for an extended period of time, ranging from a few years, to upwards of 20 years. During this time, these patients have been prescribed the same or substantially same medication, which was filled by the Walgreens pharmacist.  These patients will attest to the fact that they have been placed in this exact same predicament before, where a pharmacy stopped honoring their physician's prescriptions. They were then forced to find another

---

[7] *See In Re Holiday CVS, LLC*, 77 Fed. Reg. 198 (2012) (Pharmacy license revoked where controlled substances were dispensed when physicians were red flagged and patients went to multiple pharmacies.).

provider, where they undergo the same medical management and receive the same prescriptions for the same medication which was filled at their same pharmacy location.

96. Walgreens' motivation for instituting blocks on physicians is likely an attempt to avoid the scrutiny it has underwent in the past with regulatory agencies.

97. There is no harm or injury to Walgreens for removing its corporate block from Dr. Morgan's profile and permit the filling of his prescriptions issued for all controlled substances, especially when Walgreens is willing to honor the same prescription if issued by another provider.

98. Dr. Morgan, his clinic and his patients will suffer irreparable injury if this Court does not act. Walgreens made a corporate decision that impacts the health of over 100 current patients of Dr. Morgan. These patients have chronic pain resulting from various medical issues including but not limited to HIV/AIDS neuropathy, diabetic neuropathy, Crohn's Disease, various Cancers, quadriplegia, traumatic injuries, rheumatoid arthritis, limb deformities, spinal surgeries, radiculopathy/sciatica, plantar fascial fibromatosis, and amputations/phantom limb pain. A determination for continued treatment of chronic pain has already been made by other physicians. Therefore, the denial of necessary medical care, and specifically pain treatment for debilitating and severe medical conditions, is unjustified and will cause irreparable injury.

99. Patients whose physician-patient relationship is instantly severed by Walgreens will face immediate and debilitating pain and or withdrawal symptoms due to abrupt discontinuation of their medication regimen. Lack of available providers in the local area will cause patients to go without treatment causing further injury and exacerbation of their fragile medical conditions and or require patients to seek urgent or emergency medical care.

100.   Walgreens seeks to deny treatment of patients treated by Dr. Morgan without justification, thereby casting each patient into the parade of horrible symptoms and a chaotic scramble to

seek care with another medical provider or pharmacy.

101.    These patients will experience all of the pains and discomforts that come with denial of

legitimate medical care.  Accordingly, it is in the public's interest to enter Plaintiff's relief.

102.    Blanket prohibition on filling valid and legitimate prescriptions for controlled substances

issued by a pain management provider and family medicine doctor for over one full year will

cause Dr. Morgan to suffer irreparable severe injury to his reputation, business, and

professional employment status.  This will result in Dr. Morgan's inability to appropriately

treat patients within his scope of practice, lead to the deterioration, decline and ultimate demise

of his medical practice. This will also render him unemployable.

**WHEREFORE, Plaintiffs respectfully demand that:**

1.    Summons be issued to Defendant Walgreens;

2.    This Court enjoin Defendant Walgreens from instituting a corporate block on all of

Dr. Morgan's prescriptions for controlled substances;

3.    This Court award Plaintiff all costs of this action including reasonable attorney's fee; and

4.    This Court award Plaintiff compensatory damages, any and all other relief to which Plaintiff

may appear entitled.

Respectfully submitted,

/s/*Erica F. Chaplin*
Erica F. Chaplin, Esq.
FLBN: 0048023
Anderson & Welch, LLC
500 S. Australian Avenue, 6th Flr
West Palm Beach, FL 33401
Tel: 561-832-3386
Fax: 561-820-4867
Email: chaplinlaw@gmail.com
Email: andewelch@andersonandwelch.com
*Attorney for Plaintiff, Courtney R. Morgan, M.D.*

## <u>VERIFICATION OF COURTNEY MORGAN, M.D.</u>

I, Courtney Morgan, M.D. after being first duly sworn, state that I have read and reviewed the foregoing *Verified Complaint* and that the allegations contained therein are true and correct to the best of my knowledge and belief.

Dated: _08/07/2024_

_____
Courtney Morgan, MD.

State of Florida
Broward County

The foregoing *Verification* was acknowledged, sworn to and subscribed to before me by Courtney Morgan, M.D. on this the 7th day of August, 2024.

_Andrea Williams_
Notary Public, Florida
Notary Expiration Date: 10.17.2027

ANDREA R. WILLIAMS
Notary Public-State of Florida
Commission # HH 460069
My Commission Expires
October 17, 2027

# TAB 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

| | | |
|---|---|---|
| **Courtney Morgan, M.D.**, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Case No.: 0:24cv61442 |
| **Walgreen Co.**, | § | |
| *Defendant.* / | | JURY |

### FIRST AMENDED VERIFIED COMPLAINT

**COMES NOW**, Plaintiff, Courtney Morgan, M.D., by and through his undersigned counsel, and files his *Verified Complaint* seeking monetary damages in excess of $500,000, exclusive of costs, interest an attorneys' fees, and a *Temporary Restraining Order, Preliminary Injunction* and *Permanent Injunction* against Defendant, Walgreen Co., and alleges and states:

### JURISDICTIONAL ALLEGATIONS

1. This Court has jurisdiction over this matter because of diversity of citizenship between the parties, the amount in controversy, exclusive of interest and costs, exceeds seventy-five thousand dollars ($75,000), and jurisdiction is therefore proper pursuant to 28 U.S.C. §1332.

2. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a), because it is the Judicial District in which substantial events that have given rise to this *Verified Complaint* occurred.

### PARTIES

3. Courtney Morgan, M.D. [hereinafter Dr. Morgan or Plaintiff] is a resident of the State of Florida, domiciled in Palm Beach County, Florida. At all times relevant herein, Dr. Morgan is and has been authorized and licensed, without limitation to a) transact business, b) provide medical services, and c) prescribe medications including controlled substances within the State

1

of Florida, individually as a physician as well as in association with his medical practice, Hop Medical Services, PLLC, which is located within Broward County, Florida.

4. At all times relevant herein, Walgreen Co., [hereinafter Walgreens] is and has been an Illinois corporation whose principal place of business is located in Deerfield, Illinois.  Walgreens has stores and pharmacies throughout the state of Florida, including Broward County, and the United States of America.

### GENERAL ALLEGATIONS AND FACTS COMMON TO ALL COUNTS

5. Dr. Morgan is a licensed physician within the State of Florida.  He obtained a resident's license on June 24, 2004, and his full unrestricted physician's medical license on June 20, 2006.

6. On or about August 16, 2006, Dr. Morgan established his medical practice, Hop Medical Services, PLLC [hereinafter Hop Medical], as a Family Medicine Clinic.  He has always been the sole owner and operator of this practice.

7. Dr. Morgan trained in the Family Medicine & Community Health residency program at the University of Miami/Jackson Memorial Medical Center. This training encompassed extensive exposure to pain management, which was an essential medical need for patients with various comorbidities, such as sickle cell crises, traumatic injuries, cancer, neuropathies, HIV/AIDS, uncontrolled diabetic neuropathies, peripheral vascular diseases, back and joint pain, migraines, fibromyalgia, post-surgical pain, and various neurological conditions.

8. Although renewal of a Florida medical license requires 40 hours of Continuing Medical Education (CME) every 2 years, Dr. Morgan has completed a total of 171 credits in courses related to prescribing controlled substances within the past 18 months, 98 of which are directly related to chronic pain management.

9.   On July 2, 2020, Hop Medical was issued its pain management clinic license from the Florida Department of Health. Dr. Morgan is and has been the sole practitioner, Designated Doctor, and Medical Director for Hop Medical.

10.  Dr. Morgan is qualified to own, operate, and prescribe controlled substances in a pain management clinic, pursuant to Florida's laws and administrative rules. Dr. Morgan's Florida medical license and DEA license for prescribing of controlled substances are both current, unrestricted, and active.

**Medical Practice and Patient Population**

11.  All Hop Medical patients are treated for chronic (non-acute) pain.  In certain situations, a few patients are also treated for primary care issues.  For example, if a patient does not have or cannot afford regular visits with a primary care physician (PCP), Dr. Morgan will often serve as their PCP until they can establish a PCP.  In addition, Dr. Morgan provides primary care services temporarily if a patient's established PCP is unreachable, or appointments are too far out for the PCP to attend to an urgent situation such as uncontrolled hypertension (HTN), temporary increased anxiety (where patients are usually also being managed by Psychiatry), exacerbated chronic obstructive pulmonary disease (COPD), asthma, congestive heart failure (CHF), and other co-morbid ailments.

12.  The clinic's patients are generally referred from other health care providers who recommend continued management of chronic pain for patients with multiple co-morbidities, complex medical problems, failed surgeries and or failed interventional treatments.  In other words, these patients have been in pain management for treatment of chronic pain by either their PCP, specialist, or hospital provider, prior to presenting to Dr. Morgan for continuity of medical care.

13. Dr. Morgan's patients are often treated for chronic pain related to long-term medical issues, such as various cancers (prostate, breast, colon, colorectal, metastatic and stage 4 in nature), sickle cell disease, HIV neuropathy, diabetic neuropathy, vertebral degenerative disease (with bulging/herniated discs, fusion, compression, bone spurs, facet narrowing, central canal narrowing), amputees, rheumatoid arthritis, arterial vasculitis with peripheral vascular disease of lower extremities, traumatic debilitations (resulting from gunshot wound injuries, crushing from heavy objects in accidents, falling from roof/building/ladder/bridge, motor vehicle accidents, sport injuries, bone fractures, etc.).  Also, some of his patients have been diagnosed with a terminal illness and are treated for chronic pain within the scope of palliative medicine.

14. All patients who have been accepted into Hop Medical for the management of chronic pain have either received and or are receiving other treatment modalities for interventional pain management.  These various interventions include one or a combination of the following: surgeries, paraspinal steroidal injections, radiofrequency ablations, total hip replacement, total knee replacements, discectomy, intramuscular injections (knee, spine, shoulder), rhizotomy, epidurals, chiropractic treatments (spinal manipulation, electrical muscle stimulation, etc.), acupuncture, physical therapy, TENS (transcutaneous electrical nerve stimulation), traction, home care treatments (water exercise, low impact exercises, stretching), heat/cold treatments, braces and stabilizers for knees, back, and wrists, as well as over the county (OTC) medications and topical creams.

**Practice Procedures and Patient Care**

15. Prior to the scheduling of a new patient appointment with Dr. Morgan, patient screening is performed where medical and non-medical background information is obtained for the staff and Dr. Morgan's review. Specifically, criminal background searches are conducted, as certain

drug-related charges would preclude a patient's admission into the clinic. Relevant medical records are obtained, and preliminary intake forms are also filled out by the patient.

16. At the first appointment, additional patient information and medical history are collected, along with any additional medical records requested by the staff.   The patient completes a comprehensive questionnaire regarding past medical, surgical and family history, including but not necessarily limited to previous providers, failed conservative measures (i.e., physical therapy, chiropractic care, etc.), current medications, failed medications, causative factors for pain, and assessments of how chronic pain affects the patient mentally and socially (i.e., depression, anxiety, mood, sleep, etc.).   The patient's controlled substance prescription history is also retrieved from E-Forcse, the state-maintained database of prescribed controlled substances. All of the foregoing is reviewed prior to the patient being seen by Dr. Morgan.

17. When presenting to Dr. Morgan, the patient undergoes a physical examination conducted only by Dr. Morgan, who also obtains a full history of the patient. Additional diagnostic studies or other tests may be ordered by Dr. Morgan. Using this information, a treatment plan is formulated that may include, rehabilitative therapies (i.e., physical/occupational therapy,) laboratory testing, medication management, specialist referrals (i.e., orthopedists, vascular surgeons, neurologists, nephrologists, podiatrists, therapists, chiropractors, psychiatric and other behavioral health consultations and therapies, etc.), and considerations of non-opioid alternatives (i.e., home care exercises/therapies, adjunctive therapies, interventional treatments, invasive and surgical interventions, etc.).  Both short and long-term treatment goals are set. These weekly/monthly goals are reviewed at each medical visit for progress and achievement.  Every patient is given informational materials regarding non-opioid alternatives.

18. When devising and formulating a treatment plan for a patient, any decision to prescribe controlled substances as part of the treatment plan is based on many different factors that may include the following: information from the referring physician, diagnostic studies and testing, Florida Department of Health E-Forcse reports, previously prescribed medications including controlled substances, other medications that the patient is prescribed by other specialists, patient opioid risk level, patient history, age, allergies and various other co-morbidities and conditions as well as the patient's functional history. Treatment plans are generally created with the goal of controlling patient's pain, where the benefit outweighs the risks.

19. After consultation, Dr. Morgan makes a preliminary decision whether to accept the patient and whether to either continue controlled substances therapy as part of a treatment plan and or recommend another or additional avenues for treatment of chronic pain. The patient is educated and counselled about the risks and benefits of the use of opioids and controlled substances and the options for non-opioid alternatives. Patient then has a follow-up appointment in a timeframe as determined by Dr. Morgan, no greater than 28 days, to reassess the patient and effectiveness of treatment.

20. Dr. Morgan has established a rigorous compliance policy where each individual patient's compliance is closely monitored.  Patients are asked to give informed consent to treatment and are required to execute a Treatment Agreement. They are given a summary of the clinic's policies for random urine drug screening and advised of the expectations of compliance with the clinic's policies, the doctor's orders, and cooperation with clinic's compliance officer. "Doctor shopping" is explained as well as the importance of maintaining strict compliance with the Treatment Agreement and the security of their prescribed medications.

**Safeguards Against Diversion and Misuse of Controlled Substances**

21. Safeguards against diversion and misuse of controlled substances implemented by Dr. Morgan

    includes in part, the following:

    A. <u>Review by Compliance Officer:</u> A thorough criminal background check is conducted by the compliance officer on each new patient, screening for drug related criminal history. Medical records are obtained directly from medical providers for verification and clarification of the patient's medical history as well as review for consistency and authenticity. A patient may be interviewed by the compliance officer to obtain additional information or clarification. All of the foregoing information is reviewed for the purpose of assessing the legitimacy of the patient from a non-medical perspective.

    B. <u>Florida's Prescription Drug Monitoring Program (PDMP) System): E-Forcse</u>
    The e-Forcse system is checked prior to prescribing any controlled substance. A rigorous and methodical review of the E-Forcse report detects whether the patient has engaged, or is engaging in "doctor shopping," whether the patient is taking the medication as prescribed or medication that is not prescribed, and whether diversion is apparent, among other things.

    C. <u>Random Drug Test (RDT):</u>  Prominent office postings state that patients must submit to random drug tests for usage of their prescribed medication and illicit drugs. It is also stated that failure to submit to a RDT, adulteration of a specimen, or testing positive for illicit drugs or medications not prescribed may be grounds for immediate discharge from the clinic.  Patients are subjected to random drug tests no less than once every three months, even if the patient is assessed as low or moderate risk for misuse.

    D. <u>Treatment Agreement:</u>  All patients enter into a Treatment Agreement, and a summary of same is provided to the patient.  The Treatment Agreement addresses misuse and diversion of medication, and states causes for discharge, which include:

       - Patient gives, sells, or misuses the pain medication
       - Incarceration due to drug related offense
       - Patient attempts to obtain pain medication sooner than next office visit from any other physician, emergency room, or any other source in the absence of a true emergency
       - Patient provides false information / false medical records
       - Patient fails to keep appointments
       - Patient does not subject him or herself to a random urine analysis
       - Unsatisfactory test result (i.e., RDT) or failure to obtain recommended/ordered tests
       - Allegations, suspicious information or investigation initiated by anyone regarding potential violations of this agreement which is brought to the attention of clinic staff

    E. <u>Chart Review & Staff Meetings:</u> Chart reviews are performed quarterly, where if any irregularities are observed, inquiries are made to the patient. For example, if a patient has missed appointments and cannot be reached, the compliance officer may investigate

whether a patient has been hospitalized or arrested.[1] Staff meetings are held every month, where any issues with prospective, new or return patients can be raised and addressed. All of the foregoing also provides useful information to prevent medication errors and potentially dangerous drug interactions.

F. <u>Communication with Pharmacists:</u> Dr. Morgan has an 'open door' policy when communicating with pharmacists about the medical care of mutual patients. This open communication not only allows for discussion of the patient's treatment and their clinical stability, but also allows for exchange of information when either the physician or the pharmacist suspects diversion, misuse or doctor/pharmacy shopping.

G. <u>Strict No Refill Policy</u>
Refill authorizations are never given for pain medications. Patients must appear in person for their medical visit for reevaluation every 28 days. Prescriptions are not resent to the pharmacy if medications have been stolen, lost or misplaced.

22. If a patient has failed one of Dr. Morgan's routine compliance surveillance tools, then a decision is made regarding appropriate measures for that individual patient. These measures may include counselling, treatment with other medications, discharging the patient from the practice and or referral to appropriate providers for additional care, counseling, or treatment.

**Florida Department of Health's Random Annual Inspection & Audit Results**

23. Florida Department of Health (DOH) performs a mandatory annual random inspection and audit on all licensed pain management clinics. The audits consist of a comprehensive review of the medical practice, with visual inspection of the entire facility, current licensures, certificates and permits, daily patient panels, office policies, staff meeting minutes, and random review of medical charts.

24. The clinic has passed every annual DOH inspection and audit since issuance of its pain management clinic license. ***After review of the clinic's medical charts by the DOH during its most recent random inspection and audit conducted just two months ago on May 31, 2024, positive findings, in part included*** (See Exh. 1, Florida DOH Inspection Results):

---

[1] Of note, any drug related arrests are required to be disclosed by the patient pursuant to their Treatment Agreement.

- Complete medical history and physician examination, including history of drug abuse and dependence.
- Complete physical exam is performed by the physician on the same day that the physician prescribes a controlled substance.
- Documentation in the patient's record of the reason for prescribing more than 72-hour supply of controlled substances for the treatment of chronic non-malignant pain.
- Clear and complete medical justification for continued treatment with controlled substances
- Steps to ensure medically appropriate use of controlled substances is documented clearly and completely when continuing controlled substance prescribing while waiting on consultant's report on patients showing signs or symptoms of substance abuse.
- Written individualized treatment plan has been developed for each patient with objectives used to determine treatment success. The physician adjusts drug therapy to the individual needs of each patient. Other treatment modalities are considered. Interdisciplinary nature of treatment plan is documented.
- Patients are referred as necessary for additional evaluation and treatment in order to achieve treatment objectives with special attention given to those patients at risk for misuse of medications and those in living arrangements that pose a risk for medication misuse or diversion.
- Patients with signs or symptoms of substance abuse are immediately referred to a board-certified pain management physician, addiction medicine specialist, or a mental health addiction facility unless the physician is board-certified or board-eligible in pain management.
- Quality assurance program that includes the following components: the identification, investigation and analysis of the frequency and causes of adverse incidents to patients; the identification of trends or patterns of incidents; measures to correct, reduce, minimize, or eliminate the risk of adverse incidents to patients; the documentation of these functions; and periodic review at least quarterly of such information by the designated physician.

25. To date, Dr. Morgan has never had any patient overdose on the controlled substances that he has prescribed during his twenty (20) years of practice. He has maintained a strict medical practice with prescribing standards in compliance with all state and federal regulatory agencies, rarely even implementing telehealth services during the pandemic.  **In fact, in past inspections and audits conducted by the Florida DOH, the auditor redacted and photocopied certain records maintained by Dr. Morgan, for the purpose of utilizing them as an example and gold standard for other pain management clinics to emulate.**

**Communications with Walgreen Co.**

26. On or about June 20, 2024, Dr. Morgan received his first letter from Walgreens via FedEx stating that information about his prescribing practices was requested, and based on a failure to respond, Walgreens would discontinue dispensing controlled substance prescribed by him starting August 16, 2024.  (See Exh. 2, Walgreens Letter dated June 18, 2024)  The letter further stated that:

> "**Team members at your local pharmacy had no role in making this decision and cannot make exceptions to this decision.**" *(emphasis added)*
>
>  "If your prescribing changes materially after the period of at least one year from the block effective date, contact us [ ] to request a review."

27. Dr. Morgan immediately contacted Walgreens via phone and email, advising that he has never received any previous communication from Walgreens requesting information. (See Exh. 3, Dr. Morgan's Letter dated June 20, 2024.)

28. In response, Walgreens sent a letter on or about June 25, 2024, to Dr. Morgan stating in part the following:

> "[O]ur nation faces an epidemic of prescription misuse, addiction, and diversion. While this issue concerns practicing providers who prescribe controlled substances, pharmacists have a corresponding responsibility to dispense controlled substances only in situations where there is a legitimate medical need."
>
> "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."

This letter also requested information about Dr. Morgan and his medical practice. It was further stated that if no response was received by July 9, 2024, then Walgreens "may discontinue dispensing controlled substances" prescribed by Dr. Morgan as of August 16, 2024, and that

this restriction would not affect the dispensing of non-controlled substances.  (See Exh. 4, Walgreens Letter dated June 25, 2024)

29. On July 4, 2024, Dr. Morgan provided his 56-page response inclusive of exhibits, which in part consisted of the information contained in this very pleading, in paragraphs 5-25.  (Exh. 5, Dr. Morgan's Letter dated July 4, 2024, including exhibits)

30. On or about July 16, 2024, Walgreens sent a letter to Dr. Morgan stating the following:

> "We have reviewed the materials you provided.  At this time, Walgreens has decided not to deviate from the dispensing decision as outlined in our letter dated June 18, 2024."

> "If your prescribing changes materially, please contact us after August 16, 2025 [ ] to request review."

> (See Exh. 6, Walgreens Letter dated July 16, 2024)

Walgreens affirmed that it would block Dr. Morgan's prescriptions for all controlled substances beginning August 16, 2024, for one full year, before he can request "review."

31. All correspondence to Dr. Morgan and his patients were signed by Walgreen Co.

**Usurpation of Pharmacists' Independent Judgment by Defendant Walgreens; and Prohibition of Pharmacist Compliance with Florida Board of Pharmacy's Professional Standards of Practice**

32. The Florida Board of Pharmacy regulates the professional conduct of pharmacists. Accordingly, standards of practice have been established specifically for the filling of controlled substance prescriptions. Pursuant to Florida Administrative Code 64B16-27.831:

> **"The Board of Pharmacy recognizes that it is important for the patients of the State of Florida to be able to fill valid prescriptions for controlled substances. In filling these prescriptions, the Board does not expect pharmacists to take any specific action beyond exercising sound professional judgment."**

33. Pharmacists are required to fill valid prescriptions. Therefore, the pharmacist's obligation is to exercise sound professional judgment in determining the validity of a prescription. **"A**

**prescription is valid when it is based on a practitioner-patient relationship and when it has been issued for a legitimate medical purpose."** *Id.*

34. "Every patient's situation is unique and prescriptions for controlled substances shall be reviewed with each patient's unique situation in mind." *Id.* **"When validating a prescription, neither a person nor a licensee shall interfere with the exercise of the pharmacist's independent professional judgment."** *Id.*

35. Neither in conversation, nor in written communication, did Walgreens ever question Dr. Morgan's medical judgment, notify or inform Dr. Morgan of any specific patient prescription being in question or suspected of not being medically necessary, illegitimate, or otherwise problematic. Moreover, at no time has any individual pharmacist employed by or affiliated with Defendant Walgreens contacted, notified, or otherwise questioned Dr. Morgan regarding the medical necessity and appropriateness of any prescriptions for controlled substances which he has prescribed for his patients. To the best of Dr. Morgan's knowledge, every prescription he has issued to Walgreens has been filled by Walgreens pharmacists. None of Dr. Morgan's prescriptions have been rejected by any Walgreens pharmacists as illegitimate, medically unnecessary, nor otherwise questioned.

36. The prescriptions issued by Dr. Morgan are supported by medical necessity and fully adhere to all applicable state and federal legal guidelines and regulations regarding the prescribing of controlled substances, and Walgreens has produced nothing to suggest otherwise.

37. No pharmacist with Walgreens, or any other pharmacy, has contacted Dr. Morgan or the Hop Medical staff to question the medical necessity of the prescriptions, or otherwise question the compliance of his prescriptions with all applicable federal and state legal guidelines and clinical guidelines regarding the prescribing of controlled substances.

38. Defendant Walgreens has not provided any specific grounds or reasons for its actions of blocking its pharmacists from filling Dr. Morgan's prescriptions for controlled substances. Walgreens did, however, notify patients that they would still be delighted to fill any of Dr. Morgan's other types of prescriptions (for non-controlled substances).

39. Despite these facts, Defendant Walgreens sent Dr. Morgan the July 11, 2024, letter, reaffirming its decision to block the filling of Dr. Morgan's prescriptions for controlled substances as of August 16, 2024. This was not a decision of "team members at [the] local pharmacy" but instead a *corporate decision*, where local pharmacists "cannot make exceptions." This means that as of August 16, 2024, Dr. Morgan is **blocked** in the Walgreens electronic central pharmacy system, thereby preventing any Walgreens pharmacists from being able to exercise independent judgment in filling his medically legitimate controlled substance prescriptions.

**Injury and Harm to Current and Prospective Patients**

40. The action of Walgreens forces Dr. Morgan's patients to either continue under the care of a physician the patient has known for years and attempt to find a satisfactory alternative to Walgreens; or to continue as a patient of Walgreens and leave Dr. Morgan, the medical provider they have chosen to manage their chronic pain.

41. According to the 2022 U.S. Census Bureau, the populations of Palm Beach, Broward and Miami-Dade County are 1.518 million, 1.947 million and 2.674 million, respectively. According to the Florida DOH, Palm Beach, Broward and Miami-Dade County have 12, 17, and 17 licensed pain management clinics, respectively, excluding Hop Medical. With a total of 46 licensed pain management clinics to service a total population of 6.139 million in the tri-county area, it is foreseeable that Dr. Morgan's patients will have difficulty obtaining timely care from another licensed pain management facility.

42. Furthermore, the Center for Disease Control (CDC) and Food and Drug Administration (FDA) warn against abrupt discontinuation of opioid medication, which can result in uncontrolled pain or withdrawal symptoms. Therefore, if a patient is unable to obtain another pain management healthcare provider prior to the depletion of their controlled substance medications, the patient will be in distress with foreseeable health liabilities. As a result, the patient may require urgent or emergency medical care.

43. Although Walgreens' communications indicated a general concern regarding the "epidemic of prescription misuse, addiction, and diversion," associated with opioids, Walgreens intends to block ***all*** of Dr. Morgan's controlled substance prescriptions, ***including non-opioid controlled substances*** as of August 16, 2024. Therefore, Dr. Morgan's patients who are treated with prescriptions for *non-opioid controlled substances* for other chronic medical issues such as epilepsy, androgen deficiency, chronic obstructive pulmonary disease (COPD), congestive heart failure (CHF), HIV/AIDS, obesity and other illness, are faced with the same dilemma of either finding another provider to manage their care or finding another pharmacy to fill their prescriptions for the non-opioid controlled substances.

44. In the event new patients present with issues requiring treatment with a non-opioid controlled substance, those patients, too, will also be forced to either seek medical consultation with another provider or find another pharmacy to fill their prescription for the non-opioid controlled substance. **This block on filling Dr. Morgan's non-opioid controlled substances will prevent patients from being treated for urgent medical conditions and or continuity of medical care requiring such treatment, which may be detrimental to patient health.**

45. Walgreens' actions unfairly, improperly, and needlessly create a conundrum and a potentially fatal, real, and serious health risk for these patients.

46. The relationship between physician and patient is vital, but so too is that between a pharmacist and patient. It is even more important when a patient is taking opioid pain medications. Termination of that relationship places a harsh stigma on pain patients who may be labeled as "pharmacy shoppers" for switching pharmacies as a result of Walgreens' actions, and thereafter, treated with suspicion.[2]

47. As a result of Walgreens' action, significant stigma will be attached to Dr. Morgan's patients who must now face an inquiry as to why they switched pharmacies and or doctors, which may lead to undue profiling of the patient. Other pharmacies and or doctors will reject legitimate pain patients due to this stigma, which will leave patients in distress when untreated for their chronic illnesses.

48. Walgreens' actions unfairly, improperly, and needlessly cause a vulnerable population of legitimate pain patients to suffer unnecessarily.

49. Dr. Morgan currently treats over 100 patients who regularly fill their medications at Walgreens locations. Dr. Morgan also accepts new patients, in his discretion, who may choose to fill their medications at Walgreens often based on preference or insurance coverage. These patients will be harmed, indeed, and have their health and welfare seriously jeopardized, as a result of Walgreens' unjustified and unjustifiable action against Dr. Morgan.

**Damage to Dr. Morgan's Medical Practice and Reputation**

50. The Walgreens June 19, 2024, letter sent to all of Dr. Morgan's patients stated that, "Based on an internal review, Walgreens has decided to no longer dispense controlled substance prescriptions from your prescriber Courtney Morgan, M.D." (See Exh. 7, Letter to Patients

---

[2] This concept was established by the DEA in its administrative proceedings to indicate a patient who has gone to more than one pharmacy in order to get a prescription filled.

dated July 19, 2024[3]) The contents of this letter necessarily imply a judgment or conclusion of Dr. Morgan prescribing controlled substances in a manner that is illegitimate, improper, illegal, or otherwise not in keeping with standards of care, which is damaging to his professional reputation, medical practice and standing in the community.

51. Patients who are bound to Walgreens through their healthcare insurance will be forced to try to find another healthcare provider to manage their chronic pain and other medical issues.  They are forced to leave Dr. Morgan, which otherwise would not occur but for Walgreens' action. Indeed, given the state of availability of medical practitioners and/or appointments with those accepting new patients, and patients' access to them, this may prove to be an impossible task for any patient, let alone a medically compromised patient.

52. Walgreens' denial of care to Dr. Morgan's patients will have a domino effect and a substantial impact on his patients and his practice. Local pharmacies and large chain retailers will learn of Walgreens' decision and take similar action. Dr. Morgan's prescriptions will be refused at local pharmacies because of the stigma attached to Dr. Morgan and his practice as a result of Walgreens' decision to deny this type of care to his patients. Therefore, even patients who do not fill their medications at Walgreens will be impacted by the collateral effects of Walgreens' decision once local pharmacies learn of this action.

53. Dr. Morgan's practice has been largely built based on physician referrals, (i.e., PCPs, orthopedic/spine surgeons, neurosurgeons, etc.). Informing providers or new patients that Walgreens will not fill his prescriptions for *all controlled substances*, in and of itself implies a judgment or conclusion of Dr. Morgan prescribing controlled substances in a manner that is

---

[3] Note that the letter referencing "internal review" was issued prior to Dr. Morgan's July 4, 2024, response, and therefore based on what can only consist of their database of prescriptions absent any application to a medical condition.

illegitimate, improper, illegal or otherwise not in keeping with standards of care, which is damaging to his professional reputation, medical practice, and standing in the medical community. Provider referrals will inevitably cease, and some prospective patients will not become patients if they cannot have their prescriptions filled at Walgreens.

54. Dr. Morgan has developed respectable and professional relationships with the Walgreens' pharmacists and is known for working together with them as a team, for the patient's medical care. The Walgreens electronic central pharmacy system has noted that Dr. Morgan's controlled substances will be blocked as of August 16, 2024, but, cynically, non-controlled substances are not affected. Even the Walgreens pharmacists with whom Dr. Morgan has communicated about mutual patients were surprised to learn of his newly changed by his status in their system.  Nonetheless, this implies a judgment or conclusion by Defendant regarding Dr. Morgan prescribing controlled substances in a manner that is illegitimate, improper, illegal, or otherwise not in keeping with standards of care, all of which are damaging to his professional reputation and standing in the medical community. It is, moreover, a wholly arbitrary decision based upon neither factual nor rational criteria.

**<u>Walgreens' Action is Unjustified and Results in the Improper Regulation of the Practice of Medicine</u>**

55. Walgreens has a long and sordid history of settlements and judgments against it for its role in the Opioid Epidemic. To state a few, in 2013, Walgreens entered into a settlement with the DEA and agreed to pay $80 million in civil penalties, which was the largest settlement in DEA history at that time. In the 2022 *National Opioid Settlement*, Walgreens agreed to pay over $5.2 billion over 15 years.  In 2022, Walgreens also entered into an agreement with the State of Florida to pay $620 million over 18 years.

56. In order to stem its unlawful and non-compliant actions which resulted in the aforementioned settlements, Walgreens created its "Target Drug Good Faith Dispensing Policy" (TD GFD) around 2013. This policy targets three medications for mandatory review by pharmacists, to determine the validity of the prescription, to wit: whether a physician-patient relationship exists, and whether the prescription was issued for a legitimate medical purpose).

57. The procedures outlined in the TD GFD policies have been criticized by the American Medical Association (AMA), as the policies direct pharmacists to assess beyond the legitimacy of a prescription and into the realm medical management, which pharmacists are not qualified to do.  According to the AMA, pharmacists, "*under no circumstances should be required to confirm the appropriateness of a prescription; the decision is purely a medical one, completely in the purview of the treating physician*."[4]

58. Nonetheless, Dr. Morgan's communications with Walgreens pharmacists *pursuant their TD GFD review*, along with his submission of patient medical records, has always resulted in the dispensing of the same prescriptions by Walgreens pharmacists that the corporate office has now chosen to block for no stated reason.  **This further indicates that all store-based pharmacists' professional judgment is being unilaterally superseded and redefined by Walgreens' unjustified corporate actions.**

59. Additionally, the July 11, 2024, Walgreens letter to Dr. Morgan stated that in order for this block to be removed, Dr. Morgan's would need to materially change his prescribing.  **This is an indisputable attempt by Walgreens' corporate office to medically manage patients, which is a direct violation of Florida's Administrative Rules for the practice of pharmacy.**

---

[4] https://www.thefdalawblog.com/2013/06/ama-tells-pharmacists-dont-call-us-well-call-you-/

Medical management of patient is performed by physicians, not pharmacists, much less a pharmacy's corporate office.

60. Furthermore, the June 19, 2024, letter to Dr. Morgan's patients, it was indicated that although Dr. Morgan's prescriptions for controlled substances would not be accepted, *all other prescriptions submitted by the patient's other providers would continue to be accepted.* Therefore, if these patients are prescribed the same medications by another provider for continuity of care, those prescriptions for controlled substances will be filled. Clearly, Walgreens has not, and cannot make a determination that the prescriptions issued by Dr. Morgan were not for a legitimate medical purpose. Hence, there is no justification for Walgreens' action of blocking Dr. Morgan's prescriptions for controlled substances.

61. Walgreens intends to fill the same prescription for controlled substances for the same patient when issued by one physician, but not the other. This is tantamount to imposing a restriction on Dr. Morgan's medical and prescribing licenses. It is, moreover, a biased restraint on trade, medical decision-making, patient choice, and violates every precept of national and Florida standards of medical care.

62. Walgreens is one of the largest drugstore chains in the United States. [5] In 2023, Walgreens filled approximately 800 million prescriptions.[6] It is tied to numerous major health insurance policies. Therefore, the effect of this block by Walgreens is far-reaching. If Walgreens is permitted to block Dr. Morgan's prescriptions, then his over 100 patients will not be able to receive adequate medical care, in addition to any prospective patient who has Walgreens as

---

[5] https://www.walgreensbootsalliance.com/our-business/us-retail-pharmacy-segment, U.S. Retail Pharmacy Segment, August 31, 2023.
[6] *Id.*

their pharmacy, for at least one full year.  This is tantamount to imposing a restriction on Dr. Morgan's medical and prescribing licenses.

63. Moreover, if Dr. Morgan were to seek employment for a position as a primary care/family medicine physician, he would be an unemployable candidate with the inability to have prescriptions for ***both opioid and non-opioid controlled substances*** honored by Walgreens. ***This restriction holds not only in the state of Florida, but throughout the nation.*** Dr. Morgan is licensed in three (3) other U.S. jurisdictions, where he would also be unemployable because of Walgreens' action.  This is tantamount to imposing a restriction on Dr. Morgan's medical and prescribing licenses.

64. Walgreens is not a federal, state, or local regulatory agency for the practice of medicine.  It is not authorized to issue, restrict, impose discipline upon, or revoke medical licenses or DEA licenses. Dr. Morgan's medical and DEA licenses are current, unencumbered, and not the subject of any disciplinary action. For the reasons described above, blocking Dr. Morgan's prescriptions for controlled substances is tantamount to imposing a restriction on his medical and prescribing licenses.

<u>**COUNT 1**</u>
**TORTIOUS INTERFERANCE WITH A BUSINESS RELATIONSHIP**

For Plaintiff's cause of action against Defendant, Plaintiff re-alleges and adopts, as if fully set forth, the allegations contained in paragraphs 1-64, and would further state:

*Physician-Patient Relationship*

65. According to the American Medical Association ("AMA") Code of Ethics, an implied contract exists between patients and their physicians, which gives rise to physicians' ethical responsibility to place patients' welfare above the physician's own self-interest or obligations to others, and to use sound medical judgment on patients' behalf, and to advocate for their patients' welfare.

66. Defendant, a large national pharmacy chain, has knowledge of the sanctity of the relationship between a physician and patient and a pharmacist and patient.

*Current Pain Management Patients*

67. Defendant deliberately, intentionally, and improperly interfered with this relationship between Dr. Morgan and his patients by prohibiting its pharmacists from exercising their professional duty and discretion as pharmacists and instituting a corporate block to prohibit the filling of Dr. Morgan's valid prescriptions for all controlled substances.

68. Defendant deliberately, intentionally, and improperly interfered with Dr. Morgan's patient's ability to receive adequate treatment from him by prohibiting pharmacists from filling their valid prescriptions for all controlled substances issued by Dr. Morgan.

69. Defendant deliberately, intentionally, and improperly interfered with the relationship between Dr. Morgan and his patients who fill prescriptions at Walgreens and caused a breach of that relationship by refusing to honor his valid prescriptions issued for legitimate medical purposes.

70. Defendant's actions of blocking all of Dr. Morgan's prescriptions for controlled substances is unjustified. The same prescriptions blocked when issued by Dr. Morgan, can be filled when issued by another provider for the same patients at the same Walgreens pharmacy locations.

### Prospective Pain Management Patients

71. Defendant has knowledge of and understands the fact physicians and medical practices often accept new patients continually.

72. Defendant deliberately, intentionally, and improperly interfered with anticipated relationships between Dr. Morgan and prospective patients by prohibiting its pharmacists from exercising their professional duty and discretion as pharmacists and instituting a corporate block to prohibit the filling of Dr. Morgan's prescriptions for all controlled substances.

73. Defendant deliberately, intentionally, and improperly interfered with Dr. Morgan's prospective patient's ability to receive adequate treatment from him by prohibiting pharmacists from filling their valid prescriptions for all controlled substances issued by Dr. Morgan.

74. Defendant deliberately, intentionally, and improperly interfered with the relationship between Dr. Morgan and his prospective patients who choose to fill prescriptions at Walgreens by preventing the establishment and development of that relationship by refusing to honor his valid prescriptions issued for a legitimate medical purpose.

75. Defendant's actions of blocking all of Dr. Morgan's prescriptions for controlled substances is unjustified. The same prescriptions blocked when issued by Dr. Morgan, can be filled when issued by another provider for the same patients at the same Walgreens pharmacy location.

### Primary Care Patients and Ability to Practice Medicine

76. Defendant knows that Dr. Morgan is qualified to treat patients within the scope of family medicine. Defendant knows that the practice of family and primary care medicine encompasses,

in part, the prescribing of *non-opioid controlled substances*.

77. Defendant deliberately, intentionally, and improperly interfered with anticipated relationships between Dr. Morgan and prospective primary care patients by prohibiting its pharmacists from exercising their professional duty and discretion as pharmacists and instituting a corporate block to prohibit the filling of Dr. Morgan's prescriptions for *all controlled substances*.

78. Defendant deliberately, intentionally, and improperly interfered with Dr. Morgan's prospective primary care patient's ability to receive adequate treatment by prohibiting pharmacists from filling their valid prescriptions for *all controlled substances* issued by Dr. Morgan.

79. Defendant deliberately, intentionally, and improperly interfered with the relationship between Dr. Morgan and his prospective primary care patients who choose to fill prescriptions at Walgreens and thereby interfered with the establishment and development of that relationship by refusing valid prescriptions issued for a legitimate medical purpose.

80. Dr. Morgan is unemployable for any position as a family medicine or primary care physician (*i.e., urgent care centers, community health centers, family medicine physician groups, etc.*) as a physician whose prescriptions for controlled substances will not be honored by Walgreens. Medical facilities will not accommodate the logistics necessary to redirect patients to another provider or another pharmacy.

*Walgreens' Action is Unjustified*

81. Many of the patients affected by Walgreens' decision have been patients of Walgreens for an extended period of time, ranging from a few years, to upwards of 20 years. During this time, these patients have been prescribed the same or substantially same medication, which was filled by the Walgreens pharmacist. These patients will attest to the fact that they have been placed in this exact same predicament before, where a pharmacy stopped honoring their

physician's prescriptions. They were then forced to find another provider, where they undergo the same medical management and receive the same prescriptions for the same medication which was filled at their same pharmacy location.

82. Regardless of the foregoing, Defendant's actions imply that Dr. Morgan did something unlawful or improper, by Walgreens' refusal to honor his valid licenses for the unrestricted prescribing of all medically necessary controlled substances.

83. In taking this action against Dr. Morgan, Defendant breached its own policies and violated Florida's Board of Pharmacy Rules by usurping the professional judgment of its own local store-based pharmacists and engaging in the unauthorized practice of pharmacy.

84. As a direct and proximate result of the Defendant's actions, Dr. Morgan and his clinic will suffer, as patients who choose to stay with Walgreens pharmacy will leave his practice; and other local pharmacies that follow suit and mirror Walgreens' action, will also cause additional patients to leave the practice.  The departure of patients from Dr. Morgan's practice and the limitations of accepting new patients who are not with Walgreens will contribute to the decline of Dr. Morgan's medical practice.

85. The Defendant's actions directly impact Dr. Morgan's reputation with his patients, prospective patients, medical providers in the community, local pharmacies, and regulatory agencies.  The reputation of Dr. Morgan and his clinic will be tarnished and damaged beyond repair.

86. As a direct and proximate result of Defendant's conduct, Dr. Morgan and his clinic will have suffered injuries, actual monetary loss, and reputational damages in an amount that exceeds the jurisdictional minimum of this Court.

## COUNT 2
## INJUNCTIVE RELIEF

For Plaintiff's cause of action against Defendant, Plaintiff re-alleges and adopts, as if fully set forth, the allegations contained in paragraphs 1-86, and would further state:

87. Defendant intentionally engaged in the unlicensed practice of pharmacy by making a unilateral and biased corporate decision to block Dr. Morgan's prescriptions for controlled substances, thereby prohibiting local store-based pharmacists from exercising their professional judgment in determining the validity of an individual prescription.  By doing so, Walgreens, without justification, has blocked the filling of Dr. Morgan's valid and legitimate patient prescriptions issued to treat medical conditions.

88. Walgreens recognizes that it is one of the nation's largest pharmacy chains, and accordingly, its decisions carry weight in the pharmacy community.

89. Walgreen's action to block Dr. Morgan's prescriptions for all controlled substances will become known to other pharmacies, medical professionals, regulatory agencies, and current and prospective patients.  Smaller pharmacies are certain to mirror Walgreen's decision due to stigmatization and fear of regulatory scrutiny.  Hence, those pharmacies will begin to refuse Dr. Morgan's legitimate prescriptions issued to its legitimate patient population based solely on Walgreens' unjustified decision to block all of Dr. Morgan's controlled substance prescriptions, absent a determination of issuance of an invalid prescription for any patient.

90. As a result, Dr. Morgan's patients will begin to have their prescriptions refused by local pharmacies regardless of their medical need.

91. Given the abbreviated time-period between notice and denial of Dr. Morgan's prescriptions, it is virtually impossible for patients to access new medical providers on such short notice. Judicial notice must be taken that there is an acute shortage of medical practitioners in the State

of Florida, and there is now often months long waits to see such practitioners.  This scenario

is even worsened by the fact that Walgreens has taken, and continues to take this same action

against multiple physicians delivering pain management medical services.  This creates not

only a hostile and dangerous environment in the medical field, but it may also lead patients to

seek medicine outside of the observable care of a medical doctor.  In short, patients will be

denied much needed medical care due to the biased, capricious, unilateral and *non-medical

corporate decision* of the Defendant, while unnecessarily placing the patient's health at risk.

92. Dr. Morgan's patients cannot simply go to another pharmacy. As a result of Defendant's

unlawful and unjustified actions, his patients will be labeled as "pharmacy shoppers" and

treated with suspicion. This concept was established by the DEA in its administrative

proceedings, and it takes aggressive action up to and including registration suspension against

a pharmacy that fills prescriptions for patients who use multiple pharmacies or received

prescriptions from physicians who are "red flagged."[7]

93. Stigma associated with pain patients and pain management providers in the United States is a

real concern. In 2019, the United States Department of Health and Human Services (HHS)

issued a report addressing the stigma that pain management patients face. HHS determined that

"reducing barriers to care that exist as a consequence of stigmatization is crucial for patient

engagement and treatment effectiveness." Walgreen's unjustified actions are directly contrary

to HHS's direction to increase patient engagement and retard stigmatization.

94. Dr. Morgan, his clinic and his patients will carry stigma because of Walgreens' decision.  Real

patients with very serious medical issues will be denied treatment if Walgreens is permitted to

continue to make corporate medical decisions that will impact patients suffering from pain.

---

[7] *See In Re Holiday CVS, LLC*, 77 Fed. Reg. 198 (2012) (Pharmacy license revoked where controlled substances were dispensed when physicians were red flagged, and patients went to multiple pharmacies.).

95. Dr. Morgan will be successful on the merits of this action, as Walgreens' action was unjustified.  Walgreens did not review a single patient medical record before summarily determining that Dr. Morgan's prescriptions did not serve a legitimate medical purpose. It did not speak with a single patient, nor isolate a single prescription as invalid.

96. Furthermore, many of the patients affected by Walgreens' decision have been patients of Walgreens for an extended period of time, ranging from a few years, to upwards of 20 years. During this time, these patients have been prescribed the same or substantially same medication, which was filled by the Walgreens pharmacist.  These patients will attest to the fact that they have been placed in this exact same predicament before, where a pharmacy stopped honoring their physician's prescriptions. They were then forced to find another provider, where they undergo the same medical management and receive the same prescriptions for the same medication which was filled at their same pharmacy location.

97. Walgreens' motivation for instituting blocks on physicians is likely an attempt to avoid the scrutiny it has undergone in the past with regulatory agencies due to no fault of Dr. Morgan, nor by any reputable medical practitioner following the same or similar rigorous screening and medical protocols employed by Dr. Morgan in his practice. Dr. Morgan and his patients are being smeared with the same broad brush of the unscrupulous practices of the past.

98. There is no harm or injury to Walgreens for removing its corporate block from Dr. Morgan's profile and permit the filling of his prescriptions issued for all controlled substances, especially when Walgreens is willing to honor the same prescription if issued by another provider.

99. Dr. Morgan, his clinic and his patients will suffer irreparable injury if this Court does not expeditiously act.  Walgreens made a "corporate decision" that impacts the health of over 100 current patients of Dr. Morgan.   These patients have chronic pain resulting from various

medical issues including but not limited to HIV/AIDS neuropathy, diabetic neuropathy, Crohn's Disease, various Cancers, quadriplegia, traumatic injuries, rheumatoid arthritis, limb deformities, spinal surgeries, radiculopathy/sciatica, plantar fascial fibromatosis, and amputations/phantom limb pain. A determination for continued treatment of chronic pain has already been made by other physicians. Therefore, the denial of necessary medical care, and specifically pain treatment for debilitating and severe medical conditions, is unjustified and will cause irreparable injury.

100.    Patients whose physician-patient relationship is instantly severed by Walgreens will face immediate and debilitating pain and or withdrawal symptoms due to abrupt discontinuation of their medication regimen. Lack of available providers in the local area will cause patients to go without treatment causing further injury and exacerbation of their fragile medical conditions and or require patients to seek urgent or emergency medical care.

101.    Walgreens seeks to deny treatment of patients treated by Dr. Morgan without justification, thereby casting each patient into the parade of horrible symptoms and a chaotic scramble to seek care with another medical provider or pharmacy.

102.    These patients will experience all of the pains and discomforts that come with denial of legitimate medical care.  Accordingly, it is in the public's interest to enter Plaintiff's relief.

103.    Blanket prohibition on filling valid and legitimate prescriptions for controlled substances issued by a pain management provider and family medicine doctor for over one full year will cause Dr. Morgan to suffer irreparable severe injury to his reputation, business, and professional employment status.  This will result in Dr. Morgan's inability to appropriately treat patients within his scope of practice, leading to the deterioration, decline and ultimate demise of his medical practice. This will also render him unemployable.

**WHEREFORE, Plaintiffs respectfully demand that:**

1.   Summons be issued to Defendant Walgreens;

2.   This Court enjoin Defendant Walgreens from instituting a corporate block on all of

     Dr. Morgan's prescriptions for controlled substances;

3.   This Court award Plaintiff all costs of this action including reasonable attorney's fee; and

4.   This Court award Plaintiff compensatory damages, any and all other relief to which Plaintiff

     may appear entitled.

                              Respectfully submitted,

                              /s/*Erica F. Chaplin*
                              Erica F. Chaplin, Esq.
                              FLBN: 0048023
                              Anderson & Welch, LLC
                              500 S. Australian Avenue, 6th Flr
                              West Palm Beach, FL 33401
                              Tel: 561-832-3386
                              Fax: 561-820-4867
                              Email: chaplinlaw@gmail.com
                              Email: andewelch@andersonandwelch.com
                              *Attorney for Plaintiff, Courtney R. Morgan, M.D.*

## VERIFICATION OF COURTNEY MORGAN, M.D.

I, Courtney Morgan, M.D. after being first duly sworn, state that I have read and reviewed the foregoing *Verified Complaint* and that the allegations contained therein are true and correct to the best of my knowledge and belief.

Dated: _____08/08/2024_____

*Courtney Ricardo Morgan*
_____
Courtney Morgan, MD.


State of Florida
~~XXXXXXXXXXXX~~
~~Broward County~~
County of Nassau

The foregoing *Verification* was acknowledged, sworn to and subscribed to before me by Courtney Morgan, M.D. on this the __8th__ day of ____August____, 2024 by means of online notarization.

Type of ID produced: DRIVER LICENSE

_____  Aleksandr Kozlov
Notary Public, Florida

Notary Expiration Date: __11/02/2027__

ALEKSANDR KOZLOV
Notary Public - State of Florida
Commission # HH 461002
Expires on November 2, 2027

Notarized remotely online using communication technology via Proof.

# TAB 4-1

# Exhibit List

| Exhibit | Description |
|---|---|
| 1 | Florida Department of Health Inspection Results<br>Inspection Date: May 31, 2024 |
| 2 | Letter from Walgreens: June 18, 2024 |
| 3 | Letter from Dr. Morgan: June 20, 2024 |
| 4 | Letter from Walgreens: June 25, 2024 |
| 5 | Letter from Dr. Morgan: July 4, 2024 |
| 6 | Letter from Walgreens: July 16, 2024 |
| 7 | Letter from Walgreens to Patients: June 19, 2024 |

**Exhibit 1**
Florida Department of Health Inspection Results
Inspection Date: May 31, 2024



# STATE OF FLORIDA
# DEPARTMENT OF HEALTH
# INVESTIGATIVE SERVICES
### INV440A - Pain Management Clinic



INSPECTION AUTHORITY – SECTIONS 458.3265, 459.0137, 893.09 AND CHAPTER 456, FLORIDA STATUTES

File # 2131
Insp # 5938

| NAME OF ESTABLISHMENT<br>HOP MEDICAL SERVICES PLLC | PERMIT NUMBER<br>1827 | | DATE OF INSPECTION<br>05/31/2024 |
|---|---|---|---|
| DOING BUSINESS AS | | | |
| STREET ADDRESS<br>2722 NE 1ST STREET SUITE 2 | | TELEPHONE #<br>305-773-3744 | EXT |
| CITY<br>POMPANO BEACH | COUNTY<br>BROWARD | | STATE/ZIP<br>FL/33062 |

### Additional Information

**Physician Tracking**

| | |
|---|---|
| | |

**AHCA Healthcare num**

| | |
|---|---|
| AHCA NUM   hq52 | |

### License Relations

**Designated Physician**

| | |
|---|---|
| MORGAN, COURTNEY RICARDO | License # 96210 |

**PMC Physician**

| | |
|---|---|
| MORGAN, COURTNEY RICARDO | License # 96210 |

**Pain Clinic Owner**

| | |
|---|---|
| MORGAN, COURTNEY RICARDO | License # 96210 |

## INV 440A - Pain Management Clinic

### Pain Management Clinic Requirements

| | |
|---|---|
| The pain-management clinic is registered with the department and the department has been notified of the designated physician. [458.3265(1)(a)2.; 459.0137(1)(a)2., F.S.] | Yes |
| The designated physician practices at the clinic location. [458.3265(1)(c); 459.0137(1)(c), F.S.] | Yes |
| The clinic, including its grounds, buildings, furniture, appliances and equipment is structurally sound, in good repair, clean, and free from health and safety hazards. [458.3265(3)(h)1.; 459.0137(3)(h)1., F.S.] | Yes |
| The clinic has evacuation procedures in the event of an emergency which includes provisions for the evacuation of disabled patients and employees, and has a written facility specific disaster plan which includes provisions for the protection of medical records and any controlled substances. [458.3265(3)(h)2.3.; 459.0137(3)(h)2., 3., F.S.] | Yes |
| The clinic is located and operated at a publicly accessible fixed location. [458.3265(3)(f)1.i.; 459.0137(3)(f)1., F.S.] | Yes |
| Sign containing the clinic name, hours of operations and a street address is posted where viewable by the public. [458.3265(3)(f)1.a.; 459.0137(3)(f)1.a., F.S.] | Yes |
| Clinic has a publicly listed telephone number and a dedicated phone number to send and receive faxes with a fax machine that is operational twenty-four hours per day. [458.3265(3)(f)1.b.; 459.0137(3)(f)1.b., F.S.] | Yes |
| Clinic has emergency lighting and communications; reception and waiting area; restroom; administrative area including room for storage of medical records, supplies and equipment; private patient examination room(s); and treatment room(s) if treatment is being provided to the patient. [458.3265(3)(f)1.c.-h.; 459.0137(3)(f)1. c.-h., F.S.] | Yes |
| A printed sign disclosing the name and contact information of the clinic's Designated Physician and the names of all physicians practicing in the clinic, is located in a conspicuous place in the waiting room viewable by the public. [458.3265(3)(f)1.i.; 459.0137(3)(f)1.i., F.S.] | Yes |
| Storage and handling of prescription drugs complies with Section 499.0121, Florida Statutes, Section 893.07, Florida Statutes, [458.3265(3)(f)1.j.; 459.0137(3)(f)1.j., F.S.] | N/A |
| The clinic maintains equipment and supplies to support infection prevention and control activities. The clinic identifies infection risks based on geographic location, community, and population served; the care, treatment and services it provides; and an analysis of its infection surveillance and control data. [458.3265(3)(g)1.;2. 1.-3.; 459.0137(3)(g)1.;2. 1.-3., F.S.] | Yes |

**INV440A - Pain Management Clinic**
HOP MEDICAL SERVICES PLLC

Insp # 5938

File # 2131

| | |
|---|---|
| The clinic maintains written infection prevention policy and procedure that address the following: prioritized risks; limiting unprotected exposure to pathogens; limiting the transmission of infections associated with procedures performed in the clinic; and limiting the transmission of infections associated with the clinic's use of medical equipment, devices and supplies. [458.3265(3)(g)3. a.-d.; 459.0137(3)(g)3. a.-d., F.S.] | Yes |
| Clinic has an ongoing quality assurance program that objectively and systematically monitors and evaluates quality and appropriateness of patient care, evaluates methods to improve patient care, identifies and corrects deficiencies within the facility, alerts the designated physician to identify and resolve recurring problems, and provides for opportunities to improve the facility's performance and to enhance and improve the quality of care provided to the public. [458.3265(3)(i).; 459.0137(3)(i), F.S.] | Yes |
| The designated physician has established a quality assurance program that includes the following components: the identification, investigation and analysis of the frequency and causes of adverse incidents to patients; the identification of trends or patterns of incidents; measures to correct, reduce, minimize, or eliminate the risk of adverse incidents to patients; the documentation of these functions; and periodic review at least quarterly of such information by the designated physician. [458.3265(3)(i)1.-4.; 459.0137(3)(i)1.-4., F.S.] | Yes |
| Designated physician reports all adverse incidents to the Department of Health as set forth in Section 458.351, Florida Statutes. [458.3265(3)(j)1.; 459.0137(3)(j) 1., F.S.]<br>  *No adverse incidents have occurred since last inspection.* | Yes |
| Designated physician reports quarterly to the Board of Medicine or Osteopathic Medicine in writing the number of new and repeat patients seen and treated at the clinic who are prescribed controlled substance medications for the treatment of chronic, non-malignant pain; the number of patients discharged due to drug abuse; the number of patients discharged due to drug diversion; and the number of patients treated at the pain clinic whose domicile is located somewhere other than in Florida. [458.3265(3)(j)2. a.-d.; 459.0137(3)(j)2. a.-d., F.S.] | Yes |
| Physician maintains control and security of prescription blanks and other methods for prescribing controlled substances and reports in writing any theft or loss of prescription blanks to the department within 24 hours. [458.3265(3)(d); 459.0137(3)(d), F.S.] | Yes |
| Physicians are in compliance with the requirements for counterfeit-resistant prescription blanks as defined in Section 893.065. [Sections 458.3265(3)(d); 459.0137(3)(d), F.S.] | Yes |
| Dispensing is being performed in compliance with 465.0276, F.S. Only physicians licensed under chapter 458 and 459 are dispensing any medication. [Sections 458.3265(3)(d) and 459.0137(3)(b), F.S.] | N/A |
| Controlled substance biennial inventory conducted. [893.07(1)(a), F.S.] | N/A |
| There is no indication physicians have advertised the use, sale, or dispensing of any controlled substance appearing on any schedule in Chapter 893. [Section 458.331(1)(rr) and 459.015(1)(tt), F.S.] | Yes |
| Effective January 1, 2012 all physicians have designated himself or herself as a controlled substance prescribing practitioner on the physician's practitioner profile. [456.44(2)(a), F.S.] | Yes |
| All physicians practicing in this clinic have advised the Board, in writing, within 10 calendar days of beginning or ending his or her practice at this pain-management clinic. [458.3265(3)(e); 459.0137(3)(e), F.S.] | Yes |
| All physicians practicing in this clinic meet the training requirements for physicians practicing in pain management clinics [64B8-9.0131; 64B15-14.0051, F.A.C.] | Yes |
| At least one employee on premises is certified in basic life support. [458.3265(3)(h)4.; 459.0137(3)(h)4., F.S.] | Yes |

**Remarks:**

I have read and have had this inspection report and the violations if any explained, and the information given is true and correct to the best of my knowledge. This inspection is not deemed complete until patient records are reviewed and deemed in compliance with section 458.3265, 459.0137, and chapter 456, Florida Statutes. I understand that any action taken to correct violations shall be documented in writing by the owner or designated physician of the pain clinic and will be verified by follow up visits by the department personnel. [458.3265(3)(b), 459.0137(3)(b), F.S.]

Investigator/Sr. Pharmacist Signature:

CASTROVINCI, STACEY

Representative:

Courtney Morgan MD

Date:5/31/2024

Date:5/31/2024



# STATE OF FLORIDA
## DEPARTMENT OF HEALTH
## INVESTIGATIVE SERVICES
### INV440B - Pain Management Clinic



INSPECTION AUTHORITY â€" SECTIONS 458.3265, 459.0137, 893.09 AND CHAPTER 456, FLORIDA STATUTES

File # 2131
Insp # 5938

| NAME OF ESTABLISHMENT<br>HOP MEDICAL SERVICES PLLC | PERMIT NUMBER<br>1827 | | DATE OF INSPECTION<br>05/31/2024 |
|---|---|---|---|
| DOING BUSINESS AS | | | |
| STREET ADDRESS<br>2722 NE 1ST STREET SUITE 2 | | TELEPHONE #<br>305-773-3744 | EXT |
| CITY<br>POMPANO BEACH | COUNTY<br>BROWARD | | STATE/ZIP<br>FL/33062 |

**Additional Information**

**Physician Tracking**

| | |
|---|---|
| | |

**AHCA Healthcare num**

| AHCA NUM   hq52 | |
|---|---|

**License Relations**

**Designated Physician**

| MORGAN, COURTNEY RICARDO | License # 96210 |
|---|---|

**PMC Physician**

| MORGAN, COURTNEY RICARDO | License # 96210 |
|---|---|

**Pain Clinic Owner**

| MORGAN, COURTNEY RICARDO | License # 96210 |
|---|---|

### INV 440B - Pain Management Clinic

**Pain Management Clinic Requirement**

| Complete physical exam is performed by a physician, physician's assistant or advanced registered nurse practitioner on the same day that the physician prescribes a controlled substance. [458.3265(3)(c); 459.0137(3)(c), F.S.] | Yes |
|---|---|

**Maintains accurate, current and complete records that are accessible and readily available for review and comply with the requirements of 456.44(3)(f), the applicable practice act, and applicable board rule. The medical records must include but are not limited to:**

| Complete medical history and physician examination, including history of drug abuse and dependence. [456.44(3)(f)1, F.S.] | Yes |
|---|---|
| Diagnostic, therapeutic, and laboratory results. [456.44(3)(f)2, F.S.] | Yes |
| Evaluations and consultations. [456.44(3)(f)3, F.S.] | Yes |
| Treatment objectives. [456.44(3)(f)4, F.S.] | Yes |
| Discussion of risks and benefits. [456.44(3)(f)5, F.S.] | Yes |
| Treatments. [456.44(3)(f)6, F.S.] | Yes |
| Medications, including date, type, dosage, and quantity prescribed. [456.44(3)(f)7, F.S.] | Yes |
| Instructions and agreements. [456.44(3)(f)8, F.S.] | Yes |
| Periodic reviews. [456.44(3)(f)9, F.S.] | Yes |
| Results of any drug testing. [456.44(3)(f)10, F.S.] | Yes |
| A photocopy of the patient's government-issued photo identification. [456.44(3)(f)11, F.S.] | Yes |
| Duplicate of all written controlled substance prescriptions. [456.44(3)(f)12, F.S.] | Yes |
| The physician's full name presented in a legible manner. [456.44(3)(f)13, F.S.] | Yes |

**Pain Management Clinic Requirements**

**INV440B - Pain Management Clinic**

Insp # 5938

**HOP MEDICAL SERVICES PLLC**

File # 2131

| | |
|---|---|
| Controlled substance prescriptions have the quantity of the drug prescribed in both textual and numerical format and are dated with the abbreviated month written out on the face of the prescription. [456.42(1), F.S.] | Yes |
| A written individualized treatment plan has been developed for each patient with objectives used to determine treatment success. The physician adjusts drug therapy to the individual needs of each patient. Other treatment modalities are considered. Interdisciplinary nature of treatment plan is documented. [456.44(3)(b)] | Yes |
| The physician is documenting in the patient's record the reason for prescribing more than 72-hour supply of controlled substances for the treatment of chronic non-malignant pain. [458.3265(3) (c); 459.0137(3)(c), F.S.] | Yes |
| Patients are seen by the physician at regular intervals, not to exceed 3 months, to assess the efficacy of treatment. Continuation or modification of therapy depends on the physician's evaluation of the patient's progress. [456.44(3)(d) F.S.] | Yes |
| Patients are referred as necessary for additional evaluation and treatment in order to achieve treatment objectives with special attention given to those patients at risk for misuse of medications and those in living arrangements that pose a risk for medication misuse or diversion. [456.44(3)(e), F.S.] | Yes |
| Patients with signs or symptoms of substance abuse are immediately referred to a board certified pain management physician, addiction medicine specialist, or a mental health addiction facility unless the physician is board-certified or board-eligible in pain management. [456.44(3)(g), F.S.] | Yes |
| Clear and complete medical justification for continued treatment with controlled substances and steps to ensure medically appropriate use of controlled substances is documented clearly and completely when continuing controlled substance prescribing while waiting consultant's report on patients showing signs or symptoms of substance abuse. [456.44(3)(g), F.S.] | Yes |
| Physician is incorporating consultant's recommendation for continuing, modifying, or discontinuing controlled substance therapy into the treatment plan. [456.44(3)(g), F.S.] | Yes |

**The physician has discussed the risks and benefits of the use of controlled substances and is using a written controlled substance agreement between the patient outlining the patient's responsibilities including, but not limited to:**

| | |
|---|---|
| Number and frequency of controlled substance prescriptions and refills. [456.44(3)(c)1, F.S.] | Yes |
| Patient compliance and reasons for which drug therapy may be discontinued. [456.44(3)(c)2, F.S.] | Yes |
| Agreement that controlled substances for the treatment of chronic nonmalignant pain shall be prescribed by a single treating physician unless otherwise authorized by the treating physician and documented in the medical record. [456.44(3)(c)3, F.S.] | Yes |

**Remarks:**

I have read and have had this inspection report and the violations if any explained, and the information given is true and correct to the best of my knowledge. This inspection is not deemed complete until patient records are reviewed and deemed in compliance with section 458.3265, 459.0137, and chapter 456, Florida Statutes. I understand that any action taken to correct violations shall be documented in writing by the owner or designated physician of the pain clinic and will be verified by follow up visits by the department personnel. [458.3265(3)(b), 459.0137(3)(b), F.S.]

Investigator/Sr. Pharmacist Signature:

CASTROVINCI, STACEY

Date:5/31/2024

Representative:

Courtney Morgan MD

Date:5/31/2024

**Exhibit 2**
Letter from Walgreens: June 18, 2024



Walgreen Co.
102 Wilmot Rd. MS#2280
Deerfield, IL 60015
Email: PrescriberEvaluation@walgreens.com
Phone: 866-412-1790 | Fax: 224-516-6011
Walgreens.com

June 18th, 2024

COURTNEY MORGAN, MD
DRIVE THRU DOC
2722 NE 1ST ST
STE 2
POMPANO BEACH, FL 33062

Dear Courtney Morgan, MD,

Walgreens recently asked you to provide information about your prescribing practices.

Based on the failure to respond, Walgreens will discontinue dispensing controlled substances prescribed by you as of August 16th, 2024. This decision does not affect Walgreens dispensing of non-controlled substance prescriptions written by you.  Please do not send electronic prescriptions for controlled substances to Walgreens.  We will notify your patients with prescriptions on file with us that Walgreens will no longer fill controlled substances prescribed by you.  So as not to impact patient care, please ensure your patients are aware that Walgreens will no longer fill controlled substance prescriptions prescribed by you.

Please do not contact team members at Walgreens pharmacies regarding this issue.  Team members at your local pharmacy had no role in making this decision and cannot make exceptions to this decision.  If you do need to speak to someone, contact Walgreens at 1-866-412-1790.

If your prescribing changes materially after the period of at least one year from block effective date, contact us at PrescriberEvaluation@walgreens.com to request a review.

Sincerely,

Walgreen Co.

Member of Walgreens Boots Alliance

**Exhibit 3**
Letter from Dr. Morgan: June 20, 2024

COURTNEY R. MORGAN, M.D.
2722 North East 1ˢᵗ Street, Suite 2
Pompano Beach, FL 33062
Tel: 954-247-9324 • Fax: 844-840-8030
Email: hopmedicalservicesfl@gmail.com

**Hop Medical**
SERVICES

June 20, 2024

*Sent via email and fax to:*
*PrescriberEvaluation@walgreens.com*
*224-516-6011*

Walgreens Co.
102 Wilmot Road, MS #2280
Deerfield, IL 60015

To Whom This May Concern:

On June 20, 2024, this office received the attached letter stating that:
   (1) Walgreens asked for information about our prescribing practices
   (2) We did not respond to the request
   (3) Walgreens will discontinue dispensing controlled substances prescribed by me,
        Courtney Morgan, M.D. as of August 16, 2024.

The phone number provided was called, and we spoke with Representative Latoya (Rep. #5511549). **She was advised that our office never received any communication from Walgreens requesting any information.**  The attached letter is our first and only communication from Walgreens.

Also of note, the letter received was addressed to _Drive Thru Doc,_ a clinic that does not accept patients with medical issues that are treated with controlled substances.  However, our EMR does have a glitch that sometimes redirects the prescription send-source to Drive Thru Doc.  This is a computer / EMR error.

The clinic under which controlled substances are prescribed by me is Hop Medical Services, PLLC. Hop Medical Services is a Pain Management Clinic, with license number PMC 1827.  This office was opened at the above location around June 2020.  This medical facility has been in good standing with the Florida Department of Health (DOH), with excellent comments from the DOH auditors during their random annual audits.  In fact, last year the auditor requested permission to photocopy some our office materials, with the intent to used them in a "gold standard" demonstration for other pain management facilities. We once again, passed the annual review with praises on May 31, 2024.

Hop Medical Services, PLLC has never received any deficiency notices by any agency.  My DEA and medical licenses are active and unrestricted.  Hence, the communication received was shocking not only for the foregoing reasons, but also because our office has maintained a great working relationship with Walgreens pharmacists, with open communication regarding our mutual patients and their diagnoses, treatments and plan of care.

Page **1** of **2**

COURTNEY R. MORGAN, M.D.
2722 North East 1st Street, Suite 2
Pompano Beach, FL 33062
Tel: 954-247-9324 • Fax: 844-840-8030
Email: hopmedicalservicesfl@gmail.com

Pharmacists and I have openly discussed medication step downs and modifications, or the need for maintenance, and the patient's stability.  They are aware of other providers who are part of the patients' medical team, such as infectious disease specialists, orthopedists, cardiologists, podiatrists, surgeons, oncologists, etcetera.

While Hop Medical Services is a Pain Management Clinic, some primary care services are provided to patients.  Therefore, controlled substances other than pain management medication is prescribed with continuity of care, such as seizure medication, hormone medication, HIV medication, etcetera.

Walgreens Company is granted licensures by pharmacy boards to dispense medications in accordance with the state laws and administrative rules.  The general premise is that pharmacists are to fill prescriptions written by a licensed physician provided the prescription is valid with complete information and it is issued for a legitimate medical purpose. If there are any questions regarding a particular prescription, the pharmacist may then contact the physician for clarification and verification. The letter received does not follow the foregoing general rules.

Refusal to honor all controlled substance prescriptions issued by any single physician violates the foregoing principles and results in irreparable harm to the physician.  Patients who are forced to find another physician to undertake continuity of the care will foreseeably receive the same medical management by another physician.  Therefore, refusing to honor all controlled substance prescriptions issued by a physician does not change the patient's management, especially if the patient is under therapeutic dosage of medication and is clinically stable.

Please contact me at your earliest convenience to address this matter.

Sincerely,

Dr. Courtney Morgan

**Exhibit 4**
Letter from Walgreens: June 25, 2024

COURTNEY MORGAN, MD



Walgreen Co.
102 Wilmot Rd. MS#2280
Deerfield, IL 60015
Email: PrescriberEvaluation@walgreens.com
Fax: 224-516-6011
Walgreens.com

June 25th, 2024

COURTNEY MORGAN, MD
HOP MEDICAL SERVICES
2722 NORTH EAST 1ST ST
STE 2
POMPANO BEACH, FL 33062

Dear Courtney Morgan, MD,

As you are aware, our nation faces an epidemic of prescription misuse, addiction, and diversion. While this issue concerns practicing providers who prescribe controlled substances, pharmacists have a corresponding responsibility to dispense controlled substances only in situations where there is a legitimate medical need. The federal regulation is as follows:

> "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances." 21 C.F.R. § 1306.04.

To ensure our pharmacists are complying with their obligations under federal law, we would like to learn more about your practice and prescribing patterns through your written answers to the questions in this letter. In addition to answering these questions, you may include other information if you so choose. Once we receive this information, we will decide whether to continue dispensing controlled substances that you have prescribed.

If you are unable or unwilling to provide this information by **July 9th, 2024** we may discontinue dispensing controlled substances that you have prescribed **as of August 16th 2024**. Please complete the attached questionnaire and fax to (224) 516-6011 or email your responses to PrescriberEvaluation@walgreens.com.

Thank you, in advance, for working with Walgreens to improve the safety of our patients and community by reducing prescription drug misuse, abuse, and diversion.

Sincerely,


Walgreen Co.


Member of Walgreens Boots Alliance

**Exhibit 5**
Letter from Dr. Morgan: July 4, 2024

COURTNEY R. MORGAN, M.D.
2722 North East 1st Street, Suite 2
Pompano Beach, FL 33062
Tel: 954-247-9324 • Fax: 844-840-8030
Email: hopmedicalservicesfl@gmail.com

July 4, 2024

*Sent via email and fax to:*
*PrescriberEvaluation@walgreens.com*
*224-516-6011*

Walgreens Co.
102 Wilmot Road, MS #2280
Deerfield, IL 60015

To Whom This May Concern:

Your response to my June 20, 2024, correspondence, was received, along with the attached *Due Diligence Request for Information*.

Attached is my response to your *Due Diligence Request for Information*, with attached exhibits.

**Please confirm receipt.**

Also, per your request, my preferred contact information is as follows:

   **Preferred Primary Address**:  2722 NE 1st Street, Suite 2, Pompano Beach, FL 33062
   **Secondary Address**:  ██████████████████████

   **Primary Email Address**:  ████████████
   **Secondary Email Address**:  hopmedicalservices@gmail.com

      **Fax**:  844-840-8030

I can be reached directly at ████████, or in the alternative at ████████.  If there are any questions, please do not hesitate to contact at your earliest convenience.

Sincerely,

Dr. Courtney Morgan

087

**Exhibit 6**
Letter from Walgreens: July 16, 2024



Walgreen Co.
106 Wilmot Rd. MS#2280
Deerfield, IL 60015
Email: PrescriberEvaluation@walgreens.com
Phone: 866-412-1790 | Fax: 224-516-6011
Walgreens.com

July 16th, 2024

COURTNEY MORGAN, MD
HOP MEDICAL SERVICES
2722 NORTH EAST 1ST ST
STE 2
POMPANO BEACH, FL 33062

Dear Courtney Morgan, MD,

Thank you for your submission. We have reviewed the materials you provided. At this time, Walgreens has decided not to deviate from the dispensing decision as outlined in our letter dated June 18th, 2024. This decision does not affect the dispensing of non-controlled prescriptions to your patients.

If your prescribing changes materially, please contact us after August 16th, 2025 at PrescriberEvaluation@walgreens.com to request a review.

Sincerely,

Walgreen Co.

Member of Walgreens Boots Alliance

**Exhibit 7**
Letter from Walgreens to Patients: June 19, 2024

*Walgreens*

Walgreen Co.
102 Wilmot Rd.
Deerfield, IL 60015
1-800-WALGREENS
1-800-925-4733
Walgreens.com

June 19, 2024

Dear Patient,

Based on an internal review, Walgreens has decided to no longer dispense controlled substance prescriptions from your prescriber COURTNEY MORGAN, MD.

This decision is based on the relationship between Walgreens and your prescriber. Local pharmacy team members were not involved in the decision and cannot make exceptions. We value you as a patient and are invested in your safety and wellness. This in no way impacts your relationship with Walgreens, nor will it impact your health care plan from other prescribers. **You will continue to be able to fill non-controlled substances from your prescriber at any Walgreens location**.

Upon patient request, active controlled substance prescriptions with refills remaining may be transferred to non-Walgreens pharmacies subject to federal and state regulatory requirements. Please consult with your prescriber to determine available treatment options.

We apologize for any inconvenience.

Sincerely,

Walgreen Co.

Member of Walgreens Boots Alliance

091

TAB 10

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

| | | |
|---|---|---|
| **Courtney Morgan, M.D.,** | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Case No.: 0:24cv61442 |
| **Walgreen Co.,** | § | |
| *Defendant.* / | | JURY |

**EXPEDITED MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**
*Memorandum of Law Incorporated*

   **COMES NOW**, Plaintiff, COURTNEY MORGAN, M.D. ("Dr. Morgan"), by and through undersigned counsel, pursuant to Fed.R.Civ.P., Rule 65, and files this *Expedited Motion for a Temporary Restraining Order and Preliminary Injunction* and moves this Court to issue a *Temporary Restraining Order* against WALGREEN, CO., ("Walgreens"), on the bases established here, and states the following in the support thereof:

**RELEVANT PROCEDURAL BACKGROUND**

1. On August 7, 2024, Plaintiff filed original *Verified Complaint* with a claim against Defendant for Tortious Interference with Business and also seeking Injunctive Relief.  {DE 1}

2. On August 8, 2024, Plaintiff filed his *First Amended Verified Complaint* against Defendant Walgreens with the same claim and request for Injunctive Relief.  [DE 4]

**BACKGROUND AND RELIEF REQUESTED**

3. Defendant Walgreens has notified Plaintiff, Dr. Morgan, that effective August 16, 2024, it will block prescriptions for all controlled substances issued by Dr. Morgan.   [DE 4, ¶26] Defendant's action is made without justification and will result in irreparable economic and reputational harm to Dr. Morgan and his clinic. [Id. ¶50-64] Moreover, Dr. Morgan's patient

will likely be harmed and experience uncontrollable pain and or withdrawal symptoms due to abrupt discontinuation of their needed medical treatment. [Id. ¶40-49]

4. Accordingly, Plaintiff now files this *Expedited Motion for a Temporary Restraining Order and Preliminary Injunction*, seeking immediate action from the Court to prevent irreparable harm to the Plaintiff and in the interest of the public. [Id.]

5. Plaintiff requests that this Court decide upon this motion and issue a *Temporary Restraining Order* prior to August 15, 2024, prohibiting Defendant Walgreens from effectuating its block on Dr. Morgan's prescribing, thereby permitting needed patient continuity of care, during the pendency *Plaintiff's Motion for a Preliminary Injunction*.

6. **This motion will not be moot within 7 (seven) days; however, Dr. Morgan will begin to incur damages, and his patients will likely begin to experience the harms described.**

## PARTIES

7. Courtney Morgan, M.D. [hereinafter Dr. Morgan or Plaintiff] is a resident of the State of Florida, domiciled in Palm Beach County, Florida.  At all times relevant, Dr. Morgan is and has been authorized and licensed, without limitation to a) transact business, b) provide medical services, and c) prescribe medications including controlled substances within the State of Florida, as a licensed medical doctor. [Id. ¶3]

8. At all times relevant, Walgreen Co., [hereinafter Walgreens] is and has been an Illinois corporation with principal place of business located in Deerfield, Illinois.  Walgreens has pharmacies throughout the nation, including the state of Florida and Broward County. [Id. ¶4]

## SUMMARY

9. Dr. Morgan has been notified by Walgreens that effective August 16, 2024, it will not fill prescriptions for controlled substances issued by him. (Exh. 1, Letter to Plaintiff, June 18,

2024; Exh. 2, Letter to Plaintiff, July 16, 2024).  No explanation accompanied these notices, nor at any point was an explanation given by Walgreens to Dr. Morgan for its decision. [Id.] This block was a corporate decision, as indicated in the Walgreens' letter dated June 18, 2024, which stated, "*Team members in your local pharmacy had no role in making this decision and cannot make exceptions to this decision*." [Id.] This block was instituted without justification and in violation of Florida's Administrative Code which governs the practice of pharmacy. [Id.; *see also* Fl.Admin.Code 64B16-27.831] Dr. Morgan has no restrictions or any limitations from federal or state agencies or licensing authorities which would necessitate such action. [DE 4, ¶10] Dr. Morgan and his staff have not received any complaints from local Walgreens pharmacists regarding Dr Morgan's prescribing or his medical practice.  [Id. ¶35] While no reason has been provided for this action, Walgreens stated that if Dr. Morgan's "prescribing changes materially" *after August 16, 2025,* he could then ask for review and essentially request Walgreens to resume filling his prescriptions for controlled substances. [Exh. 2]

Over 100 of Dr. Morgan's patients use Walgreens to fill their medications.  [Id. ¶49] Walgreen's unilateral prohibition creates tremendous problems for these patients who will be forced to try to find another physician or another pharmacy. [Id. ¶40] These patients will face problems associated with long wait times for a doctor's appointment, being accused of doctor-shopping or pharmacy-shopping, and not being accepted into a clinic or pharmacy. [Id. ¶41] The patients will likely be left in great distress after their medications are depleted, which will create an urgent or emergency situation for the patient, whose health will be put at risk due to the actions of Walgreens. [Id.  ¶42] Furthermore, this block will (i) force current patients to leave Dr. Morgan's clinic, who would not otherwise leave; (ii) prohibit the development of new patient relationships with prospective patients who are also patients of Walgreens; and (iii) interfere with

the employability of Dr. Morgan as a family medicine/primary care doctor, since patients would not be able to receive adequate care if they cannot fill Dr. Morgan's prescriptions for controlled substances at one of the nation's largest retail pharmacies.  [Id. ¶40-54]

The Plaintiff and his patients have a long-standing relationship in which Walgreens is arbitrarily and capriciously interfering. [Id. ¶40] The Plaintiff seeks the Court's action to maintain the *status quo*. Previous attempts to discuss this matter of the impending restriction have been fruitless, as the only Walgreens' agent reached at the number provided advised that no substantive information whatsoever could be given, beyond verifying that the communication received by Dr. Morgan was an authentic communication from Walgreens. [Id. ¶27] Therefore, pursuant to Fed.R.Civ.P., Rule 65, Plaintiff requests this Court restrain Walgreens from blocking Dr. Morgan's prescriptions for controlled substances and temporarily enjoin Walgreens from this action until the Court hears evidence to support a permanent injunction on Walgreens actions.

## <u>RELEVANT FACTS GIVING RISE TO THIS EXPEDITED MOTION FOR A TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION</u>

Dr. Morgan has been a licensed practitioner within the State of Florida since 2004, as a resident, with his full unrestricted physician's medical license issued in 2006. [Id. ¶5] Dr. Morgan trained in the Family Medicine & Community Health residency program at the University of Miami/Jackson Memorial Medical Center. [Id. ¶7] This training encompassed extensive exposure to pain management, which was essential for patients with various comorbidities, such as sickle cell crises, traumatic injuries, cancer, neuropathies, HIV/AIDS, uncontrolled diabetic neuropathies, peripheral vascular diseases, back and joint pain, migraines, fibromyalgia, post-surgical pain, and various neurological conditions. [Id.] Dr. Morgan has completed a total of 171 credits in continuing education courses related to prescribing controlled substances within the past 18 months, 98 of which are directly related to chronic pain management.  [Id. ¶8]

4

In 2006, Dr. Morgan opened his Family Medicine Clinic, Hop Medical Service, PLLC (Hop Medical), for which he has been the sole owner and operator. [Id. ¶6] In 2020, Hop Medical obtained a pain management clinic license. [Id. ¶9] Dr. Morgan has been the sole practitioner, Designated Doctor, and Medical Director for his pain management clinic. [Id.] Dr. Morgan is qualified to own, operate, and prescribe controlled substances in a pain management clinic, pursuant to Florida's laws and administrative rules. Dr. Morgan's Florida medical license and DEA license for prescribing of controlled substances are both current, unrestricted, and active. [Id. ¶10]

**Patient Population & Medical Practice**

All Hop Medical patients are treated for chronic (non-acute) pain. [Id. ¶11] In certain situations, a few patients are also treated for primary care issues. [Id.] Dr. Morgan provides primary care services temporarily if a patient does not have a PCP or the PCP is unreachable or appointments are too far out for urgent situations (i.e., uncontrolled hypertension, exacerbated chronic obstructive pulmonary disease (COPD), congestive heart failure (CHF), etc.). [Id.]

The clinic's patients are generally referred from other health care providers (PCPs, specialists, hospitalists, etc.) who recommend continued management/continuity of care for chronic pain for patients with multiple co-morbidities, complex medical problems, failed surgeries and or failed interventional treatments. [Id. ¶11] Dr. Morgan's patients are often treated for chronic pain related to long-term medical issues, such as various cancers (prostate, breast, colon, colorectal, metastatic and stage 4 in nature), sickle cell disease, HIV neuropathy, diabetic neuropathy, vertebral degenerative disease (with bulging/herniated discs, fusion, compression, bone spurs, facet narrowing, central canal narrowing), amputees, rheumatoid arthritis, arterial vasculitis with peripheral vascular disease of lower extremities, traumatic debilitations (resulting from gunshot wound injuries, crushing from heavy objects in accidents, accidental falls (from

roof/building/ladder/bridge), motor vehicle accidents, sport injuries, and bone fractures). [Id. ¶13] Some patients have also been diagnosed with a terminal illness and are treated for chronic pain within the scope of palliative medicine. [Id.]

All patients who have been accepted into Hop Medical for the management of chronic pain have either received and or are receiving other treatment modalities for interventional pain management. [Id. ¶14] This would include but is limited to one or a combination of the following: injections, surgeries, ablations, hip/knee replacement, discectomy, acupuncture, chiropractic care, physical therapy, home care treatments, over the counter medications and topical creams. [Id.]

**Practice Procedures and Patient Care**

Prior to the scheduling of a new patient appointment with Dr. Morgan, patient screening is conducted with a review of medical and non-medical information, consisting of criminal background research, relevant medical records and preliminary intake forms. [Id. ¶15] These materials are reviewed by the Compliance Officer for non-medical exclusionary purposes (i.e., certain drug related criminal history, unexplained inconsistencies in medical records, etc.). [Id.]

At the first appointment, additional patient information and records are collected, along with a comprehensive questionnaire regarding past medical, surgical and family history, previous providers, failed conservative treatments and medication, factors that cause, aggravate or lessen pain, and the effects of chronic pain mentally and socially on the patient. [Id. ¶16] The patient's controlled substance prescription history is also retrieved from E-Forcse[1] [Id.] All of the foregoing is reviewed prior to the patient being seen by Dr. Morgan. [Id.]

When presenting to Dr. Morgan, the patient undergoes a physical examination conducted only by Dr. Morgan, who also obtains a full history of the patient. [Id. ¶17] Additional diagnostic

---

[1] E-Forces is the state-maintained database of prescribed controlled substances.

studies or other tests may be ordered by Dr. Morgan. [Id.] Using this information, a treatment plan is formulated that may include, rehabilitative therapies, laboratory testing, medication management, specialist referrals, and considerations of non-opioid alternatives. [Id.] Any decision to prescribe controlled substances as part of the treatment plan is based on many different aforementioned information and factors. [Id. ¶18] Treatment plans are generally created with the goal of controlling patient's pain, where the benefit outweighs the risks. [Id.] Patient treatment goals are set, monitored, assessed and reassessed. [Id. ¶17] The patient is educated and counselled on the risks and benefits of the use of opioids and controlled substances and the options for non-opioid alternatives. Patient then has follow-up appointments no greater than 28 days out. [Id. ¶19]

**Safeguards Against Diversion and Misuse of Medications**

Dr. Morgan has established a rigorous compliance policy, which also includes safeguards against diversion and misuse of controlled substances.   [DE 4, ¶21]

1. Initial review for criminal history and consistency in medical records is conducted by the Compliance Officer for the purpose determining legitimacy of the patient.  [Id.]

2. Patients sign a treatment agreement. The clinic's policies are explained, so patients understand they are expected to comply with the doctor's orders, submit to random drug tests, not engage in doctor shopping, keep their medications secure, attend appointments, provide truthful information and disclose any new arrests that are drug related.  [Id.]

3. There is a strict no refill policy.  Every patient must attend to their appointment at least every 28 days.  Stolen, lost, or misplaced medications are not resent to the pharmacy. [Id.]

4. Retrieval of the E-Forcse and Random Drug Tests are used to determine whether the patient is taking the medications prescribed to them, whether the patient is taking illicit drugs, whether the patient has been or is doctor shopping.  Patients are subjected to random drug tests no less than once every three months, even if the patient is assessed as low or moderate risk for misuse. Failure to submit to a RDT, adulteration of a specimen or testing positive for illicit drugs or medications not prescribed may be grounds for immediate discharge from the clinic. [Id.]

5. Chart reviews are performed to detect any irregularities, medical errors or potentially dangerous drug interactions and to address issues with any new or follow-up patient. [Id.]

6. Open communication with pharmacists is used for patient care and detection of any suspected diversion or misuse of medication or doctor/pharmacy shopping. [Id.]

If a patient fails one of Dr. Morgan's routine compliance surveillance tools, then a decision is made regarding appropriate measures for that individual patient. [Id. ¶22] These measures may include counselling, treatment with other medications, discharging the patient from the practice and or referral to appropriate providers for additional care, counseling, or treatment. [Id.]

**Florida Department of Health's Random Annual Inspection & Audit Results**

Florida Department of Health (DOH) conducts mandatory annual random inspections and audits of all licensed PMCs, which consist of a comprehensive review of the medical practice, including in part, visual inspection of the entire facility, current licensures, certificates and permits, daily patient panels, office policies, staff meeting minutes, and random review of medical charts. Hop Medical has passed every annual DOH inspection and audit and has literally been used as a gold standard for other clinics by the DOH inspector. [Id. ¶23-24] **The most recent FL Department of Health's audit of medical records on May 31, 2024, included summarized findings, in part, consisting of: complete medical history and physical examination, documented reason for prescribing controlled substances for chronic pain, clear and individualized treatment plan developed, adjustment of drug therapy to the individual needs of each patient, and "complete medical justification for continued treatment with controlled substances."** (Id.; *see also* Exh. 3, FL DOH May 31, 2024, Inspection Results)

Dr. Morgan has never had any patient overdose on the controlled substances that he has prescribed in his over twenty (20) years of practice. [Id. ¶25] He has maintained a strict medical practice with prescribing standards in compliance with all state and federal regulatory agencies, rarely even implementing telehealth services during the pandemic. [Id.]

**Communications with Walgreen Co.**

On June 20, 2024, Dr. Morgan received his first letter from Walgreens via FedEx stating that information about his prescribing practices had been requested, and based on a failure to respond, Walgreens would discontinue dispensing controlled substances prescribed by him starting August 16, 2024.  [Id. ¶26; *see also* Exh. 1)  The letter further stated that: "**Team members at your local pharmacy had no role in making this decision and cannot make exceptions to this decision.**" [Id.]  Dr. Morgan immediately contacted Walgreens to clear up the miscommunication, and thereafter received a general questionnaire about Dr. Morgan and his medical practice.  [Id. ¶27-28] On July 4, 2024, Dr. Morgan provided a timely 56-page response which included in part the same information contained in this motion, as well as exhibits. [Id. ¶29] On or about July 16, 2024, Walgreens sent a letter to Dr. Morgan stating the following: "We have reviewed the materials you provided.  [Id. ¶30] At this time, Walgreens has decided not to deviate from the dispensing decision as outlined in our letter dated June 18, 2024." [Id. ¶30; *see* Exh. 2) Therefore, effective August 16, 2024, Dr. Morgan is **blocked** in the Walgreens electronic central pharmacy system, thereby preventing any Walgreens pharmacists from being able to exercise independent judgment in filling his valid prescriptions for controlled substances issued for legitimate medical purposes. [Id. ¶30-31]

No reason was given for Walgreens' decision. [Id. ¶35]  This decision violates the very principles of the practice of pharmacy and the care required for patients prescribed controlled substances. [Id. ¶61]  The Fl. Admin. Code 64B16-27.831 states:

> **"The Board of Pharmacy recognizes that it is important for the patients of the State of Florida to be able to fill valid prescriptions for controlled substances. In filling these prescriptions, the Board does not expect pharmacists to take any specific action beyond exercising sound professional judgment."** [Id. ¶32]

Pharmacists are required to fill valid prescriptions. The pharmacist's obligation is to exercise

sound professional judgment in determining the validity of a prescription. [Id. ¶33] **"A prescription is valid when it is based on a practitioner-patient relationship and when it has been issued for a legitimate medical purpose."** [Id. ¶33]   "Every patient's situation is unique and prescriptions for controlled substances shall be reviewed with each patient's unique situation in mind." [Id. ¶34].  **"When validating a prescription, neither a person nor a licensee shall interfere with the exercise of the pharmacist's independent professional judgment."** [Id.] Defendant Walgreens has usurped their own pharmacist's exercise of independent professional judgment in violation of Florida's Board of Pharmacy Rules.  [Id. ¶39]

Neither in conversation, nor in written communication, did Walgreens ever question Dr. Morgan's medical judgment, notify or inform him of any specific patient prescription being questioned or suspected of not being medically necessary, illegitimate, or otherwise problematic. [Id. ¶35] Moreover, at no time has any individual pharmacist employed by or affiliated with Defendant Walgreens contacted, notified, or otherwise questioned Dr. Morgan regarding the medical necessity and appropriateness of any issued prescriptions for controlled substances.  [Id.] None of Dr. Morgan's prescriptions have been rejected by any Walgreens pharmacists as illegitimate, medically unnecessary, nor otherwise questioned. [Id.] To the best of Dr. Morgan's knowledge, every prescription sent to Walgreens has been filled by Walgreens pharmacists. [Id.] The prescriptions issued by Dr. Morgan are supported by medical necessity and fully adhere to all applicable state and federal legal guidelines and regulations regarding the prescribing of controlled substances, *as indicated in the Florida Department of Health's May 31, 2024, Inspection Report* [See Exh. 3]; and, Walgreens has produced nothing to suggest otherwise.  [DE 4, ¶36]

On or about June 19, 2024, Walgreens sent a letter to all of Dr. Morgan's patients which stated that, "Based on an internal review, Walgreens has decided to no longer dispense controlled

substance prescriptions from your prescriber Courtney Morgan, M.D." [Id. ¶50; see Exh. 4, Letter to Patients dated July 19, 2024[2]]  The contents of this letter necessarily imply a judgment or conclusion of Dr. Morgan prescribing controlled substances in a manner that is illegitimate, improper, illegal, or otherwise not in keeping with standards of care, which is damaging to his professional reputation, medical practice and standing in the community. [Id.]

Dr. Morgan currently treats over 100 patients who regularly fill their medications at Walgreens locations. [Id. ¶49] Dr. Morgan also accepts new patients who may choose to fill their medications at Walgreens.  [Id.] The action of Walgreens will force Dr. Morgan's patients to find another provider whose prescriptions are honored by Walgreens. [Id. ¶40-41] It will also deter prospective patients who use Walgreens from establishing a patient-physician relationship with Dr. Morgan, since they will not be able to fill any prescriptions for controlled substances. [Id. ¶53]

Although Walgreens' communications implied a general concern for the "epidemic of prescription misuse, addiction, and diversion," associated with opioids, Walgreens intends to block *all controlled substance prescriptions* issued by Dr. Morgan as of August 16, 2024. [Id. ¶43] Therefore, Dr. Morgan's patients who are treated with *non-opioid controlled substances* for other chronic medical issues such as epilepsy, androgen deficiency, chronic obstructive pulmonary disease (COPD), congestive heart failure (CHF), HIV/AIDS, obesity and other illness, are faced with the same dilemma of either finding another provider to manage their care or finding another pharmacy to fill their prescriptions for the non-opioid controlled substances.  [Id. ¶44]

Furthermore, since this block would last over one year, if Dr. Morgan were to seek employment for a position as a primary care/family medicine physician, he would be an

---

[2] Note that the letter referencing "internal review" was issued prior to Dr. Morgan's July 4, 2024, response, and therefore based on what can only consist of their database of prescriptions absent any application to a medical condition.

unemployable candidate with the inability to have prescriptions for **both opioid and non-opioid controlled substances** honored by Walgreens.  [Id. ¶62-63] **This restriction holds not only in the state of Florida, but throughout the nation.** [Id.] Dr. Morgan is licensed in three (3) other U.S. jurisdictions, where he would also be unemployable because of Walgreens' action.  [Id.] This is tantamount to imposing a restriction on Dr. Morgan's medical and prescribing licenses. [Id. ¶64]

Most importantly, the actions of Walgreens will jeopardize the health of his patients.  [Id. ¶49] With a total of 46 licensed pain management clinics to service a total population of 6.139 million in the tri-county area[3], it is likely that the patients who are forced to find another physician to manage their chronic pain will have difficulty obtaining timely care from another licensed pain management facility prior to the depletion of their controlled substance medications, which will leave them in distress with foreseeable health liabilities, including the likelihood of experiencing uncontrolled pain and or withdrawal symptoms.[4]  [Id. ¶41-42, 45] The patients who choose continue care under Dr. Morgan, may similarly face difficulties with finding another pharmacy to accept them as a patient. [Id. ¶45] Both physicians and pharmacists will inquire as to why the patient has left the doctor or pharmacy. [Id. ¶46] These patients will face judgment of possible doctor shopping or pharmacy shopping, and as a result may be rejected by the medical professionals and left in distress, without their needed medical medications.  [Id.] As a result of abrupt discontinuation of opioid medication therapy, patients may then require urgent or emergency medical care. [Id. ¶47-49] The described dynamic creates not only a hostile and dangerous environment in the medical field, but it may also lead patients to seek medicine outside of the observable care of a medical doctor. [Id. ¶91] In short, patients will be denied much needed

---

[3] 2022 U.S. Census Bureau for Miami Dade, Broward and Palm Beach County; and Florida DOH.
[4] Center for Disease Control (CDC) and Food and Drug Administration (FDA) warn against abrupt discontinuation of opioid medication, which can result in uncontrolled pain or withdrawal symptoms.

medical care due to the biased, capricious, unilateral and *non-medical corporate decision* of the Defendant, while unnecessarily placing the patient's health at risk. [Id.]

## MEMORANDUM OF LAW

**A. Standards for Issuance of a Temporary Restraining Order and Preliminary Injunction.**

      The Court of Appeals for the Eleventh Circuit has explained that the four factors to be considered in determining whether to grant a temporary restraining order or preliminary injunction are the same. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225 (11th Cir. 2005). A movant must establish "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Id.* at 1225-26 (citing *Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir. 1995); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)).

      The primary difference between the entry of a temporary restraining order and a preliminary injunction is that a temporary restraining order may be entered before the defendant has an adequate opportunity to respond, even if notice has been provided. *Textron Fin. Corp. v. Unique Marine, Inc.*, No. 08-10082-CIV, 2008 WL 4716965, at \*5 (S.D. Fla. Oct. 22, 2008).

      Under Federal Rule of Civil Procedure 65(b), a court may issue a temporary restraining order without notice to the adverse party only if:

    (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

    (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.  Fed. R. Civ. P. 65(b)(1).

Temporary restraining orders should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing. *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 439 (1974).

**B. Substantial Likelihood that Plaintiff will Succeed on the Merits of the Claim for Tortious Interference with a Business Relationship**.

The elements of tortious interference with a contract or a business relationship are: (1) the existence of either a contract or a business relationship between the plaintiff and a third party, (2) the defendant's knowledge of the contract or business relationship, (3) the defendant's intentional and unjustified interference with the contract or business relationship, and (4) damage to the plaintiff. *Consistent Funding LLC v. S. Fla. Constr. of Naples, Inc.,* No. 21-CV-22797, 2021 WL 3371902, at *1 (S.D. Fla. Aug. 3, 2021) (*citing Seminole Tribe of Fla. v. Times Publ'g Co.*, 780 So. 2d 310, 315 (Fla. 4th DCA 2001).

There is no question that the Plaintiff has an existing contractual and/or business relationship with current patients who are being treated for chronic pain and have been treated for chronic pain by Dr. Morgan for a significant period. [Id. ¶65-66] Defendant Walgreens is aware that these patients require the use of prescribed controlled substances for treatment of their chronic pain and other chronic conditions, and these prescriptions have been issued by Dr. Morgan for a legitimate medical purpose and are supported by medical necessity. [Id. ¶36, 81] Walgreens is aware of the existence of this business and/or contractual relationship. [Id. ¶65-66]

Plaintiff's state and federal licenses to practice medicine and prescribe controlled substances are current, active, and unencumbered. [Id. ¶77, 82] His prescribing of controlled substances to patients with chronic pain conditions are in strict compliance with regulatory standards. [Id. ¶36] Dr. Morgan has implemented numerous safeguards against diversion and misuse of controlled substances. [Id. ¶21] Patients undergo proper workup for a treatment plan.

[Id. ¶24-25] Patients are explained the clinic's policies, bound to their treatment agreement, and warned against "doctor shopping" and guarding their medications, since there is a strict no refill policy. Patients are also seen at least every 28 days. [Id. ¶19-20] The inspection and audit of Dr. Morgan's clinic and prescribing practices was conducted by the Florida Department of Health on May 31, 2024, which found "**complete medical justification for continued treatment with controlled substances.**" [Id. ¶24]

Defendant Walgreens' interference was intentional, as they advised Dr. Morgan, each of his patients in their central electronic pharmacy system, and the Walgreens' pharmacists through direct contact, that Walgreens would no longer accept any of Dr. Morgan's prescriptions for controlled substances. [Id. ¶50]

Defendant Walgreens has provided no justification for its decision to block *all controlled substances – both opioid and non-opioid controlled substances* - prescribed by Dr. Morgan. [Id. ¶54, 60] Walgreens' pharmacists have not questioned Plaintiff's prescribing practices for patients, neither has any of his prescriptions been rejected by a local pharmacist as not being prescribed for a legitimate medical purposed, medical necessity or otherwise problematic. [Id. ¶35] Walgreens has provided absolutely nothing to justify its decision to refuse to honor the Plaintiff's legitimate prescriptions for patients suffering from chronic pain conditions. [Id. ¶35] Moreover, *Walgreens intends to fill the same prescriptions when written for the patients by another provider,* as alluded to in Defendant Walgreens' June 19, 2024, letter to the patients. [Id. ¶61] Patients of Walgreens will attest to this experience with Walgreens, of being forced to find another provider, and then undergo the same medical management with a new provider with issuance of the exact same prescription. [Id. ¶81] As such Walgreens is intentionally interfering in the relationship of Dr. Morgan and his patients, without justification. [Id. ¶87]

*See subsequent section for damage to Plaintiff as a result of Defendant's action.*

**C.   Irreparable Injury will be Suffered if the Relief is Not Granted**

As demonstrated in his *First Amended Verified Complaint*, this blanket prohibition on filling valid for any controlled substances for over one full year will cause Dr. Morgan to suffer irreparable injury to his reputation, business, and professional employment status. [Id. ¶103] Defendant's action would essentially remove Plaintiff from the practice of medicine, as his medical practice and reputation will be irreparably damaged, and he will be rendered unemployable. [Id. ¶84, 99, 103] The block on all prescriptions for controlled substances issued by Dr. Morgan will result in patients leaving his care in order to seek other physicians who can manage their chronic pain and other chronic conditions through prescriptions that will be honored and filled by Walgreens. [Id. ¶40, 51, 84]

Walgreens' denial of care to Dr. Morgan's patients will also have a domino effect, as local pharmacies, other medical professionals and the patient community will learn of Walgreens' decision to block is controlled substance prescriptions. [Id. ¶52] Dr. Morgan has developed respectable and professional relationships with pharmacists in the community. [Id. ¶53-54] He is known for working together with them as a team, for the patient's medical care. [Id.] Dr. Morgan has even been referred patients by pharmacists, as well as his physician colleagues (PCPs, specialists, etc.).   [Id.] These medical professionals will come to know that Dr. Morgan's prescriptions will no longer be filled by Walgreens, which implies Dr. Morgan prescribing controlled substances in a manner that is illegitimate, improper, illegal or otherwise not in keeping with standards of care. [Id.] Local pharmacies will take similar action, and as a result, even patients who do not fill their medications at Walgreens will be impacted by the collateral effects of Walgreens' decision. [Id.] These patients will be forced to find another medical provider for the

management of their pain, patient referrals will cease, and prospective patients will seek health care elsewhere. [Id.] Dr. Morgan's clinic will diminished and eventually be dissolved. [Id. 103]

Dr. Morgan is qualified to provide family medicine/PCP services. [Id. ¶76] As a result of Walgreens' action, Dr. Morgan will be unemployable for any position in family medicine or primary care (*i.e., urgent care centers, community health centers, family medicine physician groups, etc.*), as a physician whose prescriptions for controlled substances will not be honored by Walgreens. [Id. ¶77-80] Medical facilities will not accommodate the logistics necessary to redirect patients to another provider or another pharmacy. [Id. ¶80]

Walgreens' action will impair Dr. Morgan's ability to adequately treat patients within his scope of practice, leading to the deterioration, decline and ultimate demise of his medical practice and will also render him unemployable. [Id. 103] damages suffered by Dr. Morgan, as a result of Defendant Walgreens' action, would be impossible to calculate. [Id.] He will suffer irreparable injury to his medical practice, reputation and ability to be employed as a medical doctor in the absence of the requested temporary restraining order and preliminary injunction. [Id.]

**D. <u>Threatened Injury Outweighs the Harm the Relief Would Inflict on the Non-Movant</u>**

Indeed, the actions of Walgreens and the denial of the Plaintiff's request for injunctive relief will cause substantial harm to others by requiring patients with serious ongoing chronic pain conditions to seek another health care provider or another pharmacy in order to maintain their treatment. [Id. ¶99-100] This will undoubtedly result in the disruption to the ongoing care of the Plaintiff's patients, and this disruption will be detrimental to their health and wellbeing where patients are likely to experience uncontrollable pain and or withdrawal symptoms. [Id.]

Walgreens will not suffer any injury by being enjoined from refusing to fill Dr. Morgan's legitimate prescriptions. [Id. ¶98] In the June 19, 2024, letter to Dr. Morgan's patients, it was

indicated that although Dr. Morgan's prescriptions for controlled substances would not be accepted, *all other prescriptions submitted by the patient's other providers would continue to be accepted.* [Id. ¶60] Walgreens already acknowledged that some patients would find another pharmacy, while knowing that many patients are bound to them through insurance. [Id.] Moreover, Walgreens intends to fill the same prescriptions for controlled substances for continuity of care and management of the patient's chronic pain, provided that the prescription is issued by a provider other than Dr. Morgan. [Id. ¶61] Issuing the requested injunctive relief sought by the Plaintiff would not cause any harm to the Defendant, and if anything, serves as a benefit to the Defendant by reducing the liability resulting from foreseeable patient harm and distress they are creating.

**E.  Requested Injunctive Relief will Serve the Public's Interest**

Without this Court's intervention, over 100 (one hundred) patients, all who are considered long term patients of Dr. Morgan, will be forced to decide whether to: (1) leave the care of the Dr. Morgan, and seek care elsewhere in order to properly have their medical conditions treated and managed; or (2) find another pharmacy to accept them as patients. [Id. ¶40, 62] This Court must also recognize that establishing a relationship with another pain management clinic or doctor is not as simple just calling a medical office and making an appointment. [Id. ¶90] Wait time for appointments can be months long, and patients can be rejected due to suspected doctor shopping. [Id.] Similarly, finding a pharmacy can be equally challenging, with suspicions of pharmacy shopping.  [Id. ¶92] Also important is the fact that Dr. Morgan's medical office is among the small pool of licensed pain management clinics in the tri-county area. [Id. ¶41] It will be difficult for his patients to become established patients in another medical clinic and receive treatment within short period of time. [Id.] Further, bearing in mind the list of diagnoses for these patients, transportation impediments are also a factor when a patient is restructuring their medical care.

Patients who may have taken months or years to reach this level of medical and clinical stability, undoubtedly, will be forced to leave the care of Dr. Morgan if Walgreens' action is permitted. [Id. ¶96] The disturbance of medical care for these chronic pain patients is contrary to the public interest.  Abrupt discontinuation of opioids is warned against by the Center for Disease Control (CDC) and Food and Drug Administration (FDA), as patients will be harmed and likely experience uncontrollable pain and withdrawal symptoms. [Id. ¶42] The absence of necessary and ongoing medical care can create urgent and emergency situations. [Id.]

Walgreens is unlawfully practicing pharmacy by usurping the independent judgment of the pharmacists who determine on an individual basis whether a prescription is valid, in violation of the Florida Administrative Code. [Id. ¶33-34, 83] Furthermore, the consequences of Walgreens actions are tantamount to regulating the practice of medicine and prescribing authority. [Id.] Blocking the filling of all controlled substances for a physician will affect that physician's ability to effectively treat their patients. [Id. ¶103] This is not a mom-and-pop pharmacy, but one of the nation's largest pharmacy retailers in the nation. [Id. ¶62] Their action alone will render physicians as unemployable, just as in this case. [Id. ¶80] It is not unusual for a physician to be licensed in multiple state jurisdictions. [Id. ¶63] Therefore, this unemployability is not just within the state of Florida, but throughout the nation. [Id.] Walgreens' action is a biased restraint on trade, medical decision-making, patient choice, and violates every precept of national and Florida standards of medical care. [Id. ¶61]

Consequently, the injunctive relief sought by the Plaintiff would serve the public's interest by promoting the continuity of care for these patients with chronic pain conditions and other co-morbidities, as well as prohibiting a corporate pharmacy from engaging in the unauthorized regulation of the medical professions.

## CONCLUSIONS

For all of the foregoing reasons, the *Plaintiff's Motion for Temporary Restraining Order* should be granted, and the Defendant should be temporarily restrained in and enjoined from blocking the filling of Plaintiff's valid prescriptions for controlled substances, pending a hearing on *Plaintiff's Motion for Preliminary Injunction*. Due to the nature of this request and the underlying fact that Walgreens will not be harmed by maintaining the status quo, the Plaintiff ask for no or minimal bond.

Pursuant to Fed.R.Civ.P., Rule 65(b)(1), this Court should issue the temporary restraining order without an adversarial hearing because:

(A) The specific facts in the *First Amended Verified Complaint* clearly show that immediate and irreparable injury, loss, or damage will result to Plaintiff and his patients before Walgreens can be heard in opposition; and

(B) The undersigned's affidavit certifies the efforts made to give notice and the reasons why notice should not be required. [Exh. 5, *Affidavit in Support of Expedited Motion for Temporary Restraining Order*]

**Dated: August 13, 2024**

Respectfully submitted,

/s/*Erica F. Chaplin*
Erica F. Chaplin, Esq.
FLBN: 0048023
Anderson & Welch, LLC
500 S. Australian Avenue, 6th Flr
West Palm Beach, FL 33401
Tel: 561-832-3386
Fax: 561-820-4867
Email: chaplinlaw@gmail.com
Email: andewelch@andersonandwelch.com
*Attorney for Plaintiff, Courtney R. Morgan, M.D*

## Table of Contents for Exhibits

| Exhibit | Description |
|---------|-------------|
| 1 | Letter to Dr. Morgan dated June 18, 2024 |
| 2 | Letter to Dr. Morgan dated July 16, 2024 |
| 3 | *Florida Department of Health's May 31, 2024, Inspection Report* |
| 4 | Letter to Patients dated June 19, 2024 |
| 5 | Affidavit in Support of Expedited Motion for Temporary Restraining Order |
| 6 | Proposed Order (Granting Temporary Restraining Order) |
| 7 | Proposed Order (Setting Hearing) |

# TAB 11

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-61442-CIV-SMITH**

COURTNEY MORGAN, M.D.,

         Plaintiff,

vs.

WALGREEN CO.,

         Defendant.

_____/

<u>**ORDER SETTING HEARING**</u>

This matter is before the Court on Plaintiff's Expedited Motion for Temporary Restraining Order and Preliminary Injunction [DE 10].  Upon consideration, it is

**ORDERED that:**

1.    Plaintiff shall serve a copy of its Motion and this Order on Defendant by **5:00 p.m. on August 14, 2024.**

2.    The Court will hold a hearing on the Expedited Motion for Temporary Restraining Order on **August 15, 2024 at 9:30 a.m.** at 299 E. Broward Boulevard, Room 207, Fort Lauderdale, FL 33301.

3.    By **5:00 p.m. on August 14, 2024,** Plaintiff shall submit a proposed order granting the Motion for Temporary Restraining Order that sets out the relevant facts and the applicable law and applies the law to the facts.

**DONE and ORDERED** in Fort Lauderdale, Florida, this 14th day of August, 2024.

**RODNEY SMITH**
**UNITED STATES DISTRICT JUDGE**

# TAB 14

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

Case No.: 24-61442-CIV-SMITH

**Courtney Morgan, M.D.**,

        Plaintiff,

    v.

**Walgreen Co.**,

        Defendant.

_____/

**ORDER GRANTING MOTION FOR
TEMPORARY RESTRAINING ORDER**

Pending before the Court is Plaintiff's Expedited Motion for Temporary Restraining Order and Preliminary Injunction [DE 10], brought pursuant to Rule 65(b) of the Federal Rules of Civil Procedure. The Court has reviewed the record herein, including the evidence submitted by Plaintiff in support of his First Amended Verified Complaint [DE 4] and Expedited Motion for Temporary Restraining Order. The Court also held a hearing on the Motion for Temporary Restraining Order on August 15, 2024, at 9:30 a.m., at which both parties were represented by counsel. Upon consideration, the Court makes the following findings pursuant to Fed. R. Civ. P. 65(b):

**I.    BACKGROUND**

Dr. Morgan has been notified by Walgreens that effective August 16, 2024, and for one full year thereafter, it will not fill prescriptions for controlled substances issued by him. (*See* De 4-1 at 8, 13, 17.) Dr. Morgan has over 100 patients who fills their medications at Walgreens. They, too, received notice that Walgreens would no longer fill the prescriptions for controlled substances issued by Dr. Morgan. (*See, e.g.,* DE 4-1 at 19.)

No explanation accompanied these notices as to the reason for the block, nor has any

1

117

explanation been provided by Walgreens to Dr. Morgan for its decision.  As indicated in the June 18, 2024, letter, the block on Dr. Morgan's controlled substance prescriptions was not made by a local pharmacist, but by the corporate office.  The letter also indicated that the patient's other prescribers would not be affected.  The letter did not indicate that any particular prescription for a patient would be blocked, as the blocking relates only to the doctor and not the medication.

Dr. Morgan has no restrictions or any limitations on his medical and prescribing license.  Both licenses are current, active, and unencumbered. He is the sole physician who operates his licensed pain management clinic, Hop Medical Services, located in Pompano Beach, Florida.  His practice has passed all annual inspections conducted by the Florida Department of Health, with the most recent inspection on May 31, 2024, where the Inspection Report states that the records demonstrated a complete medical history and physical examination, documented reason for prescribing controlled substances for chronic pain, clear and individualized treatment plan developed, adjustment of drug therapy to the individual needs of each patient, and "complete medical justification for continued treatment with controlled substances."

Dr. Morgan's patients are treated for chronic pain related to long-term medical issues, such as various cancers (prostate, breast, colon, colorectal, metastatic and stage 4), sickle cell disease, HIV neuropathy, diabetic neuropathy, vertebral degenerative disease with bulging/herniated discs, fusion, compression, bone spurs, facet narrowing, central canal narrowing, amputees, rheumatoid arthritis, arterial vasculitis with peripheral vascular disease of lower extremities, traumatic debilitations resulting from gunshot wounds, crushing from heavy objects, accidental falls, motor vehicle accidents, sport injuries, and bone fractures.  Other patients are treated for chronic pain related to terminal illnesses, within the scope of palliative medicine.

Walgreens' block on Dr. Morgan's prescriptions for controlled substances will result

in either his patients leaving his clinic to find another healthcare provider whose prescriptions for controlled substances are honored by Walgreens or his patients leaving Walgreens. Establishing care with another doctor or pharmacy my not occur quickly or at all, due to a general statewide shortage of physicians, long appointment wait-times, insurance restrictions, transportation issues and patient profiling because of a change in doctor or pharmacy. Patients without their medications will suffer from uncontrolled pain and or withdrawal symptoms, which can create an urgent or emergency situation. Furthermore, this block will prohibit the development of new patient relationships and interfere with the employability of Dr. Morgan as a family medicine/primary care doctor.

Plaintiff has brought a claim against Walgreens for Tortious Interference with Business Relationship in his First Amended Verified Complaint and requested injunctive relief.

## II.    LEGAL STANDARD

The Eleventh Circuit has explained that the four factors to be considered in determining whether to grant a temporary restraining order or preliminary injunction are the same. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225 (11th Cir. 2005). A movant must establish "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Id.* at 1225-26 (citing *Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir. 1995); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)).

## III.   ANALYSIS

The elements of tortious interference with a contract or a business relationship are: (1) the existence of either a contract or a business relationship between the plaintiff and a third party, (2) the defendant's knowledge of the contract or business relationship, (3) the defendant's intentional and unjustified interference with the contract or business relationship,

and (4) damage to the plaintiff. *Consistent Funding LLC v. S. Fla. Constr. of Naples, Inc.,* No. 21-CV-22797, 2021 WL 3371902, at *1 (S.D. Fla. Aug. 3, 2021) (*citing Seminole Tribe of Fla. v. Times Publ'g Co.*, 780 So. 2d 310, 315 (Fla. 4th DCA 2001)).

The Court finds that, based on the evidence currently before the Court, Plaintiff has demonstrated he has a substantial likelihood of success on the merits of his claim of tortious interference with a business relationship. Dr. Morgan and his patients have a business relationship of which Defendant is aware. With this awareness, Defendant provided written notices to both Plaintiff and Plaintiff's patients regarding its decision to stop filling Plaintiff's prescriptions for controlled substances. Defendant's decision to block all prescriptions for controlled substances was intentional and directed at Dr. Morgan. No justification for Walgreen's decision is presented in the notices to Dr. Morgan and his patients. Dr. Morgan's licenses are current and valid.

"The Florida Board of Pharmacy recognizes that it is important for the patients of the State of Florida to be able to fill valid prescriptions for controlled substances." Fl. Admin. Code 64B16-27.831. "Every patient's situation is unique and prescriptions for controlled substances shall be reviewed with each patient's unique situation in mind." *Id.* The blocking of the prescriptions at a corporate level for all controlled substances for a doctor is neither a decision made at the individual patient level, nor the exercise of independent professional judgment by the store pharmacist, who has the responsibility of determining the validity of a prescription, specifically, whether a practitioner-patient relationship exits and whether the prescription was issued for a legitimate medical purpose, as required by the Florida Board of Pharmacy. *Id.* Finally, Plaintiff will suffer damages. Dr. Morgan will lose patients, as over 100 patients of his fill their prescriptions with Walgreens. Dr. Morgan will also be limited as to the new patients he would be able to accept.

Irreparable injury will be suffered by Dr. Morgan, as his practice will be affected by

this block on having his controlled substance prescriptions filled with one of the largest retail pharmacies in the nation.  The filtering of this fact throughout the community will damage his reputation and business, and ultimately impair his ability to practice medicine as a doctor, and adequately treat patients.

Defendant is not injured by the relief sought. As a result of Defendant's actions, Plaintiff's patients will either find another doctor to prescribe the controlled substances needed for their treatment or go to another pharmacy.

Last, the relief requested would serve the public interest.  Patients will suffer physically and mentally if they are forced to go without their medication.  Abrupt discontinuation of these medications is advised against by the CDC and FDA, which both warn of the resulting harms. Further, a physician with valid medical and prescribing licenses would be removed from the practice of medicine as a result of Defendant's action, in a state with a shortage of physicians.

## IV.    CONCLUSION

The Court find the Plaintiff has met his burden, and specifically finds that:

(1)  Plaintiff is likely to succeed on the merits of his claim that Defendant has interfered with Plaintiff's relationships with his patients by refusing to fill prescriptions written by Plaintiff, and Defendant has done so without evidence that Plaintiff has violated any law or professional protocol related to such prescriptions;

(2) By virtue of the actions taken by Defendant against Plaintiff, Plaintiff faces immediate and irreparable harm to his business, professional relationships in the medical community, patient relationships, and reputation unless a temporary restraining order issues to enjoin Defendant's actions and preserve the status quo until the Court holds a hearing on the merits;

(3) The balance of the hardships between the parties weighs in favor of issuing a temporary restraining order, in as much as Defendant's actions pose a threat to Plaintiff's professional reputation and livelihood.  In addition, issuance of a temporary restraining order will not injure or harm Defendant or interfere with Defendant's ability to provide pharmaceutical services to the area and will preserve the status quo; and

(4)  Because Plaintiff's patients' medical care is implicated by Defendant's actions and a fully licensed physician would be removed from the practice of medicine, the public interest weighs in favor of issuance of a temporary restraining order.

Accordingly, it is

**ORDERED** that Plaintiff's Expedited Motion for Temporary Restraining Order [DE 10]

is **GRANTED**:

1. Defendant, Walgreen Co., its officers, agents, servants, employees, or other persons who are in active concert or participation with it, be, and are hereby, ENJOINED from refusing to fill prescriptions written by Courtney Morgan, M.D. for any pharmaceutical product; and

2. A Security Bond in the amount of $ 100 shall be tendered by Plaintiff as sufficient surety.

3. A hearing on Plaintiff's Motion for a Preliminary Injunction [DE 10] is set for **August 22, 2024 at 1:30 p.m.**, 299 East Broward Blvd., Courtroom 207, Fort Lauderdale, FL 33301. This Temporary Restraining Order shall be valid from the date of entry until the hearing on Plaintiff's Motion for Preliminary Injunction.

4. Defendant shall file a response to the Motion for Preliminary Injunction by **August 19, 2024 at noon.** Any reply shall by filed by **August 20, 2024 at noon.**

**DONE AND ORDERED** in Ft. Lauderdale, Florida, this 15th, day of August 2024 at

10:10 a.m.

_____
**RODNEY SMITH**
**UNITED STATES DISTRICT JUDGE**

Copies to:
Counsel of Record

# TAB 19

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

| | | |
|---|---|---|
| **Courtney Morgan, M.D.**, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Case No.: 0:24cv61442-RS |
| **Walgreen Co.**, | § | |
| *Defendant.* / | | JURY |

### PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

**COMES NOW**, Plaintiff, COURTNEY MORGAN, M.D. ("Dr. Morgan"), by and through undersigned counsel, pursuant to Fed.R.Civ.P., Rule 65, and files his *Reply to Defendant's Response in Opposition to Plaintiff's Motion for Preliminary Injunction*, and states the following in the support thereof:

### RELEVANT PROCEDURAL BACKGROUND

1. On August 13, 2024, Plaintiff filed his *Expedited Motion for a Temporary Restraining Order and Preliminary Injunction* against Defendant Walgreens, requesting that the Defendant be prohibited from blocking Plaintiff's valid prescriptions. [DE 10]

2. On August 15, 2024, the Court found that Plaintiff met his burden of proof to satisfy each element required to enter the *Temporary Restraining Order* and did enter same. [DE 13]

3. Defendant filed a response on August 19, 2024, challenging each element required for a preliminary injunction and asserting the Primary Jurisdiction Doctrine as controlling for referral of this matter to the administrative arena, specifically the Board of Pharmacy. [DE 16]

### SUMMARY OF ARGUMENT

Plaintiff contends that he has met his burden on the four (4) elements required for entry of a preliminary injunction, and that the Primary Jurisdiction Doctrine is inapplicable.

## **LEGAL STANDARD**

### A. **Preliminary Injunction**

To justify a preliminary injunction, a movant must establish (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest. *Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir. 1995). The chief function of a preliminary injunction is to preserve the *status quo* until the merits of the controversy can be fully and fairly adjudicated. *Ne. Fla. Chapter. of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990). The crucial question for issuance of an injunction is whether preservation of *status quo* is necessary in order to protect the court's ability to render a meaningful decision on merits. *Louis v. Meissner*, 530 F. Supp. 924 (S.D. Fla. 1981). If failure to grant temporary relief will allow defendant to harm plaintiff in such a way that court's ultimate decision in plaintiff's favor becomes mere useless dicta, then a preliminary injunction should issue. *Id.*

### 1. **Likelihood of Success**

The elements of tortious interference with a contract or a business relationship are: (1) the existence of either a contract or a business relationship between the plaintiff and a third party, (2) the defendant's knowledge of the contract or business relationship, (3) the defendant's intentional and unjustified interference with the contract or business relationship, and (4) damage to the plaintiff. *Consistent Funding LLC v. S. Fla. Constr. of Naples, Inc.,* No. 21-CV-22797, 2021 WL 3371902, at *1 (S.D. Fla. Aug. 3, 2021) (*citations omitted*).

Defendant argues that there are no identifiable customers. However, Plaintiff has specifically alleged that over 100 patients of his presently fill their prescriptions at Walgreens. The

relationship between Dr. Morgan and his patients have been acknowledged by Walgreens, with letters sent to both Dr. Morgan *and all his patients. See Exh., 1, Letter to Dr. Morgan and Letter to Patients Regarding Blocking Prescriptions.* This interference was intentionally directed at Dr. Morgan who in his normal practice of medicine regularly prescribes controlled substances. This nationwide corporate block is a direct interference with Dr. Morgan's medical practice and his practice of medicine.

Defendant argues that the primary basis for their action is to comply with the Settlement Agreement ("Agreement") entered into with the State of Florida. According to 2022 Defendant's press release, a settlement in the amount of $683 million is to be paid out to the State of Florida based on conduct which occurred in 2012-2013. *See Exh. 2, Walgreens Co., Website/Press Release Regarding Settlement with Florida.* The Agreement addresses a process to validate prescriptions on the *individual pharmacist level*, in accordance with the pharmacy rules which mandate the exercise of independent "professional judgment" by the individual pharmacist. *See Exh. 3, Settlement Agreement Excerpts.* The Agreement also addresses "algorithms, or other means" to identify prescribers for review. *Id.* The Agreement states that only when "concerns of illegitimate prescribing" are not resolved, may the prescriber then be blocked *in the state of Florida*, not nationwide. Most importantly, the Agreement addresses the requirement of lawful conduct, stating that the retail pharmacies are required to "comply with applicable federal and Florida state laws, including regarding the dispensing of Controlled Substances. The requirements of the Settlement Terms are in addition to, and not in lieu of, any other requirements of federal or Florida state law. Nothing in the Settlement Terms shall be construed as relieving the Settling Pharmacy of the obligation of its retail pharmacies to comply with all federal and Florida state and local laws, nor shall any of the provisions of the Settlement Terms be deemed as permission for the Settling

Pharmacy to engage in any acts or practices prohibited by such laws." *Id.*

Pursuant to Florida Statute, it is unlawful to practice pharmacy or medicine without a license. *See Fla. Stat. 465.003 and 456.0065.* Defendant's actions are the corporate practice of pharmacy and medicine. The corporation is not licensed by any agency under the Department of Health (BOP or BOM), yet it usurps a pharmacist's independent medical judgment by blocking a physician's prescriptions. Additionally, Walgreens' unjustified blocking of physicians for an extended period of time is an avenue to influence the physician's prescribing. In further evidence of this, Walgreens stated in its July 16, 2024, letter to Dr. Morgan that if his "prescribing changes materially" after August 16, 2025 (one-year after the block), then it will reconsider honoring the doctor's prescriptions for controlled substances. *See Exh. 4, Letter to Dr. Morgan, June 16, 2024.* This is Walgreens' attempt to change the medical management of patients in response to their enormous Settlement Agreement. Walgreens' action is a prime example of the inherent conflict with the corporate practice of medicine, where the obligation of a corporation to its shareholders is not same as medical professional's obligation to their patient.

**2. Irreparable Harm**

The Defendant argues Dr. Morgan will not suffer irreparable harm since (i) only controlled substances are blocked; and (ii) patients can just go to other pharmacies, for which there is no concern for the cash paying patients. Dr. Morgan stated that all of his patients are treated for chronic pain. Therefore, regardless of the few who are also treated for primary care issues, blocking controlled substances will significantly affect his business. Current patients who fill their medications at Walgreens will leave, and the pool of potential patients will be diminished.

Moreover, Dr. Morgan has alleged reputational damages, which he has already begun to suffer. It is well established that reputational damages can constitute irreparable harm due to the

difficulty or impossibility of quantifying the injury in monetary terms. *GlaxoSmithKline LLC v. Boehringer Ingelheim Pharms., Inc.*, 484 F. Supp. 3d 207 (E.D. Pa. 2020) (Harm to reputation or goodwill can constitute irreparable injury, as required for a preliminary injunction, because it is virtually impossible to quantify in terms of monetary damages.); *see also Yorktown Sys. Grp. Inc. v. Threat Tec LLC,* 108 F.4th 1287, 1296 (11th Cir. 2024); *see also BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005) (The loss of customers and goodwill is an irreparable injury.) (*citations omitted*).

The very notion of blocking such a fundamental aspect of the practice of medicine is damaging to Dr. Morgan's reputation within the medical and patient community, and anyone who becomes aware of his prescribing status with Walgreens. It reeks of the implication of improper prescribing.  It is a bell that is rung with reverberation.  Maintaining his practice will be difficult at best, and it creates an insurmountable obstacle in finding employment, should his practice fail as a consequence of the Defendant's action. Injury to Dr. Morgan's reputation was not addressed by the Defendant, but it is a real, actual, and imminent damage that cannot be understated.

Defendant has misplaced Plaintiff's argument regarding harm to patients. Beyond reputational damages amongst the patient community, the harm to the patient is to be considered within the public interest prong.

**3.  Threatened Injury to Plaintiff Outweighs the Harm the Relief Would Inflict on the Defendant**

The Defendant argues that a preliminary injunction would "interfere with the Program" and require Walgreens not to comply with their Settlement Agreement.  There is no "non-compliance" with the Agreement by unblocking a physician.  The Agreement actually calls for the institution of a process, where Walgreens is given the discretion in formulating portions of this process; and consequently, discretion in the conclusions reached when using the process. *See Exh.*

*3, Settlement Agreement Excerpts*.   A determination is made on whether the "concerns of illegitimate prescribing" from the corporate level has been "resolved."   To that end, the Defendant acknowledges that the Florida Department of Health (DOH) regulates the Board of Pharmacy. Likewise, the Board of Medicine also falls under the DOH.   Hence, an inspection by the Department of Health, inclusive of an audit of the medical records, which finds no issues with Dr. Morgan's prescribing practices should satisfy the concerns of corporate Walgreens'.   His prescribing is clearly legitimate.

The Defendant also argues that a preliminary injunction would "require Walgreens and its pharmacist to continue to fill controlled substance prescriptions written by a prescriber who has not satisfied Walgreens' concerns with prescribing patterns and practices."   **Walgreens in not a regulatory agency, nor it is authorized to regulate the practice of medicine or pharmacy.**   Dr. Morgan's prescribing has already been examined by the Florida Department of Health through random annual audits of his medical records.   The FL DOH audit which occurred most recently on May 31, 2024, resulted in findings, in part, consisting of: complete medical history and physical examination, documented reason for prescribing controlled substances for chronic pain, clear and individualized treatment plan developed, adjustment of drug therapy to the individual needs of each patient, and "complete medical justification for continued treatment with controlled substances." (*See Exh. 5, FL DOH May 31, 2024, Inspection Results*).

Although the Court must balance the relative hardship to each side, the Court need not consider the "hardship" to a defendant whose conduct is "unlawful." *Fla. Atl. Univ. Bd. of Trustees v. Parsont*, 465 F. Supp. 3d 1279, 1297 (S.D. Fla. 2020).   A defendant suffers no hardship when an injunction will merely enjoin the defendant from conducting business in a manner which is already prohibited by state and federal law. *Id.*

Again, the Defendant's action usurps the licensed pharmacist's professional judgment in violation of Florida laws and administrative rules. This conduct is contrary to the Agreement, which requires also legal compliance above all.

Last, this preliminary injunction is one of prohibition that would keep the *status quo*. According to Walgreens, the patient can have the same prescriptions for controlled substances filled when issued by another physician. Walgreens is not being ordered to do something it was not already doing or intended to continue doing. There is no harm to the Defendant. If any harm is illusory, it is the unidentified consequence of "non-compliance" with the Settlement Agreement.

**4.   Entry of a Preliminary Injunction Would Serve the Public Interest**

The Defendant argues that it is in the public's interest to block Dr. Morgan's prescriptions for controlled substances, because they need to be in compliance with their Settlement Agreement. The Defendant cites to Krueger, which is distinguished from this case. *Krueger Invs., LLC v. Cardinal Health 110, Inc.,* No. CV 12-618-PHX-JAT, 2012 WL 3028349, at *2 (D. Ariz. July 24, 2012). In Krueger, the pharmacy, had a distribution contract with the defendant for pharmaceutical products. Pursuant to the contract, the defendant conducted a compliance review for a determination of potential diversion. The defendant that found inventory inconsistencies and the disproportionately large quantities of controlled substances did pose a risk of diversion and *immediately terminated the contract*. The plaintiff was subsequently inspected by the board of pharmacy and were cited for inventory violations, but there were no finding of diversion and no additional action by any other regulatory agency. The injunction sought, but not granted, was a *mandatory injunction* for specific performance under a reinstated contract, which has a heightened burden for the Plaintiff. *Id.*; see also *Comm. of Cent. Am. Refugees v. I.N.S.,* 795 F.2d 1434, 1441 (9th Cir. 1986) (A mandatory injunction goes beyond maintaining the *status quo*. Consequently,

there is a heightened burden where the preliminary injunction, should not be granted unless the facts and law clearly favor the plaintiff.) (*citation omitted*).

This case is not similar. A distribution company does not have the same obligations of a pharmacy. It does not have the relationship that pharmacies have with patients and the accompanying responsibility to serve the community. This was a business agreement, and the distributor's action does not impair the relationship between the pharmacy and the patients. There is no business agreement between physicians and pharmacies. The license creates their obligation to act, and it is conditionally issued for that purpose. In addition, the inspection of Dr. Morgan's practice by the Florida Department of Health yielded no citations or even advisory comments.

## B. Primary Jurisdiction Doctrine

The Defendant states that the Primary Jurisdiction Doctrine applies, and that none of the five (5) exceptions to this doctrine are present. Therefore, deferral of this matter to the administrative agency is required.

Before addressing exceptions, it must be determined whether the Primary Jurisdiction Doctrine applies. "There are four factors uniformly present in cases where the doctrine of primary jurisdiction is properly invoked: (1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration." *In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Prac. Litig.*, 955 F. Supp. 2d 1311 (S.D. Fla. 2013); *see also Garcia v. Kashi Co*., 43 F. Supp. 3d 1359 (S.D. Fla. 2014). "Primary jurisdiction doctrine is not designed to secure expert advice from agencies every time a court is presented with an issue conceivably within the agency's ambit; instead, ***it is to be used only if a claim requires resolution of an issue of first***

*impression, or of a particularly complicated issue that Congress has committed to a regulatory agency.*"  *In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Prac. Litig.,* 955 F. Supp. 2d 1311 (S.D. Fla. 2013).

The Primary Jurisdiction Doctrine is inapplicable here.  This matter does not involve an issue placed by Congress within the jurisdiction of an administrative body with regulatory authority nor does it involve a statute for an industry or activity to a comprehensive regulatory scheme requiring expertise or uniformity in administration. All that it requires is Defendant's compliance with the law.  The Defendant, Walgreens Co., is not a Florida licensee under the Board of Pharmacy (BOP) or the Board of Medicine (BOM).  The Defendant is not authorized to practice pharmacy or medicine, it is not authorized to usurp individual pharmacists' professional judgment or interfere with physicians' management of patients.  *The Defendant is not a regulatory agency and should not be permitted to act in violation of rules and laws, such that the effects are tantamount to regulating professionals in the medical industry.*  The Settlement Agreement heavily leaned on by the Defendant was generated from a case in federal court, not the administrative arena.  The Agreement was not authored by BOP, BOM, or the Florida Department of Health.  The Agreement does not create new rules or laws, but instead requires the individual pharmacists to comply with same.  There is no particularly complicated issue or issue of first impression that requires the expertise of an administrative agency.

## C.  <u>Correction of Factual Inaccuracies</u>

While this recitation of attempted communications, mailing and e-mailing is irrelevant to the practice of medicine and patient care, the facts as stated need correction.  Defendant stated that:

- "On June 20, 2024, Plaintiff emailed Walgreens to state that he was in receipt of the letter and he wanted an opportunity to answer the questionnaire."
- "On June 21, 2024, Walgreens told Plaintiff it would allow and consider his [the] late submission."

- "On July 9, 2024, Plaintiff finally responded to the questionnaire."

The picture being painted here is that: Dr. Morgan ignored Walgreens communications until threatened with his prescriptions being block. Only then, did he contact Walgreens asking for the opportunity to respond to the questionnaire, which was graciously permitted. Then, his late submission was finally received 18 days later on July 9, 2024. This is completely misleading.

The June 18, 2024, the notice of blocking did not mention any questionnaire. In Dr. Morgan's June 20, 2024, letter, he stated that his office "never received any communication from Walgreens requesting any information"; therefore, he did not ask about submitting late answers to a questionnaire which he knew nothing about. The June 21, 2024, email informed Dr. Morgan of the questionnaire, and the deadline for his response was July 9, 2024. Dr. Morgan's response was submitted on July 4, 2024. Since there was no confirmation of receipt, it was resubmitted on July 9, 2024. (*See Exh. 6, Chronological Correspondence between Dr. Morgan and Walgreens*).

## <u>CONCLUSION</u>

Plaintiff has met his burden for all elements of a preliminary injunction. Preservation of the *status quo* until adjudication on the merits is essential in this case in order for the Court to render a meaningful decision on the merits. Absent the preliminary injunction, Dr. Morgan will suffer irreparable damages, such that even if he is successful on his claim, his victory would be rendered meaningless.

Preservation of the *status quo* is also in the interest of the public. Patients will suffer needlessly with delayed or absent medical care and treatment if they are forced to find another physician or pharmacy. Defendant's action also violates the principle of patient choice.

**WHEREFORE**, Plaintiff requests that this Court grant his motion for a Preliminary Injunction until this matter is decided on the merits.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via CM/ECF upon counsel on the incorporated service list on this **21ᵗʰ** day of **August, 2024.**

**Dated: August 21, 2024**                    Respectfully submitted,

                                               /s/*Erica F. Chaplin*
                                               Erica F. Chaplin, Esq.
                                               FLBN: 0048023
                                               Anderson & Welch, LLC
                                               500 S. Australian Avenue, 6ᵗʰ Flr
                                               West Palm Beach, FL 33401
                                               Tel: 561-832-3386
                                               Fax: 561-820-4867
                                               Email: chaplinlaw@gmail.com
                                               Email: andewelch@andersonandwelch.com
                                               *Attorney for Plaintiff, Courtney R. Morgan, M.D*

### SERVICE LIST
*Courtney Morgan, M.D. v. Walgreen Co.*
Case No.: 0:24cv61442 – RS
United States District Court, Southern District of Florida

Erica F. Chaplin, Esq.
FLBN: 0048023
Anderson & Welch, LLC
500 S. Australian Avenue, 6ᵗʰ Flr
West Palm Beach, FL 33401
Tel: 561-832-3386
Fax: 561-820-4867
Email: chaplinlaw@gmail.com
Email: andewelch@andersonandwelch.com
*Attorney for Plaintiff, Courtney R. Morgan, M.D*

Tamara S. Malvin, Esq.
FLBN: 72758
Akerman LP
201 E. Las Olas Boulevard, Suite 1800
Fort Lauderdale, FL 33301
Tel: 954-463-2700
Fax: 954-463-2224
Email: tamara.malvin@akerman.com
*Attorney for Defendant, Walgreens Co.*

# TAB 19-1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

| | | |
|---|---|---|
| **Courtney Morgan, M.D.**, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Case No.: 0:24cv61442-RS |
| **Walgreen Co.**, | § | |
| *Defendant*. / | | JURY |

# Exhibit List

| Exhibit | Description |
|---|---|
| 1 | Letter to Dr. Morgan (June 18, 2024) and Letter to Patients (June 19, 2024) Regarding Blocking Dr. Morgan's Prescriptions for Controlled Substances |
| 2 | Walgreens Co, Website/Press Release Regarding Settlement with Florida |
| 3 | Settlement Agreement Excerpts |
| 4 | Letter to Dr. Morgan: July 16, 2024 |
| 5 | Florida Department of Health May 31, 2024 Inspection Results |
| 6 | Chronological Correspondence Between Dr. Morgan and Walgreens |

**Exhibit 1**
Letter to Dr. Morgan (June 18, 2024)
and Letter to Patients (June 19, 2024)
Regarding Blocking Dr. Morgan's
Prescriptions for Controlled Substances



Walgreen Co.
102 Wilmot Rd. MS#2280
Deerfield, IL 60015
Email: PrescriberEvaluation@walgreens.com
Phone: 866-412-1790 | Fax: 224-516-6011
Walgreens.com

June 18th, 2024

COURTNEY MORGAN, MD
DRIVE THRU DOC
2722 NE 1ST ST
STE 2
POMPANO BEACH, FL 33062

Dear Courtney Morgan, MD,

Walgreens recently asked you to provide information about your prescribing practices.

Based on the failure to respond, Walgreens will discontinue dispensing controlled substances prescribed by you as of August 16th, 2024. This decision does not affect Walgreens dispensing of non-controlled substance prescriptions written by you. Please do not send electronic prescriptions for controlled substances to Walgreens. We will notify your patients with prescriptions on file with us that Walgreens will no longer fill controlled substances prescribed by you. So as not to impact patient care, please ensure your patients are aware that Walgreens will no longer fill controlled substance prescriptions prescribed by you.

Please do not contact team members at Walgreens pharmacies regarding this issue. Team members at your local pharmacy had no role in making this decision and cannot make exceptions to this decision. If you do need to speak to someone, contact Walgreens at 1-866-412-1790.

If your prescribing changes materially after the period of at least one year from block effective date, contact us at PrescriberEvaluation@walgreens.com to request a review.

Sincerely,

Walgreen Co.

Member of Walgreens Boots Alliance

*Walgreens*

Walgreen Co.
102 Wilmot Rd.
Deerfield, IL 60015
1-800-WALGREENS
1-800-925-4733
Walgreens.com

June 19, 2024

Dear Patient,

Based on an internal review, Walgreens has decided to no longer dispense controlled substance prescriptions from your prescriber COURTNEY MORGAN, MD.

This decision is based on the relationship between Walgreens and your prescriber. Local pharmacy team members were not involved in the decision and cannot make exceptions. We value you as a patient and are invested in your safety and wellness. This in no way impacts your relationship with Walgreens, nor will it impact your health care plan from other prescribers. **You will continue to be able to fill non-controlled substances from your prescriber at any Walgreens location**.

Upon patient request, active controlled substance prescriptions with refills remaining may be transferred to non-Walgreens pharmacies subject to federal and state regulatory requirements. Please consult with your prescriber to determine available treatment options.

We apologize for any inconvenience.

Sincerely,

Walgreen Co.

Member of Walgreens Boots Alliance

139

**Exhibit 2**
Walgreens Co, Website/Press Release
Regarding Settlement with Florida

Case 0:24-cv-61442-RS   Document 19-1   Entered on FLSD Docket 08/21/2024   Page 6 of 31
Walgreens Reaches Opioid Settlement with State of Florida | Walgreens Boots Alliance          9/28/24, 2:42 PM

USCA11 Case: 25-11887          Document: 28-1          Date Filed: 10/01/2025          Page: 147 of 236

# Walgreens Reaches Opioid Settlement with State of Florida

May 5, 2022

DEERFIELD, Ill., May 05, 2022 - Walgreens today announced that it has entered into an agreement with the State of Florida to resolve all claims related to the distribution and dispensing of prescription opioid medications across the company's pharmacies in the state.

The settlement amount of $683 million includes $620 million to be paid out to the State of Florida over 18 years, as well as a one-time payment of $63 million for attorneys' fees.

The settlement includes no admission of wrongdoing or liability by Walgreens.

"As the largest pharmacy chain in the state, we remain focused on and committed to being part of the solution, and believe this resolution is in the best interest of all parties involved and the communities we serve across Florida," said Danielle Gray, executive vice president and global chief legal officer, Walgreens Boots Alliance, Inc. "Our pharmacists are dedicated healthcare professionals who live and work in the communities they serve, and play a critical role in providing education and resources to help combat opioid misuse and abuse."

As one of Florida's leading healthcare providers, Walgreens has taken a number of actions to prevent and respond to the opioid crisis, while continuing to serve patients, including:

- Providing patient education on safe opioid use

- Making life-saving Naloxone, the opioid overdose reversal medication, available in all Walgreens pharmacies nationwide

- Providing safe and convenient medication disposal kiosks available at 1,400 Walgreens stores, along with other safe disposal options at all other Walgreens locations

- Deploying technology to help pharmacists ensure they are dispensing prescriptions written for a legitimate medical purpose

- Stopping self-distribution of opioids and all pharmaceuticals to Walgreens stores in 2014

The settlement funds will be used by the State of Florida to support its efforts to combat and treat opioid addiction. The settlement is a result of unique facts and circumstances concerning the state of Florida. It should not be used to forecast or predict the value of any other litigation claims or future settlements, and is unrelated to any other opioid-related litigation in which Walgreens is involved and which the company will continue to defend vigorously.

**About Walgreens**



**Walgreens Boots Alliance**

Walgreens (www.walgreens.com) is included in the United States segment of Walgreens Boots Alliance, Inc. (Nasdaq: WBA), an integrated healthcare, pharmacy and retail leader serving millions of customers and patients every day, with a 170-year heritage of caring for communities. As America's most loved pharmacy, health and beauty company, Walgreens purpose is to champion the health and well-being of every community in America. Operating nearly 9,000 retail locations across America, Puerto Rico and the U.S. Virgin Islands, Walgreens is proud to be a neighborhood health destination serving approximately 9 million customers each day. Walgreens pharmacists play a critical role in the U.S. healthcare system by providing a wide range of pharmacy and healthcare services. To best meet the needs of customers and patients, Walgreens offers a true omnichannel experience, with fully integrated physical and digital platforms supported by the latest technology to deliver high-quality products and services in local communities nationwide.

# Contact(s)

Fraser Engerman

fraser.engerman@walgreens.com

greens Boots Alliance, Inc.

^

**Exhibit 3**
Settlement Agreement Excerpts

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement is made and entered into this 4th day of May 2022, among <u>Walgreens</u> (defined below), the State of Florida and its Office of the Attorney General ("<u>Plaintiff</u>" or "<u>State</u>") (with Walgreens, the "<u>Settling Parties</u>"), and State Outside Litigation Counsel (defined below) in the lawsuit captioned *State of Florida, Office of the Attorney General, Department of Legal Affairs v. Purdue Pharma, L.P., et al.* (Case No. 2018-CA-001438) (Fla. Cir. Ct. Pasco County) (the "<u>Florida AG Action</u>"). This Settlement Agreement is intended by the Settling Parties to fully, finally and forever resolve, discharge and settle the <u>Released Claims</u> (as defined below), upon and subject to the terms and conditions hereof (the "<u>Settlement</u>").

WHEREAS, Plaintiff filed an amended complaint in the Florida AG Action asserting various claims against Walgreens for public nuisance, negligence, conspiracy, fraud, and violations of the Florida Deceptive and Unfair Trade Practices Act and Racketeer Influenced and Corrupt Organization Act, all based on allegations that Walgreens historically, among other acts, distributed and dispensed prescription opioid pain medication improperly in a fashion that has caused harm to the health of Florida residents and to the State. The action seeks damages, equitable abatement, civil penalties, attorneys' fees and reimbursed litigation costs, and other relief;

WHEREAS, Plaintiff brought the Florida AG Action in its sovereign capacity as the people's attorney in order to protect the public interest, including the interests of the State of Florida, its governmental subdivisions and its citizens;

WHEREAS, numerous <u>Litigating Subdivisions</u> (defined below) have filed <u>Actions</u> (defined below) in various forums against Walgreens, among others, raising Claims or allegations concerning, related to, based upon, or in connection with the <u>Covered Conduct</u> (defined below) and seeking relief that overlaps in whole or in part with the relief sought in the Florida AG Action;

WHEREAS, there are numerous <u>Subdivisions</u> (defined below) that are not Litigating Subdivisions ("<u>Non-Litigating Subdivisions</u>") that could seek to file additional Actions raising Claims or allegations concerning, related to, based upon, or in connection with the Covered Conduct and seeking relief that overlaps in whole or in part with the relief sought in the Florida AG Action and the Actions filed by Litigating Subdivisions;

WHEREAS, Walgreens (i) denies each and all of the Claims and allegations of wrongdoing made by Plaintiff in the Florida AG Action and by the Litigating Subdivisions in each of the Actions and maintains that it has meritorious defenses; (ii) denies all assertions of wrongdoing or liability against Walgreens arising out of any of the conduct, statements, acts or omissions alleged, or that could have been alleged, in the Florida AG Action or in other Actions already brought by Litigating Subdivisions or that could be brought by such plaintiffs or by Non-Litigating Subdivisions, and contends that the factual allegations made in the Florida AG Action and the Litigating Subdivisions' Actions relating to Walgreens are false and materially inaccurate; (iii) denies that Plaintiff, or any Litigating Subdivision, or any other Subdivision, or any Florida resident, was harmed by any conduct of Walgreens alleged in the Florida AG Action, the Litigating Subdivisions' Actions, or otherwise; (iv) denies liability, expressly denies any wrongdoing, and denies it violated any federal or state statute or common law; and (v) maintains that Walgreens would be able to successfully defend against Plaintiff's Claims and allegations at trial, that the

1

facts do not support the allegations, that Walgreens engaged in no misconduct or unlawful activity, and caused no harm to Plaintiff or to the Litigating Subdivisions, other Subdivisions, or any Florida residents;

WHEREAS, the State of Florida maintains that Florida should receive 13.8% of the proceeds of the total payments towards opioid settlements nationwide (based on a morphine milligram equivalency or MME analysis), and that such approach is the appropriate response, as distinct from the analysis used by a multi-state group of Attorneys Generals who have reached agreements with various manufacturers and distributors, who have determined state by state allocations based on an approach that would provide Florida with 7.0259134409% of total payments towards opioid settlements nationwide;

WHEREAS, the Parties have investigated the facts and analyzed the relevant legal issues regarding the Claims and defenses that have been or could have been asserted in the Florida AG Action and any other Actions;

WHEREAS, the Parties have each considered the costs and delays and uncertainty associated with the continued prosecution and defense of the Florida AG Action and the other Actions;

WHEREAS, the Parties believe the Settlement set forth herein avoids the uncertainties of litigation and assures that the benefits reflected herein are obtained;

WHEREAS, Plaintiff has concluded that the terms of the Settlement are fair, reasonable and adequate and in the best interest of Plaintiff and all Subdivisions and Florida citizens and residents;

WHEREAS, given the unique facts and circumstances associated with the Florida AG Action, including without limitation the ongoing trial and the 2012 and 2013 enforcement actions involving a Walgreens distribution center and certain Walgreens pharmacies in the State of Florida, the Settlement reflects a level of payment unique to the State of Florida;

WHEREAS, the Settlement is predicated, as well, on remediation and restitution as related to alleged harms or damages in respect of the portion of Walgreen's total pharmacy business that was located in Florida as reflected in the ARCOS data available to the parties;

WHEREAS, in the years following the 2012 and 2013 enforcement actions involving a Walgreens distribution center and certain Walgreens pharmacies in the State of Florida, Walgreens has put in place innovative, comprehensive and industry-leading policies, procedures and controls relating to the dispensing of prescription opioid medications and other controlled substances. The Settlement will permit the State and Walgreens to continue to work in partnership to further the public health in this respect and other respects. To the extent Walgreens' existing practices, policies, procedures or conduct are referenced or impacted by any provision of this Settlement, any such reference or impact does not reflect a contention or conclusion by any Party that Walgreens' current conduct is in any respect improper or contrary to law;

WHEREAS, Plaintiff has determined that continuation or commencement of Actions against Walgreens by Litigating Subdivisions or other Subdivisions would unduly interfere with

Plaintiff's litigation authority to bring and resolve litigation in which the State has an interest and frustrate Plaintiff's efforts to obtain a favorable settlement;

WHEREAS, the Parties agree that neither this Agreement nor any statement made in the negotiation thereof shall be deemed or construed to be a concession as to any Claim, an admission, evidence of any violation of any statute or law, evidence of any liability or wrongdoing by Walgreens, or evidence of the truth of any of the Claims, allegations, denials, or defenses made in the Florida AG Action or the Litigating Subdivisions' Actions;

WHEREAS, arm's-length settlement negotiations have taken place over the course of several weeks between Walgreens and Plaintiff; and

WHEREAS, Plaintiff views prompt settlement on the terms enclosed herein to be in the public interest and crucial to the State of Florida and its citizens; recognizes that Subdivisions may, notwithstanding their willingness to sign on to this settlement, wish to reserve the right to challenge the Attorney General's authority to bind them in other litigation that does not arise out of or relate to the Covered Conduct; and represents that Plaintiff shall not use those Subdivisions' acceptance of the terms of this Settlement as precedent in any litigation matter that does not arise out of or relate to the Covered Conduct.

NOW, THEREFORE, IT IS HEREBY AGREED by and between Plaintiff and Walgreens, by and through their respective counsel, as follows:

A.     **Definitions.**  As used in this Agreement, the following capitalized terms have the meanings specified below.

(a)     "Actions" means the Florida AG Action and any lawsuit by a Subdivision asserting any Released Claim against any Releasee.

(b)     "Agreement," "Settlement" or "Settlement Agreement" means this Settlement Agreement, together with any exhibits attached hereto, which are incorporated herein by reference.

(c)     "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. § 101, et seq.

(d)     "Bar" means either: (1) a law barring all Subdivisions in the State of Florida from maintaining Released Claims against Releasees (either through a direct bar or through a grant of authority to release Claims and the exercise of such authority in full) or (2) a ruling by the Florida Supreme Court (or a District Court of Appeal if a decision is not subject to further review by the Florida Supreme Court) setting forth the general principle that Subdivisions in the State of Florida may not maintain any Released Claims against Releasees, whether on the ground of this Agreement (or the release in it) or otherwise. For the avoidance of doubt, a law or ruling that is conditioned or predicated upon payment by a Releasee (apart from the payments by Walgreens contemplated under this Agreement) shall not constitute a Bar.

(e)     "Claim" means any past, present or future cause of action, claim for relief, cross-claim or counterclaim, theory of liability, demand, derivative claim, request, assessment,

**WALGREENS BOOTS ALLIANCE, INC.
AND WALGREEN CO.**

By: _____

Name: Danielle Gray

Title: Executive Vice President and Global Chief
Legal Officer, Walgreens Boots Alliance, Inc.


Date: May 4, 2022

**WALGREENS OUTSIDE COUNSEL**

**Foley Hoag LLP**

By:

Name:  Harlan Levy

Date:  May 4, 2022

21

**PLAINTIFF**

**STATE OF FLORIDA, including the**
**OFFICE OF THE ATTORNEY GENERAL**

By: _____

Name: John Guard
     Chief Deputy Attorney General of Florida
     Pursuant to the authority delegated to him by
     Ashley Moody, Attorney General of Florida

Date: May 4, 2022

**STATE OUTSIDE LITIGATION COUNSEL**

**Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.**

By:_____

Name: David C. Frederick

Date:_____

**Drake Martin Law Firm, LLC**

By:_____

Name: Drake Martin

Date:_____

**EXHIBIT F**

**INJUNCTIVE RELIEF**
*draft*

## I.  INTRODUCTION

A.      Within 90 days of the Effective Date of the Settlement Agreement and Release (as defined in the Settlement Agreement and Release, the "Effective Date") (except where this Agreement specifies a different implementation period), Walgreen Co. and Walgreens Boots Alliance, Inc.  (together, "Walgreens" or the "Settling Pharmacy") shall implement the terms set forth in this Agreement (the "Settlement Terms").

B.      To the extent that the Settling Pharmacy already has in place committees, departments, policies or programs that satisfy the terms of this Agreement, no re-naming is required by this Agreement.

C.      Overview

1.      The Settling Pharmacy will implement or maintain a Controlled Substance Compliance Program ("CSCP").

2.      The CSCP must include written standard operating procedures and/or corporate policies (the "CSCP Policies and Procedures") required by this Agreement.

3.      The CSCP shall apply during the term of this Agreement to each of the Settling Pharmacy's retail pharmacy stores within the State of Florida.

4.      The Settling Pharmacy shall provide a copy of the relevant CSCP Policies and Procedures to the State within 90 days of the Effective Date. To the extent any implementation is expected to require additional time, the parties agree to work together in good faith to establish a timeline for implementation.

D.      Compliance with Laws

1.      The Settling Pharmacy acknowledges and agrees that its retail pharmacies must comply with applicable federal and Florida state laws, including regarding the dispensing of Controlled Substances. The requirements of the Settlement Terms are in addition to, and not in lieu of, any other requirements of federal or Florida state law. Nothing in the Settlement Terms shall be construed as relieving the Settling Pharmacy of the obligation of its retail pharmacies to comply with all federal and Florida state and local laws, nor shall any of the provisions of the Settlement Terms be deemed as permission for the Settling Pharmacy to engage in any acts or practices prohibited by such laws.

2.      The Settlement Terms are not intended to and shall not be interpreted to prevent the Settling Pharmacy from taking or implementing any other compliance or policy steps necessary to address their retail pharmacies' conformity with local, state, and federal legal requirements. In the event that the Settling Pharmacy determines that there is a conflict between

1

## VIII.   THE PRESCRIPTION VALIDATION PROCESS

A.      As part of its CSCP, to the extent not already in place, the Settling Pharmacy shall have a Prescription Validation Process in the CSCP Policies and Procedures, as further described and set forth in this section, that each pharmacist employed by the Settling Pharmacy at a retail pharmacy in the State of Florida is directed to follow when dispensing a prescription for a Controlled Substance.

B.      The Settling Pharmacy's CSCP Policies and Procedures shall provide that a Red Flag will be considered "resolved" if, after further investigation as described below, and given other facts and circumstances surrounding the prescription, a pharmacist determines, in his or her professional judgment, that the facts that triggered the Red Flag do not lead him or her to believe that the prescription was written or is being submitted for an illegitimate medical purpose or outside the usual course of a Prescriber's professional practice.

C.      The Settling Pharmacy's CSCP Policies and Procedures shall provide that if a pharmacist identifies any "Patient Red Flags" associated with a Controlled Substance prescription (described in Section IX(1) below), before filling the prescription the pharmacist must resolve them; and that the method of resolution falls within the judgment of the pharmacist and may include reviewing the Patient's profile and history with the Settling Pharmacy, calling the Prescriber or Prescribers if appropriate, speaking with the Patient if appropriate, calling on the pharmacist's pre-existing knowledge of the Patient or Prescriber, reviewing available PDMP data, and/or reviewing other data or information available to the pharmacist.

D.      The Settling Pharmacy's CSCP Policies and Procedures shall provide that, except as allowed by Florida law, a pharmacist may only fill a Controlled Substance prescription electronically transmitted by a Prescriber for such drugs; that if the pharmacist identifies any other "Prescription Red Flags" (described in Section IX(2) below), the pharmacist must resolve them; and that the method of resolution falls within the judgment of the pharmacist and may include reviewing the Patient's profile and history with the Settling Pharmacy, calling the Prescriber or Prescribers if appropriate, speaking with the Patient if appropriate, calling on the pharmacists pre-existing knowledge of the Patient or Prescriber, reviewing available PDMP data, and/or reviewing other data or information available to the pharmacist.

E.      The Settling Pharmacy must put in place, to the extent not already in place, systems at its retail pharmacies in the State of Florida to check the licensure status of a Prescriber of Controlled Substances through a regularly updated prescriber database, to the extent such information is reasonably available for such purposes. The dispensing system shall block a Controlled Substance prescription from being filled if the prescriber database check reflects a DEA registration or state license that has been suspended.  CSCP Policies and Procedures shall require that if a pharmacist identifies any Prescriber Red Flags, the pharmacist must resolve them, and that the method of resolution falls within the judgment of the pharmacist and may include reviewing the Settling Pharmacy's records regarding the Prescriber, calling the Prescriber if appropriate, speaking with the Patient if appropriate, calling on the pharmacist's pre-existing knowledge of the Patient or the Prescriber, reviewing available PDMP data, and/or reviewing other data or information available to the pharmacist .

6

F.     The Settling Pharmacy's CSCP Policies and Procedures shall provide that the resolution of all Red Flags identified by the pharmacist must be documented. Any such records shall be maintained for the duration of this Agreement.

G.     The Settling Pharmacy's CSCP Policies and Procedures shall provide that, even if all Red Flags are resolved, a pharmacist shall reject a prescription if, in his or her professional judgment, he or she believes that it was written or is being submitted for other than a legitimate medical purpose and/or was written outside the usual course of an individual Prescriber's professional practice.

## IX.    RED FLAGS

A.     Notwithstanding any other potential Red Flags that the Settling Pharmacy may identify in its CSCP Policies and Procedures, the Settling Pharmacy shall identify in its CSCP Policies and Procedures the following potential "Patient Red Flags":

1.     A Patient seeks to fill a Designated Controlled Substance prescription more than three days prior to the contemplated exhaustion date of an earlier prescription of the same Designated Controlled Substance;

2.     A Patient seeks to fill Designated Controlled Substance prescriptions from more than four Prescribers, from separate practices, in a given 6-month period;

3.     A Patient resides more than 50 miles from the Settling Pharmacy's retail pharmacy where the Designated Controlled Substance prescription is submitted;

B.     Notwithstanding any other potential Red Flags that the Settling Pharmacy may identify in its CSCP Policies and Procedures, with respect to any Controlled Substance prescriptions, the Settling Pharmacy shall identify in its CSCP Policies and Procedures the following potential "Prescription Red Flags:"

1.     A prescription that fails to meet the requirements of law, e.g. Fla. Stat. §§ 456.42(2), (3).

2.     A prescription that appears altered;

3.     A prescription written with misspellings suggesting the prescription may not have been written by a Prescriber; A prescription using atypical abbreviations suggesting the prescription may not have been written by a Prescriber; and

4.     A prescription written with multiple colors of ink or in multiple different handwritings.

C.     Notwithstanding any other potential Red Flags that the Settling Pharmacy may identify in its CSCP Policies and Procedures, with respect to any Prescriber of Controlled Substances, the Settling Pharmacy shall identify in their CSCP Policies and Procedures the following potential "Prescriber Red Flags:"

7

1.   A Prescriber provides a Patient with prescriptions for a Designated Controlled Substance, a benzodiazepine, and carisoprodol; and

2.   A Prescriber has no office within 50 miles of the retail pharmacy store.

## X.   PRESCRIBER REVIEW

A.   To the extent not already in place, the Settling Pharmacy shall develop a process by which it regularly reviews the prescribing patterns and practices of Prescribers of Designated Controlled Substances (the "Prescriber Review Process"). The Prescriber Review Process shall employ algorithms, or other means, to review the Settling Pharmacy's retail dispensing data for potential Prescribers of concern. Once the Settling Pharmacy identifies through its process a Prescriber for further investigation, the review of a Prescriber shall include review of his or her prescribing as contained in the Settling Pharmacy's data and available licensing and disciplinary history. It may also include internet searches, interviews and other information gathered in the discretion of the employees operating the Prescriber Review Process.

B.   If after the Prescriber Review Process the Settling Pharmacy has not resolved its concerns of illegitimate prescribing, then Controlled Substance prescriptions written by the Prescriber shall be blocked from being filled by the Settling Pharmacy's retail pharmacies in the State of Florida, with an opportunity at the discretion of the Settling Pharmacy for the prescriber to seek future reinstatement by providing information to the Settling Pharmacy that may resolve its concerns. This block shall be on top of and in addition to any block based on a Prescriber's licensure. On written demand by the State, the Settling Pharmacy shall provide the names of the prescribers who it has identified for investigation and/or whose prescriptions it has blocked.

## XI.   PROACTIVE DUE DILIGENCE AND SITE VISITS

A.   During the term of this Agreement, the Settling Pharmacy shall conduct periodic proactive compliance reviews of its retail pharmacy stores in the State of Florida to assist with the identification of potential compliance issues related to the dispensing of Designated Controlled Substances at its retail pharmacy stores in the State of Florida. This may be satisfied by the use of algorithms, or other electronic means, to analyze data associated with each pharmacy to identify particular pharmacies for review. Documentation of any resulting reviews shall be maintained by the Settling Pharmacy and made accessible to all Controlled Substance Compliance Department personnel upon request for the duration of the Agreement.

B.   During the term of this Agreement, the Settling Pharmacy's field personnel shall also conduct site visits to each of its retail pharmacy stores in the State of Florida each year for the duration of the Agreement. Operating procedures shall specify that any concerns identified with the dispensing of Designated Controlled Substances shall be reported to the Controlled Substance Compliance Department. The Controlled Substance Compliance Department shall maintain documentation of any such reported concerns.

C.   During the term of this Agreement, to the extent not already in place, the Settling Pharmacy shall put in place processes to oversee inventory, recording keeping and theft and loss prevention controls at its retail pharmacy stores in the State of Florida.

8

**Exhibit 4**
Letter to Dr. Morgan: July 16, 2024



Walgreen Co.
106 Wilmot Rd. MS#2280
Deerfield, IL 60015
Email: PrescriberEvaluation@walgreens.com
Phone: 866-412-1790 | Fax: 224-516-6011
Walgreens.com

July 16th, 2024

COURTNEY MORGAN, MD
HOP MEDICAL SERVICES
2722 NORTH EAST 1ST ST
STE 2
POMPANO BEACH, FL 33062

Dear Courtney Morgan, MD,

Thank you for your submission. We have reviewed the materials you provided. At this time, Walgreens
has decided not to deviate from the dispensing decision as outlined in our letter dated June 18th, 2024.
This decision does not affect the dispensing of non-controlled prescriptions to your patients.

If your prescribing changes materially, please contact us after August 16th, 2025 at
PrescriberEvaluation@walgreens.com to request a review.

Sincerely,

Walgreen Co.

Member of Walgreens Boots Alliance

154

**Exhibit 5**
Florida Department of Health May 31, 2024
Inspection Results



# STATE OF FLORIDA
# DEPARTMENT OF HEALTH
# INVESTIGATIVE SERVICES
## INV440A - Pain Management Clinic



INSPECTION AUTHORITY â€" SECTIONS 458.3265, 459.0137, 893.09 AND CHAPTER 456, FLORIDA STATUTES

File # 2131
Insp # 5938

| NAME OF ESTABLISHMENT<br>HOP MEDICAL SERVICES PLLC | PERMIT NUMBER<br>1827 | DATE OF INSPECTION<br>05/31/2024 | |
|---|---|---|---|
| DOING BUSINESS AS | | | |
| STREET ADDRESS<br>2722 NE 1ST STREET SUITE 2 | | TELEPHONE #<br>305-773-3744 | EXT |
| CITY<br>POMPANO BEACH | COUNTY<br>BROWARD | STATE/ZIP<br>FL/33062 | |

### Additional Information

**Physician Tracking**

| | |
|---|---|
| | |

**AHCA Healthcare num**

| AHCA NUM   hq52 | |
|---|---|

### License Relations

**Designated Physician**

| MORGAN, COURTNEY RICARDO | License # 96210 |
|---|---|

**PMC Physician**

| MORGAN, COURTNEY RICARDO | License # 96210 |
|---|---|

**Pain Clinic Owner**

| MORGAN, COURTNEY RICARDO | License # 96210 |
|---|---|

## INV 440A - Pain Management Clinic

### Pain Management Clinic Requirements

| | |
|---|---|
| The pain-management clinic is registered with the department and the department has been notified of the designated physician. [458.3265(1)(a)2.; 459.0137(1)(a)2., F.S.] | Yes |
| The designated physician practices at the clinic location. [458.3265(1)(c); 459.0137(1)(c), F.S.] | Yes |
| The clinic, including its grounds, buildings, furniture, appliances and equipment is structurally sound, in good repair, clean, and free from health and safety hazards. [458.3265(3)(h)1.; 459.0137(3)(h)1., F.S.] | Yes |
| The clinic has evacuation procedures in the event of an emergency which includes provisions for the evacuation of disabled patients and employees, and has a written facility specific disaster plan which includes provisions for the protection of medical records and any controlled substances. [458.3265(3)(h)2. 3.; 459.0137(3)(h)2., 3., F.S.] | Yes |
| The clinic is located and operated at a publicly accessible fixed location. [458.3265(3)(f)1.i.; 459.0137(3)(f)1., F.S.] | Yes |
| Sign containing the clinic name, hours of operations and a street address is posted where viewable by the public. [458.3265(3)(f)1.a.; 459.0137(3)(f)1.a., F.S.] | Yes |
| Clinic has a publicly listed telephone number and a dedicated phone number to send and receive faxes with a fax machine that is operational twenty-four hours per day. [458.3265(3)(f)1.b.; 459.0137(3)(f)1.b., F.S.] | Yes |
| Clinic has emergency lighting and communications; reception and waiting area; restroom; administrative area including room for storage of medical records, supplies and equipment; private patient examination room(s); and treatment room(s) if treatment is being provided to the patient. [458.3265(3)(f)1. c.-h.; 459.0137(3)(f)1. c.-h., F.S.] | Yes |
| A printed sign disclosing the name and contact information of the clinic's Designated Physician and the names of all physicians practicing in the clinic, is located in a conspicuous place in the waiting room viewable by the public. [458.3265(3)(f)1.i.; 459.0137(3)(f)1.i., F.S.] | Yes |
| Storage and handling of prescription drugs complies with Section 499.0121, Florida Statutes, Section 893.07, Florida Statutes, [458.3265(3)(f)1.j.; 459.0137(3)(f)1.j., F.S.] | N/A |
| The clinic maintains equipment and supplies to support infection prevention and control activities. The clinic identifies infection risks based on geographic location, community, and population served; the care, treatment and services it provides; and an analysis of its infection surveillance and control data. [458.3265(3)(g)1.,2. 1.-3.; 459.0137(3)(g)1.;2. 1.-3., F.S.] | Yes |

**INV440A - Pain Management Clinic**
**HOP MEDICAL SERVICES PLLC**

Insp # 5938

File # 2131

| | |
|---|---|
| The clinic maintains written infection prevention policy and procedure that address the following: prioritized risks; limiting unprotected exposure to pathogens; limiting the transmission of infections associated with procedures performed in the clinic; and limiting the transmission of infections associated with the clinic's use of medical equipment, devices and supplies. [458.3265(3)(g)3. a.-d.; 459.0137(3)(g)3. a.-d., F.S.] | Yes |
| Clinic has an ongoing quality assurance program that objectively and systematically monitors and evaluates quality and appropriateness of patient care, evaluates methods to improve patient care, identifies and corrects deficiencies within the facility, alerts the designated physician to identify and resolve recurring problems, and provides for opportunities to improve the facility's performance and to enhance and improve the quality of care provided to the public. [458.3265(3)(i).; 459.0137(3)(i), F.S.] | Yes |
| The designated physician has established a quality assurance program that includes the following components: the identification, investigation and analysis of the frequency and causes of adverse incidents to patients; the identification of trends or patterns of incidents; measures to correct, reduce, minimize, or eliminate the risk of adverse incidents to patients; the documentation of these functions; and periodic review at least quarterly of such information by the designated physician. [458.3265(3)(i)1.-4.; 459.0137(3)(i)1.-4., F.S.] | Yes |
| Designated physician reports all adverse incidents to the Department of Health as set forth in Section 458.351, Florida Statutes. [458.3265(3)(j)1.; 459.0137(3)(j) 1., F.S.]<br>  *No adverse incidents have occurred since last inspection.* | Yes |
| Designated physician reports quarterly to the Board of Medicine or Osteopathic Medicine in writing the number of new and repeat patients seen and treated at the clinic who are prescribed controlled substance medications for the treatment of chronic, non-malignant pain; the number of patients discharged due to drug abuse; the number of patients discharged due to drug diversion; and the number of patients treated at the pain clinic whose domicile is located somewhere other than in Florida. [458.3265(3)(j)2. a.-d.; 459.0137(3)(j)2. a.-d., F.S.] | Yes |
| Physician maintains control and security of prescription blanks and other methods for prescribing controlled substances and reports in writing any theft or loss of prescription blanks to the department within 24 hours. [458.3265(3)(d); 459.0137(3)(d), F.S.] | Yes |
| Physicians are in compliance with the requirements for counterfeit-resistant prescription blanks as defined in Section 893.065. [Sections 458.3265(3)(d); 459.0137(3)(d), F.S.] | Yes |
| Dispensing is being performed in compliance with 465.0276, F.S. Only physicians licensed under chapter 458 and 459 are dispensing any medication. [Sections 458.3265(3)(b) and 459.0137(3)(b), F.S.] | N/A |
| Controlled substance biennial inventory conducted. [893.07(1)(a), F.S.] | N/A |
| There is no indication physicians have advertised the use, sale, or dispensing of any controlled substance appearing on any schedule in Chapter 893. [Section 458.331(1)(rr) and 459.015(1)(tt), F.S.] | Yes |
| Effective January 1, 2012 all physicians have designated himself or herself as a controlled substance prescribing practitioner on the physician's practitioner profile. [456.44(2)(a), F.S.] | Yes |
| All physicians practicing in this clinic have advised the Board, in writing, within 10 calendar days of beginning or ending his or her practice at this pain-management clinic. [458.3265(3)(e); 459.0137(3)(e), F.S.] | Yes |
| All physicians practicing in this clinic meet the training requirements for physicians practicing in pain management clinics [64B8-9.0131; 64B15-14.0051, F.A.C.] | Yes |
| At least one employee on premises is certified in basic life support. [458.3265(3)(h)4.; 459.0137(3)(h)4., F.S.] | Yes |

**Remarks:**

I have read and have had this inspection report and the violations if any explained, and the information given is true and correct to the best of my knowledge. This inspection is not deemed complete until patient records are reviewed and deemed in compliance with section 458.3265, 459.0137, and chapter 456, Florida Statutes. I understand that any action taken to correct violations shall be documented in writing by the owner or designated physician of the pain clinic and will be verified by follow up visits by the department personnel. [458.3265(3)(b), 459.0137(3)(b), F.S.]

Investigator/Sr. Pharmacist Signature:

CASTROVINCI, STACEY

Representative:

Courtney Morgan MD

Date:5/31/2024

Date:5/31/2024



**STATE OF FLORIDA
DEPARTMENT OF HEALTH
INVESTIGATIVE SERVICES**
**INV440B - Pain Management Clinic**

INSPECTION AUTHORITY â€" SECTIONS 458.3265, 459.0137, 893.09 AND CHAPTER 456, FLORIDA STATUTES

File # 2131
Insp # 5938

| NAME OF ESTABLISHMENT<br>HOP MEDICAL SERVICES PLLC | | PERMIT NUMBER<br>1827 | | DATE OF INSPECTION<br>05/31/2024 |
|---|---|---|---|---|
| **DOING BUSINESS AS** | | | | |
| **STREET ADDRESS**<br>2722 NE 1ST STREET SUITE 2 | | | **TELEPHONE #**<br>305-773-3744 | **EXT** |
| **CITY**<br>POMPANO BEACH | **COUNTY**<br>BROWARD | | **STATE/ZIP**<br>FL/33062 | |

**Additional Information**

**Physician Tracking**

| | |
|---|---|
| | |

**AHCA Healthcare num**

| AHCA NUM   hq52 | |
|---|---|

**License Relations**

**Designated Physician**

| MORGAN, COURTNEY RICARDO | License # 96210 |
|---|---|

**PMC Physician**

| MORGAN, COURTNEY RICARDO | License # 96210 |
|---|---|

**Pain Clinic Owner**

| MORGAN, COURTNEY RICARDO | License # 96210 |
|---|---|

### INV 440B - Pain Management Clinic

**Pain Management Clinic Requirement**

| Complete physical exam is performed by a physician, physician's assistant or advanced registered nurse practitioner on the same day that the physician prescribes a controlled substance. [458.3265(3)(c); 459.0137(3)(c), F.S.] | Yes |
|---|---|

**Maintains accurate, current and complete records that are accessible and readily available for review and comply with the requirements of 456.44(3)(f), the applicable practice act, and applicable board rule. The medical records must include but are not limited to:**

| Complete medical history and physician examination, including history of drug abuse and dependence. [456.44(3)(f)1, F.S.] | Yes |
|---|---|
| Diagnostic, therapeutic, and laboratory results. [456.44(3)(f)2, F.S.] | Yes |
| Evaluations and consultations. [456.44(3)(f)3, F.S.] | Yes |
| Treatment objectives. [456.44(3)(f)4, F.S.] | Yes |
| Discussion of risks and benefits. [456.44(3)(f)5, F.S.] | Yes |
| Treatments. [456.44(3)(f)6, F.S.] | Yes |
| Medications, including date, type, dosage, and quantity prescribed. [456.44(3)(f)7, F.S.] | Yes |
| Instructions and agreements. [456.44(3)(f)8, F.S.] | Yes |
| Periodic reviews. [456.44(3)(f)9, F.S.] | Yes |
| Results of any drug testing. [456.44(3)(f)10, F.S.] | Yes |
| A photocopy of the patient's government-issued photo identification. [456.44(3)(f)11, F.S.] | Yes |
| Duplicate of all written controlled substance prescriptions. [456.44(3)(f)12, F.S.] | Yes |
| The physician's full name presented in a legible manner. [456.44(3)(f)13, F.S.] | Yes |

**Pain Management Clinic Requirements**

## INV440B - Pain Management Clinic
### HOP MEDICAL SERVICES PLLC

Insp # 5938

File # 2131

| | |
|---|---|
| Controlled substance prescriptions have the quantity of the drug prescribed in both textual and numerical format and are dated with the abbreviated month written out on the face of the prescription. [456.42(1), F.S.] | Yes |
| A written individualized treatment plan has been developed for each patient with objectives used to determine treatment success. The physician adjusts drug therapy to the individual needs of each patient. Other treatment modalities are considered. Interdisciplinary nature of treatment plan is documented. [456.44(3)(b)] | Yes |
| The physician is documenting in the patient's record the reason for prescribing more than 72-hour supply of controlled substances for the treatment of chronic non-malignant pain. [458.3265(3) (c); 459.0137(3)(c), F.S.] | Yes |
| Patients are seen by the physician at regular intervals, not to exceed 3 months, to assess the efficacy of treatment. Continuation or modification of therapy depends on the physician's evaluation of the patient's progress. [456.44(3)(d) F.S.] | Yes |
| Patients are referred as necessary for additional evaluation and treatment in order to achieve treatment objectives with special attention given to those patients at risk for misuse of medications and those in living arrangements that pose a risk for medication misuse or diversion. [456.44(3)(e), F.S.] | Yes |
| Patients with signs or symptoms of substance abuse are immediately referred to a board certified pain management physician, addiction medicine specialist, or a mental health addiction facility unless the physician is board-certified or board-eligible in pain management. [456.44(3)(g), F.S.] | Yes |
| Clear and complete medical justification for continued treatment with controlled substances and steps to ensure medically appropriate use of controlled substances is documented clearly and completely when continuing controlled substance prescribing while waiting consultant's report on patients showing signs or symptoms of substance abuse. [456.44(3)(g), F.S.] | Yes |
| Physician is incorporating consultant's recommendation for continuing, modifying, or discontinuing controlled substance therapy into the treatment plan. [456.44(3)(g), F.S.] | Yes |

**The physician has discussed the risks and benefits of the use of controlled substances and is using a written controlled substance agreement between the patient outlining the patient's responsibilities including, but not limited to:**

| | |
|---|---|
| Number and frequency of controlled substance prescriptions and refills. [456.44(3)(c)1, F.S.] | Yes |
| Patient compliance and reasons for which drug therapy may be discontinued. [456.44(3)(c)2, F.S.] | Yes |
| Agreement that controlled substances for the treatment of chronic nonmalignant pain shall be prescribed by a single treating physician unless otherwise authorized by the treating physician and documented in the medical record. [456.44(3)(c)3, F.S.] | Yes |

### Remarks:

I have read and have had this inspection report and the violations if any explained, and the information given is true and correct to the best of my knowledge. This inspection is not deemed complete until patient records are reviewed and deemed in compliance with section 458.3265, 459.0137, and chapter 456, Florida Statutes. I understand that any action taken to correct violations shall be documented in writing by the owner or designated physician of the pain clinic and will be verified by follow up visits by the department personnel. [458.3265(3)(b), 459.0137(3)(b), F.S.]

Investigator/Sr. Pharmacist Signature:

CASTROVINCI, STACEY

Date:5/31/2024

Representative:

Courtney Morgan MD

Date:5/31/2024

**Exhibit 6**
Chronological Correspondence
Between Dr. Morgan and Walgreens

 Gmail

Hop Medical Services <hopmedicalservicesfl@gmail.com>

## Response Letter Regarding Walgreens' Notice

**Hop Medical Services** <hopmedicalservicesfl@gmail.com>                    Thu, Jun 20, 2024 at 7:40 PM
To: PrescriberEvaluation@walgreens.com, 12245166011@nextivafax.com
Cc: Courtney Morgan <hopmedicalservices@gmail.com>

Good afternoon,

Please find attached our physician's correspondence regarding the above-referenced matter.

Sincerely,
Andrea Wilson
Staff

--
*Hop Medical Services*
*Dr. Courtney Morgan, MD*
*2722 NE 1st Street, Suite 2*
*Pompano Beach, FL 33062*
*Tel: (954) 247-9324*
*Efax (844) 840-8030*
*e-mail: hopmedicalservicesfl@gmail.com*

The information contained in this email message is privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you must not review, retransmit, convert to hard copy, copy or use or disseminate this email or any attachments to it. This document may also contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL 104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure, and confidential manner. Redisclosure without additional patient consent or as permitted by law is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made. Copies of documents, enclosures thereto, and information there from will not be further released under penalties of the law. Unauthorized disclosure carries a minimum of $3,000 fine.

📄 **Letter in Response to Notice 6-18-24 with attachment.pdf**
224K

COURTNEY R. MORGAN, M.D.
2722 North East 1st Street, Suite 2
Pompano Beach, FL 33062
Tel: 954-247-9324 • Fax: 844-840-8030
Email: hopmedicalservicesfl@gmail.com

June 20, 2024

*Sent via email and fax to:*
*PrescriberEvaluation@walgreens.com*
*224-516-6011*

Walgreens Co.
102 Wilmot Road, MS #2280
Deerfield, IL 60015

To Whom This May Concern:

On June 20, 2024, this office received the attached letter stating that:
(1) Walgreens asked for information about our prescribing practices
(2) We did not respond to the request
(3) Walgreens will discontinue dispensing controlled substances prescribed by me, Courtney Morgan, M.D. as of August 16, 2024.

The phone number provided was called, and we spoke with Representative Latoya (Rep. #5511549). **She was advised that our office never received any communication from Walgreens requesting any information.** The attached letter is our first and only communication from Walgreens.

Also of note, the letter received was addressed to *Drive Thru Doc,* a clinic that does not accept patients with medical issues that are treated with controlled substances. However, our EMR does have a glitch that sometimes redirects the prescription send-source to Drive Thru Doc. This is a computer / EMR error.

The clinic under which controlled substances are prescribed by me is Hop Medical Services, PLLC. Hop Medical Services is a Pain Management Clinic, with license number PMC 1827. This office was opened at the above location around June 2020. This medical facility has been in good standing with the Florida Department of Health (DOH), with excellent comments from the DOH auditors during their random annual audits. In fact, last year the auditor requested permission to photocopy some our office materials, with the intent to used them in a "gold standard" demonstration for other pain management facilities. We once again, passed the annual review with praises on May 31, 2024.

Hop Medical Services, PLLC has never received any deficiency notices by any agency. My DEA and medical licenses are active and unrestricted. Hence, the communication received was shocking not only for the foregoing reasons, but also because our office has maintained a great working relationship with Walgreens pharmacists, with open communication regarding our mutual patients and their diagnoses, treatments and plan of care.

Page **1** of **2**

COURTNEY R. MORGAN, M.D.
2722 North East 1st Street, Suite 2
Pompano Beach, FL 33062
Tel: 954-247-9324 • Fax: 844-840-8030
Email: hopmedicalservicesfl@gmail.com

Pharmacists and I have openly discussed medication step downs and modifications, or the need for maintenance, and the patient's stability.  They are aware of other providers who are part of the patients' medical team, such as infectious disease specialists, orthopedists, cardiologists, podiatrists, surgeons, oncologists, etcetera.

While Hop Medical Services is a Pain Management Clinic, some primary care services are provided to patients.  Therefore, controlled substances other than pain management medication is prescribed with continuity of care, such as seizure medication, hormone medication, HIV medication, etcetera.

Walgreens Company is granted licensures by pharmacy boards to dispense medications in accordance with the state laws and administrative rules.  The general premise is that pharmacists are to fill prescriptions written by a licensed physician provided the prescription is valid with complete information and it is issued for a legitimate medical purpose. If there are any questions regarding a particular prescription, the pharmacist may then contact the physician for clarification and verification. The letter received does not follow the foregoing general rules.

Refusal to honor all controlled substance prescriptions issued by any single physician violates the foregoing principles and results in irreparable harm to the physician.  Patients who are forced to find another physician to undertake continuity of the care will foreseeably receive the same medical management by another physician.  Therefore, refusing to honor all controlled substance prescriptions issued by a physician does not change the patient's management, especially if the patient is under therapeutic dosage of medication and is clinically stable.

Please contact me at your earliest convenience to address this matter.

Sincerely,

Dr. Courtney Morgan

Gmail - TIME SENSITIVE: Reply Requested from Walgreens Prescriber Evaluation                                                8/20/24, 11:47 AM

 Gmail

**Courtney Morgan <hopmedicalservices@gmail.com>**

---

# TIME SENSITIVE: Reply Requested from Walgreens Prescriber Evaluation

2 messages

---

**PrescriberEvaluation** <PrescriberEvaluation@walgreens.com>              Fri, Jun 21, 2024 at 5:19 PM
To: "hopmedicalservices@gmail.com" <hopmedicalservices@gmail.com>

Dear Courtney Morgan, MD,

The Walgreens Prescriber Evaluation team has been trying to contact you regarding our continued ability to dispense controlled substance prescriptions written by you. Specifically, we sent you letters on March 12th, 2024, and March 26th, 2024, that were both returned and noted "Delay Customer not available or business closed." Enclosed in the letter was a questionnaire to solicit information about your practice to ensure our pharmacists are complying with their obligations under federal law. Also, an email was sent to crm326@gmail.com on April 4th,2024 and May 7th,2024.

We have attached a copy of the questionnaire to this message. A physical copy of the letter will be sent via FedEx on June 25th, 2024, and should arrive next day.
**If we do not receive a reply to this letter by July 9th, 2024, we may discontinue dispensing controlled substances that you have prescribed as of August 16th, 2024.**

*Thank you, in advance, for working with Walgreens to improve the safety of our patients and community by reducing prescription drug misuse, abuse and diversion.*

**Prescriber Evaluation** | Pharmaceutical Integrity

**Walgreen Co**.| 102 Wilmot Road | MS #2280

Deerfield, IL 60015

Fax: (224)516-6011

**Member of Walgreens Boots Alliance** | MyWalgreens.com

This message contains confidential quality information that is considered Patient Safety Work Product under federal law. Do not print, copy, discuss, or distribute in any form outside the Walgreens Patient Safety Evaluation System. Please delete this message upon completion of quality activities detailed within.

This email message, including attachments, may contain information that is proprietary, confidential, privileged and/or exempt from disclosure. Please hold it in confidence to protect privilege and confidentiality. If you are not the intended recipient, then please notify the sender and delete this message. Any viewing, copying, publishing, disclosure, distribution of this information, or the taking of any action in reliance on the contents of this message by unintended recipients is prohibited and may constitute

a violation of the Electronic Communications Privacy Act.

Privileged and Confidential-Patient Safety Work Product

 **PAIN Questionnaire_[Morgan].pdf**
341K

---

**Courtney Morgan** <hopmedicalservices@gmail.com>                    Thu, Jul 4, 2024 at 7:59 PM
To: PrescriberEvaluation <PrescriberEvaluation@walgreens.com>, Courtney Morgan <crm326@gmail.com>

Good evening,

Please find attached the response to your request for Due Diligence Information.
This will also be faxed to the number contained in your letter dated June 25, 2024.

Last, please confirm receipt and advise if there are any issues opening the attached file.

Thank you,
Dr. Courtney Morgan
[Quoted text hidden]
--

******Internet Email Confidentiality********

This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL 104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure, and confidential manner. Redisclosure without additional patient consent or as permitted by law is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made. Copies of documents, enclosures thereto, and information there from will not be further released under penalties of the law. Unauthorized disclosure carries a minimum of $3,000 fine.

---

**RESPONSE TO WALGREENS DUE DILIGENCE REQUEST FOR INFO (WITH EXHIBITS ATTACHED) 7-4-2024.pdf**
5564K

 Gmail

Courtney Morgan <hopmedicalservices@gmail.com>

---

# Response to Request for Due Diligence Information

**Hop Medical Services** <hopmedicalservicesfl@gmail.com>                    Tue, Jul 9, 2024 at 11:57 AM
To: 12245166011@nextivafax.com
Cc: Courtney Morgan <hopmedicalservices@gmail.com>, Courtney Morgan MD <crm326@gmail.com>

Good afternoon,

The attached correspondence was provided via email to prescriberevaluation@walgreens.com and via fax to 224-516-6011, on July 4, 2024.

The response deadline is July 9, 2024.  Another copy is attached here for your convenience.  We would like confirmation of receipt of the attached response which is a total of 56 pages, inclusive of the cover letter, response to questions and exhibits.

Thank you,
Andrea Wilson
Staff

--
*Hop Medical Services*
*Dr. Courtney Morgan, MD*
**2722 NE 1st Street, Suite 2**
**Pompano Beach, FL 33062**
*Tel: (954) 247-9324*
*Efax (844) 840-8030*
*e-mail: hopmedicalservicesfl@gmail.com*

The information contained in this email message is privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you must not review, retransmit, convert to hard copy, copy or use or disseminate this email or any attachments to it. This document may also contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL 104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information, it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure, and confidential manner. Redisclosure without additional patient consent or as permitted by law is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made. Copies of documents, enclosures thereto, and information there from will not be further released under penalties of the law. Unauthorized disclosure carries a minimum of $3,000 fine.

---

 **RESPONSE TO WALGREENS DUE DILIGENCE REQUEST FOR INFO (WITH EXHIBITS ATTACHED) 7-4-2024.pdf**
5564K

# TAB 21

```
 1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
 2                 (FT. LAUDERDALE DIVISION)

 3             CASE NO. 0:24-CV-61442-RS

 4
     COURTNEY MORGAN, M.D.              Ft. Lauderdale, Florida
 5
             PLAINTIFF,                 August 15, 2024
 6                                      Thursday
         VS.
 7
     WALGREEN CO.                       Scheduled for 9:30 a.m.
 8                                      9:35 a.m. - 10:12 a.m.

 9           DEFENDANT.

10                                      Pages 1 - 31

11   ------------------------------------------------------------

12                        HEARING ON
                   EXPEDITED MOTION FOR
13             TEMPORARY RESTRAINING ORDER

14          BEFORE THE HONORABLE RODNEY SMITH
            UNITED STATES DISTRICT COURT JUDGE
15
16   APPEARANCES:

17
     ON BEHALF OF PLAINTIFF:        ERICA FAITH CHAPLIN, ESQ.
18                                  Chaplin Law Firm PLLC
                                    10380 S.W. Village Center Drive
19                                  Port St. Lucie, Florida  34987

20
     ON BEHALF OF DEFENDANT:        TAMARA SAVIN MALVIN, ESQ.
21                                  Akerman, LLP
                                    201 East Las Olas Boulevard
22                                  Suite 1800
                                    Ft. Lauderdale, Florida  33301
23
     STENOGRAPHICALLY
24   REPORTED BY:                   GLENDA M. POWERS, RPR, CRR, FPR
                                    Official Court Reporter
25                                  United States District Court
                                    400 North Miami Avenue
```

1              Call to the order of the Court:)

2          COURTROOM DEPUTY:  Morgan versus Walgreens,

3     24-CV-61442, Smith.

4              Counsel, state your appearances for the record,

5     starting with the plaintiff.

6          MS. CHAPLIN:  Erica Chaplin on behalf of the plaintiff,

7     and with me is Dr. Courtney Morgan.

8          MS. MALVIN:  Tamara Malvin from Ackerman on behalf of

9     the defendant.

10         THE COURT:  We're here on the plaintiff's -- rather

11    both sides' expedited motion for temporary restraining order

12    and preliminary injunction.

13             Plaintiff may proceed.

14         MS. CHAPLIN:  Yes, Your Honor.  I believe that

15    plaintiff has outlined the facts in the complaint, as well as

16    in the motion, with regards to the temporary injunction.

17             I believe the plaintiffs have established a likelihood

18    of success on the merits, that irreparable harm and injury that

19    will be suffered by my client, the threatened injury does

20    outweigh the harm, as Walgreens is not going to be affected if

21    Dr. Morgan's prescriptions are accepted and permitted to be

22    filled.

23             As stated in the complaint, basically, patients have

24    encountered this before and what they end up doing is find

25    another doctor and get prescribed medications for their chronic

1    pain and for all the issues that they have, and I don't know

2    why the doctor himself is being penalized, and then last, the

3    entry of relief would serve the public.

4         Yesterday, one of Dr. Morgan's patients, who is an

5    amputee, a transplant patient, diabetic neuropathy, and all

6    other ailments, were told that they could not be filled by

7    Dr. Morgan after tomorrow -- sorry, starting tomorrow, and he's

8    a chronic patient, and he -- with regards to the claim for

9    tortious interference with business, I think it's quite obvious

10   that Walgreens is aware of a relationship between patients and

11   doctors.

12        Patients and doctors get attached to each other all the

13   time.  Sometimes it's a pretty close relationship.  Patients

14   are loyal to their doctors.  People don't even move out of

15   state because they don't want to leave their doctors.

16        They're aware of that relationship.  They have

17   knowledge of the relationship.  They intentionally interfered

18   by sending out these letters and by instituting this block.

19        They have no reason for it.  His license is clear, his

20   medical license, DEA license.  He's authorized to do this by

21   the Florida Board of Health.

22        He runs a licensed pain management clinic.

23        The Florida Department of Health, they do inspections

24   every year and, as stated in the complaint, I believe, also in

25   the motion, Dr. Morgan's clinic is one of a standard that they

1    like other clinicians to emulate.

2         They actually redacted and used samples from his

3    office -- sample materials to show other clinicians this is

4    what you need to do to run a clinic.

5         May the 1st of 2024, the most recent inspection, these

6    are the findings.  I'm going to read some of them from the

7    Department of Health, and they inspect the entire clinic as a

8    whole, physically, they look at all the materials that are

9    there.

10        They go through the records and they found complete

11   medical history and physical examination, including history of

12   drug abuse and dependency, diagnostic and therapeutic

13   laboratories in their consultations, treatment objectives,

14   discussions of the risks and benefits, the treatments and

15   medication.

16        And all the information required for medication that's

17   required by law and also by the Florida Medical Board rules.

18        The instructions, informationals, period reviews, drug

19   tests, there are random drug tests done, and then -- and then

20   an individualized treatment plan has been developed for each

21   patient with objectives used to determine treatment success.

22        The physician adjusts drug therapy to the individual

23   needs of each patient, other treatment modalities are

24   considered, into a disciplinary of the treatment is documented

25   patients seen regular intervals, patients seen for additional

1    evaluation and treatment.

2         They're also referred to other specialists.

3         Patients with signs and symptoms of substance abuse are

4    referred to those specialists to deal with that, clear and

5    complete medical justification for continued treatment with

6    controlled substances and steps to insure medically appropriate

7    use of controlled substances is documented clearly and

8    completely.

9         When continuing controlled substance prescribing,

10   physician is incorporating the consultant's recommendation, as

11   well.  I just wanted to read that briefly.  That's their

12   results from the Florida Board of Health's inspection.

13        And then last would be the damage to Dr. Morgan, which

14   is quite obvious.  He's trained in family medicine.  He's also

15   qualified to do pain management.  He trained right here down at

16   Jackson, had extensive exposure with chronic pain due to

17   traumatic injuries, cancer, all kinds of treatments.

18        He worked at hospitals where they sought him out to

19   treat that kind of pain, whether it's sickle cell and so forth.

20   He will be damaged as a family medicine physician.

21        You have to be able to prescribe to your patients, and

22   there are a lot of patients that their prescriptions, sure,

23   there's chronic pain, but then there's seizure medication for

24   congestive heart failure, LEV.

25        There's other things that go with the whole team of

1    healthcare providers providing the best care for their

2    patients.  And if Dr. Morgan is unable to do that for one of

3    the largest -- I believe, on their website, it's recognized as

4    the second largest retail pharmacy in the nation.

5        It completely impairs him if all of his patients leave

6    or how ever many patients leave and all this filters through

7    the patient community and medical community.

8        His company will shut down.  He will not be able to get

9    a job because he will not be able to do a patient with

10   insurance connected to Walgreens.

11       With regards to patients leaving, they're already being

12   treated a certain way.  They're being looked at a certain way.

13   They're talked about a certain way.  They have been scorned.

14   They're embarrassed.  They're being degraded by the

15   pharmacists.  They see this in the system:

16       You're a doctor.  You're a doctor?  It's so stressful

17   for the patients.  The day they got the letter a lot of them

18   called the office.  This is the kind of thing that wreaks

19   havoc, and there is no justification for it.

20       THE COURT:  All right.

21       Let me hear from counsel for Walgreens.

22       MS. MALVIN:  Good morning, Your Honor.

23       THE COURT:  Good morning.

24       MS. MALVIN:  I appreciate the opportunity to speak on

25   this and please bear with me because we found out about this

1       yesterday afternoon.  So, as you can imagine, I'm scrambling a

2       bit with the papers that are here.

3               I also appreciate the fact of the nature of today's

4       hearing.  Simply, the plaintiff has an extremely high burden

5       that he must satisfy in order to substantiate for the relief

6       requested today, which is an expedited TRO, and plaintiff just

7       has not satisfied that burden.

8               I did want to make a comment that I reviewed the

9       Court's order setting today's hearing.  I believe that by five

10      p.m. last night a proposed order with significant detail as to

11      the facts on the law was supposed to be submitted.

12              I don't know if that was submitted.  I did not receive

13      a copy of that.  I don't believe it was law law.  It was

14      e-mailed, Your Honor, we received it by e-mail.

15              THE COURT:  It was received by e-mail.

16              MS. MALVIN:  I have not had an opportunity to review

17      the written submission with the facts being presented to the

18      Court and how they apply to the law.

19              At the end of today's hearing -- we believe it should

20      be outright denied, of course, but at the very minimum,

21      Walgreens would like to have an opportunity to submit our own

22      written response and opposition and have a hearing on this

23      before any kind of injunctive relief is implemented.

24              THE COURT:  Let me ask you this.

25              If you're suggesting that -- Walgreens, of course,

1    should have an opportunity to respond to Walgreens letter of

2    terminating his medication by them, so how -- you can't unring

3    a bell once that ship is sailed.  Now what?

4         MS. MALVIN:  If I can go through kind of the thoughts

5    I have today, that might be able to answer your question?

6         THE COURT:  Sure.

7         MS. MALVIN:  If I don't fully answer your question,

8    what I can do -- give me second -- I will give her a copy of

9    the proposal order as well.

10        Do you have an extra copy of your proposed order?

11        Give her a copy.

12        MS. CHAPLIN:  I believe.

13        THE COURT:  Go ahead and address the Court.

14        MS. MALVIN:  Thank you, Judge.

15        So, you know, today is much more of a conversation

16   about procedure than it is substance, I believe, and

17   procedurally I think that there are kind of three overarching

18   themes that would impact your decision as to whether or not to

19   issue the expedited temporary restraining order.

20        First, of course, is we do not believe that -- despite

21   the August 16th date you referenced -- that the actual facts in

22   terms of what occurred to support the fact that this is an

23   expedited nature.

24        Secondly -- and I'll fill in the blanks momentarily --

25   plaintiff has known about this issue for months.  Plaintiff

1    does not satisfy their requirements for a TRO.

2         As counsel stated, there are four elements —— and I

3    will to through them momentarily —— where we do not believe

4    that those four elements have been established by the facts

5    presented by the plaintiff.

6         And thirdly, this is probably not the venue for this

7    action.  If there's an issue with respect to the decisions

8    being made with respect to whether the pharmacy should fulfill

9    prescriptions, that belongs with the State of Florida's Board

10   of Pharmacy.

11        And I guess a corollary to that is —— and maybe this is

12   a corollary to that, as well as the elements of the TRO —— a

13   lot of —— at least what I've read in the filings —— relates

14   back to the patients and their purported misgivings, but we

15   don't have any patients here and, unfortunately, the plaintiff

16   does not have standing to argue a position that his patients

17   may or may not be arguing themselves.

18        I guess I'm kind of going backwards, so I'll go

19   forwards now —— and I apologize for the lack of organization.

20        But with respect to this Court being the proper venue

21   for their case, a very similar case was filed in California in

22   State court in 2021 —— and I have a copy —— one printed out

23   copy, if you would like me to provide it to you, or else I can

24   provide you the citation, whichever you prefer, or both.

25        The case is Bradley versus CVS Pharmacy.  The citation

1     64 Cal.App. 5th, 902 from 2021.  And ultimately the Court there

2     determined that the primary justification doctrine applied

3     where it was not in the purview of the Court to determine

4     whether or not blocked prescription fulfilling was appropriate,

5     it was within the state board —— the state agency to make that

6     determination.

7          So, similarly here, we do not believe that this is even

8     the proper venue for this conversation, in that the plaintiff

9     has not properly —— originally, the argument would have been an

10    exhaustion of administrative remedies, but at least with

11    respect to this California case the Court did not necessarily

12    agree with the fact that it was an exhaustion of administrative

13    of remedies.  It was primarily a issue, but nonetheless, the

14    case was dismissed.  It should have been brought through the

15    board through the appropriate administrative process.

16         Similarly, here, in Florida, of course, we have the

17    Florida Administrative —— the Florida APA and the whole system

18    where plaintiff could go about challenging this decision in

19    that manner.

20         And going back to what I highlighted first, but I think

21    that it relates somewhat to what I just stated.  This is an

22    issue that the —— Walgreens, at least, has been trying to

23    notify the plaintiff since March of this issue —— certainly

24    since June, the plaintiff has known of this issue.

25         Walgreens sent letters by FedEx to the plaintiff back

1    in March, made multiple attempts that kept being returned to

2    sender.  They then sent an e-mail to the plaintiff in early

3    April.  And I do have a declaration signed by my client to this

4    effect if -- because, obviously, I can't testify, but I do have

5    a declaration that we were able to pull together quickly this

6    morning.  I can submit that to you, Your Honor.

7         They sent an e-mail in early April to the e-mail

8    address that is on file with the state as the primary e-mail

9    address for the plaintiff explaining that they were going

10   through an investigation and they had a questionnaire and could

11   he please answer that.

12        And this is all through a program that is mandated by

13   the State of Florida, which I will get to momentarily.

14        The e-mail, they never -- the plaintiff had to -- per

15   the e-mail, they had a month to respond and per the month they

16   did not receive a response.  Walgreens issued an extension to

17   respond.  Still no response.

18        Then Walgreens takes on the file, reviews it,

19   ascertains, based upon the program that they've instituted that

20   they would be implementing a block, and they sent a letter

21   again by FedEx to the same address that the previous letters

22   had been sent notifying the plaintiff of the decision, letting

23   him know that they would still fulfill his prescriptions for

24   two months, to give two months' time for patients to, you know,

25   workout with CVS, or Wal-Mart, or Publix, or private pharmacy,

1    and there are many other options besides Walgreens.

2         That letter that was sent in June, apparently, did get

3    the attention of the plaintiff and the plaintiff contacted

4    Walgreens.  Walgreens allowed him -- despite the fact that they

5    had already made this decision, they did allow him to submit

6    the questionnaire questions late, and they would re-review his

7    file.

8         The questionnaire responses were sent in July, and

9    while Walgreens did do what they said, they reviewed what was

10   presented by the plaintiff, they did a review of his file.

11        They ultimately sent a letter to the plaintiff -- and a

12   lot of this is in the complaint anyway -- and they ultimately

13   advised the plaintiff that they would not be changing their

14   decision, they would not reverse course.  That was -- plaintiff

15   knew about this as on July 17th, I believe, is the date.

16        I'm not quite sure why the hearing we're having today

17   wasn't set or attempted to be set earlier than, you know, 24

18   hours ago when plaintiff was fully aware of the finality of the

19   decision a month ago, but even more so, plaintiff was aware

20   that this was transpiring for a long time and certainly could

21   have been seeking some kind of intervention, like today, at an

22   earlier time.

23        So the timing is a little bit, I guess, concerning --

24   or maybe concerning is the wrong word, but it feels somewhat

25   like an end run around, not a proper hearing with notice and an

1  opportunity for myself and my client to really present a

2  proper, you know, case and position on the matter.

3       And then getting to the merits of the TRO.

4       First and foremost, plaintiff has to prove –– again,

5  plaintiff has the burden – and a very high burden – the case

6  law is very clear, the plaintiff has to prove that there's a

7  substantial likelihood of succeeding on the merits.

8       Plaintiff can't –– hasn't done that.  The information

9  that has been provided –– at least from what I have seen ––

10  does not substantiate and satisfy that high burden.

11       Again, there is absolutely no reason why plaintiff's

12  patients can't get their prescriptions filled by any other

13  pharmacy.  Just off the top of my head, I listed four.  There

14  are multiple pharmacies.  If you just drive down Broward

15  Boulevard you see a CVS on one side of the street and Walgreens

16  on the other.

17       THE COURT:  Do you know anything for testifying that

18  what you would tell me is that their insurance would

19  automatically ––

20       MS. MALVIN:  I don't have that information, I can't

21  tell you today.

22       THE COURT:  The short answer is no, it doesn't work

23  like that.

24       MS. MALVIN:  Walgreens provided them, ultimately,

25  opportunity; whether or not they can do that, we don't have an

1    answer from the plaintiff, whether or not that is true --

2    again, the burden is on the plaintiff.

3        Plaintiff has not presented any information

4    demonstrating that his patients don't have the opportunity to

5    go to another pharmacy.  Plaintiff also does not demonstrate

6    that any proof that he's actually losing patients because of

7    this.

8        We -- again, I have to bring it back to the fact that

9    this is not on Walgreens.  The burden is not on Walgreens.  The

10    burden is on the plaintiff, and the facts and the evidence

11    presented do not substantiate this kind of relief.

12        For the same reason, you know, the plaintiff hasn't

13    demonstrated that there is irreparable harm because, again, we

14    don't -- there's nothing that has been presented to the Court

15    to say that they are leaving or that they can't get their

16    prescriptions filled elsewhere.

17        And with respect to the other elements of the TRO, the

18    threatened injury -- there is -- Walgreens will be affected and

19    despite plaintiff's counsel's comments, Walgreens is subject to

20    a very public settlement agreement with the State of Florida,

21    and this, I think, touches upon the third and fourth elements

22    of a TRO with respect to both the impact to Walgreens, as well

23    as serving the public interest.

24        THE COURT:  Let me ask you this question here, you said

25    Walgreens is going to be affected by this.

1          Let's assume I deny the plaintiff's motion, can they

2     still get their prescriptions filled by Walgreens?

3          MS. MALVIN:  While Walgreens will have the block

4     implemented as of August 16th, so they would not be able to

5     fill certain specific prescriptions –– not all of them.

6          So the prescriptions that are controlled substances

7     would be blocked at Walgreens.  The non-controlled substance

8     prescriptions would still be able to fulfilled by Walgreens.

9          MS. CHAPLIN:  That's for Dr. Morgan –– only for

10    Dr. Morgan.  Sorry.

11         THE COURT:  That's what I'm asking, can another

12    physician at Walgreens take the same patient and have those

13    prescriptions filled other than Dr. Morgan?

14         MS. MALVIN:  I don't know all the files they used and

15    decisions made by Walgreens, so I wouldn't be able to answer

16    that question properly.  I'm counsel and I don't want to speak

17    out, don't want to over-speak or misstate.

18         This whole program –– and maybe I should have started

19    with this:  The letters, the questionnaires, the decisions,

20    this all came about because the State of Florida has mandated

21    as their –– with major opioid litigation that was settled with

22    the Attorney General of Florida, Walgreens is, you know, a

23    party to that settlement.

24         This program, the manner in which they analyze the

25    files and make these determinations is purely due to this

1    settlement agreement with the State of Florida.

2         The Attorney General should —— frankly should —— is an

3    indispensable party to this case.  The State of Florida with

4    representation by the Attorney General's Office is an

5    indispensable part of this case, as well, because it all comes

6    about due to the requirement of the settlement agreement.

7         There are very strict on Walgreens as a result of that

8    litigation and the settlement agreement.  This program was

9    developed.  This was not specific to Walgreens, you know, of

10   course, they're not the only, you know, company that —— you

11   know, fulfills prescriptions.

12        As I mentioned, the case in California involves CVS.

13        This is, you know, the manner in which the country, but

14   certainly the State of Florida is trying to deal with an opioid

15   crisis, and so Walgreens is handling its position with respect

16   to its requirements with the State of Florida by implementation

17   of this very specific program.

18        They take —— this is not some kind of overnight

19   decision where they just —— there are analytics and specifics,

20   and I can give you a little more specifics in terms of the

21   requirements of the settlement.

22        It requires that they review the prescribing patterns

23   and practices of prescribers for potentially inappropriate or

24   disproportionate prescribing, and the program uses referrals

25   from field pharmacists' analytics, other methods that define

1    prescribers that require further investigation.

2         Walgreens will send the questionnaire -- as I mentioned

3    that occurred here -- in an attempt to resolve its concerns.

4    If it cannot resolve its concerns, Walgreens will contact the

5    prescriber.

6         THE COURT:  Dr. Morgan overly prescribed medication,

7    that's why they're not authorizing him to fulfill a

8    prescription for his patient?

9         MS. MALVIN:  Again, I don't want to be -- I'm not my

10   client, I don't want to over-speak on the fly.  I have not

11   previewed the file myself.  We're here with less than 24 hours

12   notice and on a -- you know, a very expedited nature, of

13   course.

14        So I appreciate the question, but I want to make sure

15   that I don't provide you an answer that's incorrect or

16   inaccurate or incomplete.

17        So what I do know is Dr. Morgan received information

18   that I believe is contained in the complaint with respect to

19   the issues that Walgreens -- you know, with the questions

20   Walgreens had, the review of his prescribing history, and it

21   was explained to him that they were going through this program

22   process.

23        I would love to present you with one of my client

24   representatives who could speak much more articulative to me on

25   the process and how they came ultimately to the decision.

1          And I think that's part of why I'm here today, to say

2     that Walgreens should have that opportunity.

3          I'm more than happy to have that opportunity, if it's

4     appropriate in this Court and before anything were to change

5     with respect to an injunction being put into place, even if

6     temporary, my client would much prefer to have an

7     opportunity —— I would much prefer to have an opportunity to

8     present things in a much clearer manner to you than me standing

9     here, you know.

10          I think that, ultimately, the question here today is:

11          Have the procedural burdens been satisfied by the

12     plaintiff in this case?

13          And again, I have not seen anything where there is

14     concrete evidence that those procedural requirements actually

15     have been satisfied.  There are allegations.  There are

16     overarching statements.

17          But at the end of the day those are not sufficient

18     evidence to support the kind of extreme nature of relief that's

19     being requested today, and I appreciate the fact that I've

20     taken up a lot of time and ——

21          THE COURT:  Look, no one is taking up a lot of time,

22     and we will give all the time the Court needs to make this kind

23     of decision.  You don't need to be —— you're telling me case

24     law from Florida, you mentioned things about settlement which I

25     have no idea about.  So, for this Court's knowledge, I would

1    ask to follow up and you cannot respond to them, and I

2    understand that.

3         One, if you're not ready to proceed, I will give you

4    ample time.  But that being said, let me hear from the

5    plaintiff as a response now.

6         MS. CHAPLIN:  Thank you, Your Honor.

7         With regard to the case law that was brought up, my

8    opposing counsel, for defense counsel, that case was overturned

9    on appeal.  This is the proper venue.  This affects Dr. Morgan

10   nationwide.  Any case they do affects them nationwide.

11        In fact, they're doing it to multiple physicians that

12   are engaged in the same area or same field of practice.  These

13   are pain management doctors, these are anesthesiologists, and

14   they are really shrinking the population of physicians who are

15   able to do these patients.

16        Whether they're able to get their medication from any

17   other physician -- the same medication that is being prescribed

18   by Dr. Morgan, the patient letter states -- which was an

19   exhibit on this, page 19, it's a letter dated June 19th, it

20   says:

21        "This decision is on the relationship between Walgreens

22   and your prescriber."

23        That's a corporate decision.  And their corporate

24   office is in Illinois.

25        "Local pharmacy team members" -- meaning the local

1   physicians in the community pharmacies -- "were not involved in

2   the decision and cannot make exceptions."

3          So it's a systemic block in their system.

4          They say:  "We value you as a patient and are invested

5   in your safety and wellness.  This in no way impacts your

6   relationship with Walgreens, nor will it impact your healthcare

7   plan from other prescribers" -- which means those other

8   prescribers, if they find a new prescriber, a new doctor, they

9   can go to -- when they're provided that same prescription,

10  Walgreens will accept it and fill it.

11         When I do say this about patients, you know, saying

12  their experience, this has happened to them before, this and

13  that, that tarnish how the patient feels, that tarnishes

14  how Dr. Morgan -- that affects his representation.  It's what's

15  the story that they're telling the next doctor, this is my

16  experience.  I went to this doctor, this is my experience and

17  this is how they treated me.

18         This does affect him.  What happens to his patients

19  does affect him, yeah.  Dr. Morgan, at Walgreens, they're going

20  to affect any controlled substances.

21         With respect to the notice, Dr. Morgan -- as stated,

22  she said it was an e-mail.  You know things go to spam, things

23  don't always go straight directly from e-mail.  Dr. Morgan did

24  not get the notice.  Had they sent the notice FedEx maybe he

25  would have gotten it.

1          That's how she said, not accepting any prescriptions,

2    and, of course, the same day they received that FedEx –– they

3    didn't send it overnight –– I think, 19th of June he responded

4    with a two-page letter saying he didn't get the notice.  Here's

5    –– when I say multiple doctors, these doctors have no avenue of

6    recourse, they have nowhere to go when they see this happen.

7          The phone number in the letter was called.  We spoke

8    with representative Nikedra.  She was advised our office never

9    received anything from Walgreens requesting any information.

10          She was not permitted to provide any other information,

11    which we understand.  It's in the complaint.  And when I called

12    myself, to even try to get –– to make contact so that opposing

13    counsel would have notice of the complaint and also of the

14    hearing for this today, I reached the exact same road block.

15          They can't respond.  You need to refer to the letter.

16    The only thing they say is you need to refer to the letter.

17          In terms of exhaustion of remedies.  If the defendant

18    would like to stipulate to the pharmacy the corporate office is

19    practicing medicine, you know, I accept that stipulation, but

20    we still need relief today because there is no other avenue for

21    relief today at this point.

22          Furthermore, let me just add what the Florida Statute

23    says.  The Florida Statute says with regards to the practice of

24    the profession of pharmacy.

25          The practice of pharmacy, it talks about all the things

1   that can be done that a pharmacist does, compounding and all

2   those things.  It says:  "This subsection may not be

3   interpreted to permit an alteration of a prescriber's

4   directions."

5        If they're talking about -- and I understand there was

6   no response to like an overprescribing, no response from

7   Dr. Morgan involved.  The 56-page response that was provided

8   after receiving the questionnaire -- which he never got the

9   earlier communication -- that response did not pertain to one

10  specific patient.

11       "This subsection may not be interpreted to permit an

12  alteration of a prescriber's directions, the diagnosis or

13  treatment of any disease, the initiation of any drug therapy,

14  the practice of medicine, or the practice of osteopathic

15  medicine."

16       So if they're saying that they're practicing medicine

17  and making these types of decisions, like I said, if that's

18  something that they're representing, this is definitely an

19  issue for the pharmacy board and perhaps even other venues.

20       With regards to these analytics, there is another case

21  where something like this happened, and that case was, I

22  believe, in Kentucky, and I can give you the case number --

23  thank you.

24       It is Kendall E. Hansen versus CVS Pharmacy.  That was

25  in the Eastern District of Kentucky, the Northern Division.

1   And in that case the trial court did grant the TRO and the case

2   was settled down the road without -- it didn't look like there

3   was much litigation thereafter.

4        And on top of that, that one was actually heard in

5   federal court, even though it really affected only local

6   pharmacies because it was more of an instruction as opposed to

7   this extreme block nationwide.  There's nowhere in the nation

8   he can go and provide controlled substances where those

9   patients can be able to fulfill that at Walgreens.

10        THE COURT:  What is the citation of the case that

11   you're referring to?

12        MS. CHAPLIN:  I just have the case number from the

13   Pacer, 2:21-CV-00092-W0B, as in boy, dash, CJS.

14        THE COURT:  All right.  First and foremost, to --

15   there's a high burden when anyone moves to seek to get a TRO:

16        They must establish that there's a substantial

17   likelihood of success on the merits; that irreparable injury

18   would be suffered if relief was not granted; the threatened

19   injury outweighs the harm the relief would inflict on the

20   non-movant; and that the entry of the relief would serve the

21   public interest.

22        And I have heard the review of the submission filed by

23   plaintiff, and after hearing arguments from both counsel the

24   Court does find that the plaintiff has met its burden of proof

25   to satisfy each element to enter a temporary restraining order.

1      However, it's temporary, not permanent.

2              Walgreens will have the opportunity to file a more

3      in-depth response.  I'm going to set a hearing on August 22nd

4      at 1:30 p.m.  I want your response to be filed no later than

5      Monday, on August 19th, by noon, to give the response; as well,

6      if you want to file a reply, you can file by the 21st, by noon,

7      as well, for the plaintiff.

8              That being said -- and that would be a $100 security

9      bond has to be posted by today at five p.m.

10             Is that an issue of posting it at five p.m.?

11             MS. CHAPLIN:  I don't believe so, no.

12             THE COURT:  When you say --

13             MS. CHAPLIN:  No, it's not an issue, no.

14             THE COURT:  It's a yes or no.

15             MS. CHAPLIN:  It's not an issue.

16             THE COURT:  Okay.  That being said, the Court will

17     enter an order that Walgreens, its officers, agents, servants,

18     employees, or other persons who are in active concert or in

19     participation with, is hereby enjoined from refusing to fill

20     prescriptions written by Courtney Morgan, M.D., for any

21     pharmaceutical product.

22             This will be issued today, this order.

23             It's approximately 10 a.m.  There will be a security

24     bond in the amount of $100 tendered by plaintiff as sufficient

25     security and this particular restraining should be valid from

```
 1    the date of the entry until the hearing of the plaintiff on the

 2    preliminary injunction motion, which is scheduled for August

 3    22nd, 2024, at 1:30 p.m., as well.

 4           With that said, is there anything else that needs to be

 5    addressed before we are in adjournment?

 6           MS. CHAPLIN:  Nothing from the plaintiff.

 7           MS. MALVIN:  No, Your Honor.

 8           THE COURT:  From defense?

 9           MS. MALVIN:  No.  Thank you.

10           THE COURT:  Have a good day, everyone.  Thank you.

11           (Proceedings concluded at 10:12 a.m.)

12

13

14                    C E R T I F I C A T E

15

16        I hereby certify that the foregoing is an

16        accurate transcription of the

17        proceedings in the above-entitled matter.

18

19    August 19th, 2024

20

21                          S/Glenda M. Powers

21

22                          GLENDA M. POWERS, RPR, CRR, FPR
                            United States District Court
22                          400 North Miami Avenue
23                          Miami, Florida  33128
                            glenda_powers@flsd.uscourts.gov

24

25
```

**$**

**$100** [2] - 24:8, 24:24

**0**

**0:24-CV-61442-RS** [1] - 1:3

**1**

**1** [1] - 1:10
**10** [1] - 24:23
**10380** [1] - 1:18
**10:12** [2] - 1:8, 25:11
**15** [1] - 1:5
**16th** [2] - 8:21, 15:4
**17th** [1] - 12:15
**1800** [1] - 1:22
**19** [1] - 19:19
**19th** [4] - 19:19, 21:3, 24:5, 25:19
**1:30** [1] - 24:4, 25:3
**1st** [1] - 4:5

**2**

**201** [1] - 1:21
**2021** [2] - 9:22, 10:1
**2024** [4] - 1:5, 4:5, 25:3, 25:19
**21st** [1] - 24:6
**22nd** [2] - 24:3, 25:3
**24** [2] - 12:17, 17:11
**24-CV-61442** [1] - 2:3
**2:21-CV-00092-W0B** [1] - 23:13

**3**

**31** [1] - 1:10
**33128** [1] - 25:23
**33301** [1] - 1:22
**34987** [1] - 1:19

**4**

**400** [2] - 1:25, 25:22

**5**

**56-page** [1] - 22:7
**5th** [1] - 10:1

**6**

**64** [1] - 10:1

**9**

**902** [1] - 10:1
**9:30** [1] - 1:7
**9:35** [1] - 1:8

**A**

**a.m** [5] - 1:7, 1:8, 24:23, 25:11
**able** [11] - 5:21, 6:8, 6:9, 8:5, 11:5, 15:4, 15:8, 15:15, 19:15, 19:16, 23:9
**above-entitled** [1] - 25:17
**absolutely** [1] - 13:11
**abuse** [2] - 4:12, 5:3
**accept** [2] - 20:10, 21:19
**accepted** [1] - 2:21
**accepting** [1] - 21:1
**accurate** [1] - 25:16
**Ackerman** [1] - 2:8
**action** [1] - 9:7
**active** [1] - 24:18
**actual** [1] - 8:21
**add** [1] - 21:22
**additional** [1] - 4:25
**address** [4] - 8:13, 11:8, 11:9, 11:21
**addressed** [1] - 25:5
**adjournment** [1] - 25:5
**adjusts** [1] - 4:22
**administrative** [3] - 10:10, 10:12, 10:15
**Administrative** [1] - 10:17
**advised** [2] - 12:13, 21:8
**affect** [3] - 20:18, 20:19, 20:20
**affected** [4] - 2:20, 14:18, 14:25, 23:5
**affects** [3] - 19:9, 19:10, 20:14
**afternoon** [1] - 7:1
**agency** [1] - 10:5
**agents** [1] - 24:17
**ago** [2] - 12:18, 12:19
**agree** [1] - 10:12
**agreement** [4] - 14:20, 16:1, 16:6, 16:8
**ahead** [1] - 8:13
**ailments** [1] - 3:6
**Akerman** [1] - 1:21
**allegations** [1] - 18:15
**allow** [1] - 12:5
**allowed** [1] - 12:4

**alteration** [2] - 22:3, 22:12
**amount** [1] - 24:24
**ample** [1] - 19:4
**amputee** [1] - 3:5
**analytics** [3] - 16:19, 16:25, 22:20
**analyze** [1] - 15:24
**anesthesiologists** [1] - 19:13
**answer** [7] - 8:5, 8:7, 11:11, 13:22, 14:1, 15:15, 17:15
**anyway** [1] - 12:12
**APA** [1] - 10:17
**apologize** [1] - 9:19
**appeal** [1] - 19:9
**appearances** [1] - 2:4
**APPEARANCES** [1] - 1:16
**applied** [1] - 10:2
**apply** [1] - 7:18
**appreciate** [4] - 6:24, 7:3, 17:14, 18:19
**appropriate** [4] - 5:6, 10:4, 10:15, 18:4
**April** [2] - 11:3, 11:7
**area** [1] - 19:12
**argue** [1] - 9:16
**arguing** [1] - 9:17
**argument** [1] - 10:9
**arguments** [1] - 23:23
**articulative** [1] - 17:24
**ascertains** [1] - 11:19
**assume** [1] - 15:1
**attached** [1] - 3:12
**attempt** [1] - 17:3
**attempted** [1] - 12:17
**attempts** [1] - 11:1
**attention** [1] - 12:3
**Attorney** [3] - 15:22, 16:2, 16:4
**August** [7] - 1:5, 8:21, 15:4, 24:3, 24:5, 25:2, 25:19
**authorized** [1] - 3:20
**authorizing** [1] - 17:7
**automatically** [1] - 13:19
**avenue** [2] - 21:5, 21:20
**Avenue** [2] - 1:25, 25:22
**aware** [4] - 3:10, 3:16, 12:18, 12:19

**B**

**backwards** [1] - 9:18
**based** [1] - 11:19

**bear** [1] - 6:25
**BEFORE** [1] - 1:14
**behalf** [2] - 2:6, 2:8
**BEHALF** [2] - 1:17, 1:20
**bell** [1] - 8:3
**belongs** [1] - 9:9
**benefits** [1] - 4:14
**best** [1] - 6:1
**between** [2] - 3:10, 19:21
**bit** [2] - 7:2, 12:23
**blanks** [1] - 8:24
**block** [6] - 3:18, 11:20, 15:3, 20:3, 21:14, 23:7
**blocked** [2] - 10:4, 15:7
**Board** [4] - 3:21, 4:17, 5:12, 9:9
**board** [3] - 10:5, 10:15, 22:19
**bond** [2] - 24:9, 24:24
**Boulevard** [2] - 1:21, 13:15
**boy** [1] - 23:13
**Bradley** [1] - 9:25
**briefly** [1] - 5:11
**bring** [1] - 14:8
**brought** [2] - 10:14, 19:7
**Broward** [1] - 13:14
**burden** [10] - 7:4, 7:7, 13:5, 13:10, 14:2, 14:9, 14:10, 23:15, 23:24
**burdens** [1] - 18:11
**business** [1] - 3:9
**BY** [1] - 1:24

**C**

**Cal.App** [1] - 10:1
**California** [3] - 9:21, 10:11, 16:12
**cancer** [1] - 5:17
**cannot** [3] - 17:4, 19:1, 20:2
**care** [1] - 6:1
**case** [22] - 9:21, 9:25, 10:11, 10:14, 13:2, 13:5, 16:3, 16:5, 16:12, 18:12, 18:23, 19:7, 19:8, 19:10, 22:20, 22:21, 22:22, 23:1, 23:10, 23:12
**CASE** [1] - 1:3
**cell** [1] - 5:19
**Center** [1] - 1:18
**certain** [4] - 6:12,

6:13, 15:5
**certainly** [3] - 10:23, 12:20, 16:14
**certify** [1] - 25:15
**challenging** [1] - 10:18
**change** [1] - 18:4
**changing** [1] - 12:13
**CHAPLIN** [11] - 1:17, 2:6, 2:14, 8:12, 15:9, 19:6, 23:12, 24:11, 24:13, 24:15, 25:6
**Chaplin** [2] - 1:18, 2:6
**chronic** [4] - 2:25, 3:8, 5:16, 5:23
**citation** [3] - 9:24, 9:25, 23:10
**CJS** [1] - 23:13
**claim** [1] - 3:8
**clear** [3] - 3:19, 5:4, 13:6
**clearer** [1] - 18:8
**clearly** [1] - 5:7
**client** [6] - 2:19, 11:3, 13:1, 17:10, 17:23, 18:6
**clinic** [4] - 3:22, 3:25, 4:4, 4:7
**clinicians** [2] - 4:1, 4:3
**close** [1] - 3:13
**CO** [1] - 1:7
**comment** [1] - 7:8
**comments** [1] - 14:19
**communication** [1] - 22:9
**community** [3] - 6:7, 20:1
**company** [2] - 6:8, 16:10
**complaint** [7] - 2:15, 2:23, 3:24, 12:12, 17:18, 21:11, 21:13
**complete** [2] - 4:10, 5:5
**completely** [2] - 5:8, 6:5
**compounding** [1] - 22:1
**concerning** [1] - 12:23, 12:24
**concerns** [2] - 17:3, 17:4
**concert** [1] - 24:18
**concluded** [1] - 25:11
**concrete** [1] - 18:14
**congestive** [1] - 5:24
**connected** [1] - 6:10
**considered** [1] - 4:24
**consultant's** [1] - 5:10
**consultations** [1] -

4:13
**contact** [2] - 17:4, 21:12
**contacted** [1] - 12:3
**contained** [1] - 17:18
**continued** [1] - 5:5
**continuing** [1] - 5:9
**controlled** [7] - 5:6, 5:7, 5:9, 15:6, 15:7, 20:20, 23:8
**conversation** [2] - 8:15, 10:8
**copy** [6] - 7:13, 8:8, 8:10, 8:11, 9:22, 9:23
**corollary** [2] - 9:11, 9:12
**corporate** [3] - 19:23, 21:18
**counsel** [8] - 2:4, 6:21, 9:2, 15:16, 19:8, 21:13, 23:23
**counsel's** [1] - 14:19
**country** [1] - 16:13
**course** [8] - 7:20, 7:25, 8:20, 10:16, 12:14, 16:10, 17:13, 21:2
**COURT** [22] - 1:1, 1:14, 2:10, 6:20, 6:23, 7:15, 7:24, 8:6, 8:13, 13:17, 13:22, 14:24, 15:11, 17:6, 18:21, 23:10, 23:14, 24:12, 24:14, 24:16, 25:8, 25:10
**court** [3] - 9:22, 23:1, 23:5
**Court** [15] - 1:24, 1:25, 2:1, 7:18, 8:13, 9:20, 10:1, 10:3, 10:11, 14:14, 18:4, 18:22, 23:24, 24:16, 25:22
**Court's** [2] - 7:9, 18:25
**Courtney** [2] - 2:7, 24:20
**COURTNEY** [1] - 1:4
**COURTROOM** [1] - 2:2
**crisis** [1] - 16:15
**CRR** [2] - 1:24, 25:21
**CVS** [5] - 9:25, 11:25, 13:15, 16:12, 22:24

## D

**damage** [1] - 5:13
**damaged** [1] - 5:20
**dash** [1] - 23:13
**date** [3] - 8:21, 12:15,

25:1
**dated** [1] - 19:19
**DEA** [1] - 3:20
**deal** [2] - 5:4, 16:14
**decision** [12] - 8:18, 10:18, 11:22, 12:5, 12:14, 12:19, 16:19, 17:25, 18:23, 19:21, 19:23, 20:2
**decisions** [4] - 9:7, 15:15, 15:19, 22:17
**declaration** [2] - 11:3, 11:5
**DEFENDANT** [2] - 1:9, 1:20
**defendant** [2] - 2:9, 21:17
**defense** [2] - 19:8, 25:8
**define** [1] - 16:25
**definitely** [1] - 22:18
**degraded** [1] - 6:14
**demonstrate** [1] - 14:5
**demonstrated** [1] - 14:13
**demonstrating** [1] - 14:4
**denied** [1] - 7:20
**deny** [1] - 15:1
**Department** [2] - 3:23, 4:7
**dependency** [1] - 4:12
**depth** [1] - 24:3
**DEPUTY** [1] - 2:2
**despite** [3] - 8:20, 12:4, 14:19
**detail** [1] - 7:10
**determination** [1] - 10:6
**determinations** [1] - 15:25
**determine** [2] - 4:21, 10:3
**determined** [1] - 10:2
**developed** [2] - 4:20, 4:18
**diabetic** [1] - 3:5
**diagnosis** [1] - 22:12
**diagnostic** [1] - 4:12
**directions** [2] - 22:4, 22:12
**directly** [1] - 20:23
**disciplinary** [1] - 4:24
**discussions** [1] - 4:14
**disease** [1] - 22:13
**dismissed** [1] - 10:14
**disproportionate** [1] - 16:24
**District** [1] - 1:25, 22:25, 25:22

**DISTRICT** [3] - 1:1, 1:1, 1:14
**Division** [1] - 22:25
**DIVISION** [1] - 1:2
**doctor** [7] - 2:25, 3:2, 6:16, 20:8, 20:15, 20:16
**doctors** [7] - 3:11, 3:12, 3:14, 3:15, 19:13, 21:5
**doctrine** [1] - 10:2
**documented** [2] - 4:24, 5:7
**done** [3] - 4:19, 13:8, 22:1
**down** [4] - 5:15, 6:8, 13:14, 23:2
**Dr** [19] - 2:7, 2:21, 3:4, 3:7, 3:25, 5:13, 6:2, 15:9, 15:10, 15:13, 17:6, 17:17, 19:9, 19:18, 20:14, 20:19, 20:21, 20:23, 22:7
**drive** [1] - 13:14
**Drive** [1] - 1:18
**drug** [5] - 4:12, 4:18, 4:19, 4:22, 22:13
**due** [3] - 5:16, 15:25, 16:6

## E

**e-mail** [10] - 7:14, 7:15, 11:2, 11:7, 11:8, 11:14, 11:15, 20:22, 20:23
**e-mailed** [1] - 7:14
**early** [2] - 11:2, 11:7
**East** [1] - 1:21
**Eastern** [1] - 22:25
**effect** [1] - 11:4
**element** [1] - 23:25
**elements** [5] - 9:2, 9:4, 9:12, 14:17, 14:21
**elsewhere** [1] - 14:16
**embarrassed** [1] - 6:14
**employees** [1] - 24:18
**emulate** [1] - 4:1
**encountered** [1] - 2:24
**end** [4] - 2:24, 7:19, 12:25, 18:17
**engaged** [1] - 19:12
**enjoined** [1] - 24:19
**enter** [2] - 23:25, 24:17
**entire** [1] - 4:7
**entitled** [1] - 25:17

**entry** [3] - 3:3, 23:20, 25:1
**Erica** [1] - 2:6
**ERICA** [1] - 1:17
**ESQ** [2] - 1:17, 1:20
**establish** [1] - 23:16
**established** [2] - 2:17, 9:4
**evaluation** [1] - 5:1
**evidence** [3] - 14:10, 18:14, 18:18
**exact** [1] - 21:14
**examination** [1] - 4:11
**exceptions** [1] - 20:2
**exhaustion** [3] - 10:10, 10:12, 21:17
**exhibit** [1] - 19:19
**EXPEDITED** [1] - 1:12
**expedited** [5] - 2:11, 7:6, 8:19, 8:23, 17:12
**experience** [3] - 20:12, 20:16
**explained** [1] - 17:21
**explaining** [1] - 11:9
**exposure** [1] - 5:16
**extension** [1] - 11:16
**extensive** [1] - 5:16
**extra** [1] - 8:10
**extreme** [2] - 18:18, 23:7
**extremely** [1] - 7:4

## F

**fact** [7] - 7:3, 8:22, 10:12, 12:4, 14:8, 18:19, 19:11
**facts** [6] - 2:15, 7:11, 7:17, 8:21, 9:4, 14:10
**failure** [1] - 5:24
**FAITH** [1] - 1:17
**family** [2] - 5:14, 5:20
**federal** [1] - 23:5
**FedEx** [4] - 10:25, 11:21, 20:24, 21:2
**field** [2] - 16:25, 19:12
**file** [8] - 11:8, 11:18, 12:7, 12:10, 17:11, 24:2, 24:6
**filed** [3] - 9:21, 23:22, 24:4
**files** [2] - 15:14, 15:25
**filings** [1] - 9:13
**fill** [4] - 8:24, 15:5, 20:10, 24:19
**filled** [6] - 2:22, 3:6, 13:12, 14:16, 15:2, 15:13

**filters** [1] - 6:6
**finality** [1] - 12:18
**findings** [1] - 4:6
**Firm** [1] - 1:18
**first** [4] - 8:20, 10:20, 13:4, 23:14
**five** [3] - 7:9, 24:9, 24:10
**FLORIDA** [1] - 1:1
**Florida** [22] - 1:4, 1:19, 1:22, 3:21, 3:23, 4:17, 5:12, 10:16, 10:17, 11:13, 14:20, 15:20, 15:22, 16:1, 16:3, 16:14, 16:16, 18:24, 21:22, 21:23, 25:23
**Florida's** [1] - 9:9
**fly** [1] - 17:10
**follow** [1] - 19:1
**FOR** [1] - 1:12
**foregoing** [1] - 25:15
**foremost** [2] - 13:4, 23:14
**forth** [1] - 5:19
**forwards** [1] - 9:2
**four** [3] - 9:2, 9:4, 13:13
**fourth** [1] - 14:21
**FPR** [2] - 1:24, 25:21
**frankly** [1] - 16:2
**FT** [1] - 1:2
**Ft** [2] - 1:4, 1:22
**fulfill** [4] - 9:8, 11:23, 17:7, 23:9
**fulfilled** [1] - 15:8
**fulfilling** [1] - 10:4
**fulfills** [1] - 16:11
**fully** [2] - 8:7, 12:18
**furthermore** [1] - 21:22

## G

**General** [2] - 15:22, 16:2
**General's** [1] - 16:4
**GLENDA** [2] - 1:24, 25:21
**glenda_powers@ flsd.uscourts.gov** [1] - 25:23
**grant** [1] - 23:1
**granted** [1] - 23:18
**guess** [3] - 9:11, 9:18, 12:23

## H

**handling** [1] - 16:15

**Hansen** [1] - 22:24
**happy** [1] - 18:3
**harm** [4] - 2:18, 2:20, 14:13, 23:19
**havoc** [1] - 6:19
**head** [1] - 13:13
**Health** [3] - 3:21, 3:23, 4:7
**Health's** [1] - 5:12
**healthcare** [2] - 6:1, 20:6
**hear** [2] - 6:21, 19:4
**heard** [2] - 23:4, 23:22
**hearing** [10] - 7:4, 7:9, 7:19, 7:22, 12:16, 12:25, 21:14, 23:23, 24:3, 25:1
**HEARING** [1] - 1:12
**heart** [1] - 5:24
**hereby** [2] - 24:19, 25:15
**high** [4] - 7:4, 13:5, 13:10, 23:15
**highlighted** [1] - 10:20
**himself** [1] - 3:2
**history** [3] - 4:11, 17:20
**Honor** [6] - 2:14, 6:22, 7:14, 11:6, 19:6, 25:7
**HONORABLE** [1] - 1:14
**hospitals** [1] - 5:18
**hours** [2] - 12:18, 17:11

## I

**idea** [1] - 18:25
**Illinois** [1] - 19:24
**imagine** [1] - 7:1
**impact** [3] - 8:18, 14:22, 20:6
**impacts** [1] - 20:5
**impairs** [1] - 6:5
**implementation** [1] - 16:16
**implemented** [2] - 7:23, 15:4
**implementing** [1] - 11:20
**in-depth** [1] - 24:3
**inaccurate** [1] - 17:16
**inappropriate** [1] - 16:23
**including** [1] - 4:11
**incomplete** [1] - 17:16
**incorporating** [1] - 5:10
**incorrect** [1] - 17:15

**indispensable** [2] - 16:3, 16:5
**individual** [1] - 4:22
**individualized** [1] - 4:20
**inflict** [1] - 23:19
**information** [7] - 4:16, 13:8, 13:20, 14:3, 17:17, 21:9, 21:10
**informationals** [1] - 4:18
**initiation** [1] - 22:13
**injunction** [4] - 2:12, 2:16, 18:5, 25:2
**injunctive** [1] - 7:23
**injuries** [1] - 5:17
**injury** [5] - 2:18, 2:19, 14:18, 23:17, 23:19
**inspect** [1] - 4:7
**inspection** [2] - 4:5, 5:12
**inspections** [1] - 3:23
**instituted** [1] - 11:19
**instituting** [1] - 3:18
**instruction** [1] - 23:6
**instructions** [1] - 3:17
**insurance** [2] - 6:10, 13:18
**insure** [1] - 5:6
**intentionally** [1] - 3:17
**interest** [2] - 14:23, 23:21
**interfered** [1] - 3:17
**interference** [1] - 3:9
**interpreted** [2] - 22:3, 23:1
**intervals** [1] - 4:25
**intervention** [1] - 12:21
**invested** [1] - 20:4
**investigation** [2] - 11:10, 17:1
**involved** [2] - 20:1, 22:7
**involves** [1] - 16:12
**irreparable** [3] - 2:18, 14:13, 23:17
**issue** [11] - 8:19, 8:25, 9:7, 10:13, 10:22, 10:23, 10:24, 22:19, 24:10, 24:13, 24:15
**issued** [2] - 11:16, 24:22
**issues** [2] - 3:1, 17:19

## J

**Jackson** [1] - 5:16
**job** [1] - 6:9
**Judge** [1] - 8:14

**JUDGE** [1] - 1:14
**July** [2] - 12:8, 12:15
**June** [4] - 10:24, 12:2, 19:19, 21:3
**justification** [3] - 5:5, 6:19, 10:2

## K

**Kendall** [1] - 22:24
**Kentucky** [2] - 22:22, 22:25
**kept** [1] - 11:1
**kind** [11] - 5:19, 6:18, 7:23, 8:4, 8:17, 9:18, 12:21, 14:11, 16:18, 18:18, 18:22
**kinds** [1] - 5:17
**knowledge** [2] - 3:17, 18:25
**known** [2] - 8:25, 10:24

## L

**laboratories** [1] - 4:13
**lack** [1] - 9:19
**largest** [2] - 6:3, 6:4
**Las** [1] - 1:21
**last** [3] - 3:2, 5:13, 7:10
**late** [1] - 12:6
**LAUDERDALE** [1] - 1:2
**Lauderdale** [2] - 1:4, 1:22
**law** [8] - 4:17, 7:11, 7:13, 7:18, 13:6, 18:24, 19:7
**Law** [1] - 1:18
**least** [4] - 9:13, 10:10, 10:22, 13:9
**leave** [3] - 3:15, 6:5, 6:6
**leaving** [2] - 6:11, 14:15
**less** [1] - 17:11
**letter** [11] - 6:17, 8:1, 11:20, 12:2, 12:11, 19:18, 19:19, 21:4, 21:7, 21:15, 21:16
**letters** [4] - 3:18, 10:25, 11:21, 15:19
**letting** [1] - 11:22
**LEV** [1] - 5:24
**license** [2] - 3:19, 3:20
**licensed** [1] - 3:22
**likelihood** [3] - 2:17, 13:7, 23:17
**listed** [1] - 13:13

**litigation** [3] - 15:21, 16:8, 23:3
**LLP** [1] - 1:21
**local** [3] - 19:25, 23:5
**look** [3] - 4:8, 18:21, 23:2
**looked** [1] - 6:12
**losing** [1] - 14:6
**love** [1] - 17:23
**loyal** [1] - 3:14
**Lucie** [1] - 1:19

## M

**M.D** [2] - 1:4, 24:20
**mail** [10] - 7:14, 7:15, 11:2, 11:7, 11:8, 11:14, 11:15, 20:22, 20:23
**mailed** [1] - 7:14
**major** [1] - 15:21
**MALVIN** [15] - 1:20, 2:8, 6:22, 6:24, 7:16, 8:4, 8:7, 8:14, 13:20, 13:24, 15:3, 15:14, 17:9, 25:7, 25:9
**Malvin** [1] - 2:8
**management** [3] - 3:22, 5:15, 19:13
**mandated** [2] - 11:12, 15:20
**manner** [4] - 10:19, 15:24, 16:13, 18:8
**March** [2] - 10:23, 11:1
**Mart** [1] - 11:25
**materials** [2] - 4:3, 4:8
**matter** [2] - 13:2, 25:17
**meaning** [1] - 19:25
**means** [1] - 20:7
**Medical** [1] - 4:17
**medical** [4] - 3:20, 4:11, 5:5, 6:7
**medically** [1] - 5:6
**medication** [7] - 4:15, 4:16, 5:23, 8:2, 17:6, 19:16, 19:17
**medications** [1] - 2:25
**medicine** [6] - 5:14, 5:20, 21:19, 22:14, 22:15, 22:16
**members** [1] - 19:25
**mentioned** [3] - 16:12, 17:2, 18:24
**merits** [4] - 2:18, 13:3, 13:7, 23:17
**met** [1] - 23:24
**methods** [1] - 16:25
**Miami** [3] - 1:25, 25:22, 25:23

**might** [1] - 8:5
**minimum** [1] - 7:20
**misgivings** [1] - 9:14
**misstate** [1] - 15:17
**modalities** [1] - 4:23
**momentarily** [3] - 8:24, 9:3, 11:13
**Monday** [1] - 24:5
**month** [3] - 11:15, 12:19
**months** [2] - 8:25, 11:24
**months'** [1] - 11:24
**Morgan** [18] - 2:2, 2:7, 3:7, 5:13, 6:2, 15:9, 15:10, 15:13, 17:6, 17:17, 19:9, 19:18, 20:14, 20:19, 20:21, 20:23, 22:7, 24:20
**MORGAN** [1] - 1:4
**Morgan's** [3] - 2:21, 3:4, 3:25
**morning** [3] - 6:22, 6:23, 11:6
**most** [1] - 4:5
**motion** [5] - 2:11, 2:16, 3:25, 15:1, 25:2
**MOTION** [1] - 1:12
**movant** [1] - 23:20
**move** [1] - 3:14
**moves** [1] - 23:15
**MS** [24] - 2:6, 2:8, 2:14, 6:22, 6:24, 7:16, 8:4, 8:7, 8:12, 8:14, 13:20, 13:24, 15:3, 15:9, 15:14, 17:9, 19:6, 23:12, 24:11, 24:13, 24:15, 25:6, 25:7, 25:9
**multiple** [4] - 11:1, 13:14, 19:11, 21:5
**must** [2] - 7:5, 23:16

## N

**nation** [2] - 6:4, 23:7
**nationwide** [3] - 19:10, 23:7
**nature** [4] - 7:3, 8:23, 17:12, 18:18
**necessarily** [1] - 10:11
**need** [4] - 4:4, 18:23, 21:15, 21:16, 21:20
**needs** [3] - 4:23, 18:22, 25:4
**neuropathy** [1] - 3:5
**never** [3] - 11:14, 21:8, 22:8
**new** [2] - 20:8

**next** [1] - 20:15
**night** [1] - 7:10
**Nikedra** [1] - 21:8
**NO** [1] - 1:3
**non** [2] - 15:7, 23:20
**non-controlled** [1] - 15:7
**non-movant** [1] - 23:20
**nonetheless** [1] - 10:13
**noon** [2] - 24:5, 24:6
**North** [2] - 1:25, 25:22
**Northern** [1] - 22:25
**nothing** [2] - 14:14, 25:6
**notice** [7] - 12:25, 17:12, 20:21, 20:24, 21:4, 21:13
**notify** [1] - 10:23
**notifying** [1] - 11:22
**nowhere** [2] - 21:6, 23:7
**number** [3] - 21:7, 22:22, 23:12

## O

**objectives** [2] - 4:13, 4:21
**obvious** [2] - 3:9, 5:14
**obviously** [1] - 11:4
**occurred** [2] - 8:22, 17:3
**OF** [3] - 1:1, 1:17, 1:20
**Office** [1] - 16:4
**office** [5] - 4:3, 6:18, 19:24, 21:8, 21:18
**officers** [1] - 24:17
**Official** [1] - 1:24
**Olas** [1] - 1:21
**ON** [3] - 1:12, 1:17, 1:20
**once** [1] - 8:3
**one** [10] - 3:4, 3:25, 6:2, 9:22, 13:15, 17:23, 18:21, 19:3, 22:9, 23:4
**opioid** [2] - 15:21, 16:14
**opportunity** [12] - 6:24, 7:16, 7:21, 8:1, 13:1, 13:25, 14:4, 18:2, 18:3, 18:7, 24:2
**opposed** [1] - 23:6
**opposing** [2] - 19:8, 21:12
**opposition** [1] - 7:22
**options** [1] - 12:1

**order** [11] - 2:1, 2:11, 7:5, 7:9, 7:10, 8:9, 8:10, 8:19, 23:25, 24:17, 24:22
**ORDER** [1] - 1:13
**organization** [1] - 9:19
**originally** [1] - 10:9
**osteopathic** [1] - 22:14
**outlined** [1] - 2:15
**outright** [1] - 7:20
**outweigh** [1] - 2:20
**outweighs** [1] - 23:19
**over-speak** [2] - 15:17, 17:10
**overarching** [2] - 8:17, 18:16
**overly** [1] - 17:6
**overnight** [2] - 16:18, 21:3
**overprescribing** [1] - 22:6
**overturned** [1] - 19:8
**own** [1] - 7:21

## P

**p.m** [5] - 7:10, 24:4, 24:9, 24:10, 25:3
**Pacer** [1] - 23:13
**page** [2] - 19:19, 21:4
**Pages** [1] - 1:10
**pain** [7] - 3:1, 3:22, 5:15, 5:16, 5:19, 5:23, 19:13
**papers** [1] - 7:2
**part** [2] - 16:5, 18:1
**participation** [1] - 24:19
**particular** [1] - 24:25
**party** [2] - 15:23, 16:3
**patient** [12] - 3:5, 3:8, 4:21, 4:23, 6:7, 6:9, 15:12, 17:8, 19:18, 20:4, 20:13, 22:10
**patients** [26] - 2:23, 3:4, 3:10, 3:12, 3:13, 4:25, 5:3, 5:21, 5:22, 6:2, 6:5, 6:6, 6:11, 6:17, 9:14, 9:15, 9:16, 11:24, 13:12, 14:4, 14:6, 19:15, 20:11, 20:18, 23:9
**patterns** [1] - 16:22
**penalized** [1] - 3:2
**people** [1] - 3:14
**per** [2] - 11:14, 11:15
**perhaps** [2] - 22:19
**period** [1] - 4:18
**permanent** [1] - 24:1

**permit** [2] - 22:3, 22:11
**permitted** [2] - 2:21, 21:10
**persons** [1] - 24:18
**pertain** [1] - 22:9
**pharmaceutical** [1] - 24:21
**pharmacies** [3] - 13:14, 20:1, 23:6
**pharmacist** [1] - 22:1
**pharmacists** [1] - 6:15
**pharmacists'** [1] - 16:25
**Pharmacy** [3] - 9:10, 9:25, 22:24
**pharmacy** [10] - 6:4, 9:8, 11:25, 13:13, 14:5, 19:25, 21:18, 21:24, 21:25, 22:19
**phone** [1] - 21:7
**physical** [1] - 4:11
**physically** [1] - 4:8
**physician** [5] - 4:22, 5:10, 5:20, 15:12, 19:17
**physicians** [3] - 19:11, 19:14, 20:1
**place** [1] - 18:5
**PLAINTIFF** [2] - 1:5, 1:17
**plaintiff** [45] - 2:5, 2:6, 2:13, 2:15, 7:4, 7:6, 8:25, 9:5, 9:15, 10:8, 10:18, 10:23, 10:24, 10:25, 11:2, 11:9, 11:14, 11:22, 12:3, 12:10, 12:11, 12:13, 12:14, 12:18, 12:19, 13:4, 13:5, 13:6, 13:8, 14:1, 14:2, 14:3, 14:5, 14:10, 14:12, 18:12, 19:5, 23:23, 23:24, 24:7, 24:24, 25:1, 25:6
**plaintiff's** [4] - 2:10, 13:11, 14:19, 15:1
**plaintiffs** [1] - 2:17
**plan** [2] - 4:20, 20:7
**PLLC** [1] - 1:18
**point** [1] - 21:21
**population** [1] - 19:14
**Port** [1] - 1:19
**position** [3] - 9:16, 13:2, 16:15
**posted** [1] - 24:9
**posting** [1] - 24:10
**potentially** [1] - 16:23
**Powers** [1] - 25:20
**POWERS** [2] - 1:24,

25:21
**practice** [5] - 19:12, 21:23, 21:25, 22:14
**practices** [1] - 16:23
**practicing** [2] - 21:19, 22:16
**prefer** [3] - 9:24, 18:6, 18:7
**preliminary** [2] - 2:12, 25:2
**prescribe** [1] - 5:21
**prescribed** [3] - 2:25, 17:6, 19:17
**prescriber** [2] - 17:5, 19:22, 20:8
**prescriber's** [2] - 22:3, 22:12
**prescribers** [4] - 16:23, 17:1, 20:7, 20:8
**prescribing** [4] - 5:9, 16:22, 16:24, 17:20
**prescription** [3] - 10:4, 17:8, 20:9
**prescriptions** [14] - 2:21, 5:22, 9:9, 11:23, 13:12, 14:16, 15:2, 15:5, 15:6, 15:8, 15:13, 16:11, 21:1, 24:20
**present** [3] - 13:1, 17:23, 18:8
**presented** [6] - 7:17, 9:5, 12:10, 14:3, 14:11, 14:14
**pretty** [1] - 3:13
**previewed** [1] - 17:11
**previous** [1] - 11:21
**primarily** [1] - 10:13
**primary** [2] - 10:2, 11:8
**printed** [1] - 9:22
**private** [1] - 11:25
**procedural** [2] - 18:11, 18:14
**procedurally** [1] - 8:17
**procedure** [1] - 8:16
**proceed** [2] - 2:13, 19:3
**proceedings** [2] - 25:11, 25:17
**process** [3] - 10:15, 17:22, 17:25
**product** [1] - 24:21
**profession** [1] - 21:24
**program** [8] - 11:12, 11:19, 15:18, 15:24, 16:8, 16:17, 16:24, 17:21
**proof** [2] - 14:6, 23:24

**proper** [5] - 9:20, 10:8, 12:25, 13:2, 19:9
**properly** [2] - 10:9, 15:16
**proposal** [1] - 8:9
**proposed** [2] - 7:10, 8:10
**prove** [2] - 13:4, 13:6
**provide** [5] - 9:23, 9:24, 17:15, 21:10, 23:8
**provided** [4] - 13:9, 13:24, 20:9, 22:7
**providers** [1] - 6:1
**providing** [1] - 6:1
**public** [4] - 3:3, 14:20, 14:23, 23:21
**Publix** [1] - 11:25
**pull** [1] - 11:5
**purely** [1] - 15:25
**purported** [1] - 9:14
**purview** [1] - 10:3
**put** [1] - 18:5

## Q

**qualified** [1] - 5:15
**questionnaire** [5] - 11:10, 12:6, 12:8, 17:2, 22:8
**questionnaires** [1] - 15:19
**questions** [2] - 12:6, 17:19
**quickly** [1] - 11:5
**quite** [3] - 3:9, 5:14, 12:16

## R

**random** [1] - 4:19
**rather** [1] - 2:10
**re** [1] - 12:6
**re-review** [1] - 12:6
**reached** [1] - 21:14
**read** [3] - 4:6, 5:11, 9:13
**ready** [1] - 19:3
**really** [3] - 13:1, 19:14, 23:5
**reason** [3] - 3:19, 13:11, 14:12
**receive** [2] - 7:12, 11:16
**received** [5] - 7:14, 7:15, 17:17, 21:2, 21:9
**receiving** [1] - 22:8
**recent** [1] - 4:5
**recognized** [1] - 6:3

**recommendation** [1] - 5:10

**record** [1] - 2:4

**records** [1] - 4:10

**recourse** [1] - 21:6

**redacted** [1] - 4:2

**refer** [2] - 21:15, 21:16

**referenced** [1] - 8:21

**referrals** [1] - 16:24

**referred** [2] - 5:2, 5:4

**referring** [1] - 23:11

**refusing** [1] - 24:19

**regard** [1] - 19:7

**regards** [5] - 2:16, 3:8, 6:11, 21:23, 22:20

**regular** [1] - 4:25

**relates** [2] - 9:13, 10:21

**relationship** [6] - 3:10, 3:13, 3:16, 3:17, 19:21, 20:6

**relief** [10] - 3:3, 7:5, 7:23, 14:11, 18:18, 21:20, 21:21, 23:18, 23:19, 23:20

**remedies** [3] - 10:10, 10:13, 21:17

**reply** [1] - 24:6

**REPORTED** [1] - 1:24

**Reporter** [1] - 1:24

**representation** [2] - 16:4, 20:14

**representative** [1] - 21:8

**representatives** [1] - 17:24

**representing** [1] - 22:18

**requested** [2] - 7:6, 18:19

**requesting** [1] - 21:9

**require** [1] - 17:1

**required** [2] - 4:16, 4:17

**requirement** [1] - 16:6

**requirements** [4] - 9:1, 16:16, 16:21, 18:14

**requires** [1] - 16:22

**resolve** [2] - 17:3, 17:4

**respect** [10] - 9:7, 9:8, 9:20, 10:11, 14:17, 14:22, 16:15, 17:18, 18:5, 20:21

**respond** [5] - 8:1, 11:15, 11:17, 19:1, 21:15

**responded** [1] - 21:3

**response** [11] - 7:22, 11:16, 11:17, 19:5,

22:6, 22:7, 22:9, 24:3, 24:4, 24:5

**responses** [1] - 12:8

**RESTRAINING** [1] - 1:13

**restraining** [4] - 2:11, 8:19, 23:25, 24:25

**result** [1] - 16:7

**results** [1] - 5:12

**retail** [1] - 6:4

**returned** [1] - 11:1

**reverse** [1] - 12:14

**review** [6] - 7:16, 12:6, 12:10, 16:22, 17:20, 23:22

**reviewed** [2] - 7:8, 12:9

**reviews** [2] - 4:18, 11:18

**risks** [1] - 4:14

**road** [2] - 21:14, 23:2

**RODNEY** [1] - 1:14

**RPR** [2] - 1:24, 25:21

**rules** [1] - 4:17

**run** [2] - 4:4, 12:25

**runs** [1] - 3:22

## S

**S.W** [1] - 1:18

**s/Glenda** [1] - 25:20

**safety** [1] - 20:5

**sailed** [1] - 8:3

**sample** [1] - 4:3

**samples** [1] - 4:2

**satisfied** [3] - 7:7, 18:11, 18:15

**satisfy** [4] - 7:5, 9:1, 13:10, 23:25

**SAVIN** [1] - 1:20

**Scheduled** [1] - 1:7

**scheduled** [1] - 25:2

**scorned** [1] - 6:13

**scrambling** [1] - 7:1

**second** [2] - 6:4, 8:8

**secondly** [1] - 8:24

**security** [3] - 24:8, 24:23, 24:25

**see** [3] - 6:15, 13:15, 21:6

**seek** [1] - 23:15

**seeking** [1] - 12:21

**seizure** [1] - 5:23

**send** [2] - 17:2, 21:3

**sender** [1] - 11:2

**sending** [1] - 3:18

**sent** [9] - 10:25, 11:2, 11:7, 11:20, 11:22, 12:2, 12:8, 12:11, 20:24

**servants** [1] - 24:17

**serve** [2] - 3:3, 23:20

**serving** [1] - 14:23

**set** [3] - 12:17, 24:3

**setting** [1] - 7:9

**settled** [2] - 15:21, 23:2

**settlement** [7] - 14:20, 15:23, 16:1, 16:6, 16:8, 16:21, 18:24

**ship** [1] - 8:3

**short** [1] - 13:22

**show** [1] - 4:3

**shrinking** [1] - 19:14

**shut** [1] - 6:8

**sickle** [1] - 5:19

**side** [1] - 13:15

**sides'** [1] - 2:11

**signed** [1] - 11:3

**significant** [1] - 7:10

**signs** [1] - 5:3

**similar** [1] - 9:21

**similarly** [2] - 10:7, 10:16

**simply** [1] - 7:4

**Smith** [1] - 2:3

**SMITH** [1] - 1:14

**sometimes** [1] - 3:13

**somewhat** [2] - 10:21, 12:24

**sorry** [2] - 3:7, 15:10

**sought** [1] - 5:18

**SOUTHERN** [1] - 1:1

**spam** [1] - 20:22

**specialists** [2] - 5:2, 5:4

**specific** [4] - 15:5, 16:9, 16:17, 22:10

**specifics** [2] - 16:19, 16:20

**St** [1] - 1:19

**standard** [1] - 3:25

**standing** [2] - 9:16, 18:8

**started** [1] - 15:18

**starting** [2] - 2:5, 3:7

**State** [9] - 9:9, 9:22, 11:13, 14:20, 15:20, 16:1, 16:3, 16:14, 16:16

**state** [5] - 2:4, 3:15, 10:5, 11:8

**statements** [1] - 18:16

**states** [1] - 19:18

**STATES** [2] - 1:1, 1:14

**States** [2] - 1:25, 25:22

**Statute** [2] - 21:22, 21:23

**STENOGRAPHICALLY** [1] - 1:23

**steps** [1] - 5:6

**still** [5] - 11:17, 11:23, 15:2, 15:8, 21:20

**stipulate** [1] - 21:18

**stipulation** [1] - 21:19

**story** [1] - 20:15

**straight** [1] - 20:22

**street** [1] - 13:15

**stressful** [1] - 6:16

**strict** [1] - 16:7

**subject** [1] - 14:19

**submission** [2] - 7:17, 23:22

**submit** [3] - 7:21, 11:6, 12:5

**submitted** [2] - 7:11, 7:12

**subsection** [2] - 22:2, 22:11

**substance** [4] - 5:3, 5:9, 8:16, 15:7

**substances** [5] - 5:6, 5:7, 15:6, 20:20, 23:8

**substantial** [2] - 13:7, 23:16

**substantiate** [3] - 7:5, 13:10, 14:11

**succeeding** [1] - 13:7

**success** [3] - 2:18, 4:21, 23:17

**suffered** [2] - 2:19, 23:18

**sufficient** [2] - 18:17, 24:24

**suggesting** [1] - 7:25

**Suite** [1] - 1:22

**support** [2] - 8:22, 18:18

**supposed** [1] - 7:11

**symptoms** [1] - 5:3

**system** [3] - 6:15, 10:17, 20:3

**systemic** [1] - 20:3

## T

**talks** [1] - 21:25

**TAMARA** [1] - 1:20

**Tamara** [1] - 2:8

**tarnish** [1] - 20:13

**tarnishes** [1] - 20:13

**team** [2] - 5:25, 19:25

**temporary** [6] - 2:11, 2:16, 8:19, 18:6, 23:25, 24:1

**TEMPORARY** [1] - 1:13

**tendered** [1] - 24:24

**terminating** [1] - 8:2

**terms** [3] - 8:22, 16:20, 21:17

**testify** [1] - 11:4

**testifying** [1] - 13:17

**tests** [2] - 4:19

**THE** [21] - 1:14, 2:10, 6:20, 6:23, 7:15, 7:24, 8:6, 8:13, 13:17, 13:22, 14:24, 15:11, 17:6, 18:21, 23:10, 23:14, 24:12, 24:14, 24:16, 25:8, 25:10

**themes** [1] - 8:18

**themselves** [1] - 9:17

**therapeutic** [1] - 4:12

**therapy** [2] - 4:22, 22:13

**thereafter** [1] - 23:3

**they've** [1] - 11:19

**third** [1] - 14:21

**thirdly** [1] - 9:6

**thoughts** [1] - 8:4

**threatened** [2] - 2:19, 14:18, 23:18

**three** [1] - 8:17

**Thursday** [1] - 1:6

**timing** [1] - 12:23

**today** [14] - 7:6, 8:5, 8:15, 12:16, 12:21, 13:21, 18:1, 18:10, 18:19, 21:14, 21:20, 21:21, 24:9, 24:22

**today's** [2] - 7:3, 7:9, 7:19

**together** [1] - 11:5

**tomorrow** [1] - 3:7

**top** [2] - 13:13, 23:4

**tortious** [1] - 3:9

**touches** [1] - 14:21

**trained** [2] - 5:14, 5:15

**transcription** [1] - 25:16

**transpiring** [1] - 12:20

**transplant** [1] - 3:5

**traumatic** [1] - 5:17

**treat** [1] - 5:19

**treated** [2] - 6:12, 20:17

**treatment** [8] - 4:13, 4:20, 4:21, 4:23, 4:24, 5:1, 5:5, 22:13

**treatments** [2] - 4:14, 5:17

**trial** [1] - 23:1

**TRO** [8] - 7:6, 9:1, 9:12, 13:3, 14:17, 14:22, 23:1, 23:15

**true** [1] - 14:1
**try** [1] - 21:12
**trying** [2] - 10:22, 16:14
**two** [3] - 11:24, 21:4
**two-page** [1] - 21:4
**types** [1] - 22:17

## U

**ultimately** [6] - 10:1, 12:11, 12:12, 13:24, 17:25, 18:10
**unable** [1] - 6:2
**unfortunately** [1] - 9:15
**UNITED** [2] - 1:1, 1:14
**united** [1] - 1:25
**United** [1] - 25:22
**unring** [1] - 8:2
**up** [5] - 2:24, 18:20, 18:21, 19:1, 19:7
**uses** [1] - 16:24

## V

**valid** [1] - 24:25
**value** [1] - 20:4
**venue** [4] - 9:6, 9:20, 10:8, 19:9
**venues** [1] - 22:19
**versus** [3] - 2:2, 9:25, 22:24
**Village** [1] - 1:18
**VS** [1] - 1:6

## W

**Wal** [1] - 11:25
**Wal-Mart** [1] - 11:25
**WALGREEN** [1] - 1:7
**Walgreens** [47] - 2:2, 2:20, 3:10, 6:10, 6:21, 7:21, 7:25, 8:1, 10:22, 10:25, 11:16, 11:18, 12:1, 12:4, 12:9, 13:15, 13:24, 14:9, 14:18, 14:19, 14:22, 14:25, 15:2, 15:3, 15:7, 15:8, 15:12, 15:15, 15:22, 16:7, 16:9, 16:15, 17:2, 17:4, 17:19, 17:20, 18:2, 19:21, 20:6, 20:10, 20:19, 21:9, 23:9, 24:2, 24:17
**website** [1] - 6:3
**wellness** [1] - 20:5
**whichever** [1] - 9:24

**whole** [4] - 4:8, 5:25, 10:17, 15:18
**word** [1] - 12:24
**workout** [1] - 11:25
**wreaks** [1] - 6:18
**written** [3] - 7:17, 7:22, 24:20

## Y

**year** [1] - 3:24
**yesterday** [2] - 3:4, 7:1

198

TAB 22

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

| | | |
|---|---|---|
| **Courtney Morgan, M.D.,** | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Case No.: 0:24cv61442-RS |
| **Walgreen Co.,** | § | |
| *Defendant.* / | | JURY |

## PLAINTIFF'S MOTION FOR JUDICIAL NOTICE

**COMES NOW**, Plaintiff, Courtney Morgan, M.D. ("Dr. Morgan"), by and through

undersigned counsel, pursuant to Fed.R.Evid. 201, and moves this Honorable Court to take

judicial notice of statutes, administrative rules and adjudicative facts as indicated in the present

motion, and further states as follows:

## RELEVANT BACKGROUND

This suit involves Plaintiff's claim of tortious interference with business relationship and

injunctive relief brought against Defendant, Walgreen Co. ("Walgreens").  The claims arise from

Walgreens instituting an unjustified block on Dr. Morgan's prescriptions for controlled substances,

thereby damaging his business and reputation, while imposing healthcare hardships on patients.

## STATUTES AND ADMINISTRATIVE RULES  FOR JUDICIAL NOTICE

Plaintiff seeks judicial notice of the Florida Statute pertaining to the practice of medicine

and the practice of pharmacy, to wit:

**I.    Florida Statutes Relating to Pharmacists**

    **A.  Fla. Stat. 465.003 - Definitions**

        (19) "Pharmacist" means any person licensed pursuant to this chapter to practice the
            profession of pharmacy.

1

(22)  "Practice of the profession of pharmacy" includes compounding, dispensing, and consulting concerning contents, therapeutic values, and uses of any medicinal drug; consulting concerning therapeutic values and interactions of patent or proprietary preparations, whether pursuant to prescriptions or in the absence and entirely independent of such prescriptions or orders; and conducting other pharmaceutical services. For purposes of this subsection, the term "other pharmaceutical services" means monitoring the patient's drug therapy and assisting the patient in the management of his or her drug therapy, and includes reviewing, and making recommendations regarding, the patient's drug therapy and health care status in communication with the patient's prescribing health care provider as licensed under chapter 458, chapter 459, chapter 461, or chapter 466, or a similar statutory provision in another jurisdiction, or such provider's agent or such other persons as specifically authorized by the patient; and initiating, modifying, or discontinuing drug therapy for a chronic health condition under a collaborative pharmacy practice agreement. This subsection may not be interpreted to permit an alteration of a prescriber's directions, the diagnosis or treatment of any disease, the initiation of any drug therapy, the practice of medicine, or the practice of osteopathic medicine, unless otherwise permitted by law or specifically authorized by s. 465.1865 or s. 465.1895. The term "practice of the profession of pharmacy" also includes any other act, service, operation, research, or transaction incidental to, or forming a part of, any of the foregoing acts, requiring, involving, or employing the science or art of any branch of the pharmaceutical profession, study, or training, and shall expressly permit a pharmacist to transmit information from persons authorized to prescribe medicinal drugs to their patients. The practice of the profession of pharmacy also includes the administration of vaccines to adults pursuant to s. 465.189; the testing or screening for and treatment of minor, nonchronic health conditions pursuant to s. 465.1895; and the preparation of prepackaged drug products in facilities holding Class III institutional pharmacy permits. The term also includes the ordering and evaluating of any laboratory or clinical testing; conducting patient assessments; and modifying, discontinuing, or administering medicinal drugs pursuant to s. 465.0125 by a consultant pharmacist.

**B.  Fla. Stat. - 465.015 Violations and penalties. (Pharmacist)**

(1)  It is unlawful for any person to own, operate, maintain, open, establish, conduct, or have charge of, either alone or with another person or persons, a pharmacy:
(a) Which is not registered under the provisions of this chapter.
(b) In which a person not licensed as a pharmacist in this state or not registered as an intern in this state or in which an intern who is not acting under the direct and immediate personal supervision of a licensed pharmacist fills, compounds, or dispenses any prescription or dispenses medicinal drugs.

## II.   Florida Statutes Relating to Physicians

### A.  458.305 - Definitions. (Physician)

(3)   "Practice of medicine" means the diagnosis, treatment, operation, or prescription for any human disease, pain, injury, deformity, or other physical or mental condition.

(4)   "Physician" means a person who is licensed to practice medicine in this state.

### B.  456.065   Unlicensed practice of a health care profession; intent; cease and desist notice; penalties; enforcement; citations; fees; allocation and disposition of moneys collected.

(1)   It is the intent of the Legislature that vigorous enforcement of licensure regulation for all health care professions is a state priority in order to protect Florida residents and visitors from the potentially serious and dangerous consequences of receiving medical and health care services from unlicensed persons whose professional education and training and other relevant qualifications have not been approved through the issuance of a license by the appropriate regulatory board or the department when there is no board. The unlicensed practice of a health care profession or the performance or delivery of medical or health care services to patients in this state without a valid, active license to practice that profession, regardless of the means of the performance or delivery of such services, is strictly prohibited.

## III.   Florida Administrative Code (Board of Pharmacy Rules)

### A.  64B16-27.1001 Practice of Pharmacy.

Those functions within the definition of the practice of the profession of pharmacy, as defined by Section 465.003(13), F.S., are specifically reserved to a pharmacist or a duly registered pharmacy intern in this state acting under the direct and immediate personal supervision of a pharmacist. The following subjects come solely within the purview of the pharmacist.

(1)  A pharmacist or registered pharmacy intern must:
(a) Supervise and be responsible for the controlled substance inventory.
(b) Receive verbal prescriptions from a practitioner.
(c) Interpret and identify prescription contents.
(d) Engage in consultation with a practitioner regarding interpretation of the prescription and date in patient profile.
(e) Engage in professional communication with practitioners, nurses or other health professionals.
(f) Advise or consult with a patient, both as to the prescription and the patient profile record.

(5) The pharmacist performing in this state any of the acts defined as "the practice of the profession of pharmacy" in Section 465.003(13), F.S., shall be actively licensed as a pharmacist in this state, regardless of whether the practice occurs in a permitted location (facility) or other location.

**B. 64B16-27.831 Standards of Practice for the Filling of Controlled Substance Prescriptions; Electronic Prescribing; Mandatory Continuing Education.**

The Board of Pharmacy recognizes that it is important for the patients of the State of Florida to be able to fill valid prescriptions for controlled substances. In filling these prescriptions, the Board does not expect pharmacists to take any specific action beyond exercising sound professional judgment. Pharmacists should not fear disciplinary action from the Board or other regulatory or enforcement agencies for dispensing controlled substances for a legitimate medical purpose in the usual course of professional practice. Every patient's situation is unique and prescriptions for controlled substances shall be reviewed with each patient's unique situation in mind. Pharmacists shall attempt to work with the patient and the prescriber to assist in determining the validity of the prescription.

(1) Definitions: For purposes of this rule the following definitions shall apply:
   (a) Valid Prescription. A prescription is valid when it is based on a practitioner-patient relationship and when it has been issued for a legitimate medical purpose.
   (b) Invalid Prescription. A prescription is invalid if the pharmacist knows or has reason to know that the prescription was not issued for a legitimate medical purpose.
   (c) Validating a Prescription. Validating a prescription means the process implemented by the pharmacist to determine that the prescription was issued for a legitimate medical purpose.

(2) General Standards for Validating a Prescription: Each prescription may require a different validation process and no singular process can fit each situation that may be presented to the pharmacist. There are circumstances that may cause a pharmacist to question the validity of a prescription for a controlled substance; however, a concern with the validity of a prescription does not mean the prescription shall not be filled. Rather, when a pharmacist is presented with a prescription for a controlled substance, the pharmacist shall attempt to determine the validity of the prescription and shall attempt to resolve any concerns about the validity of the prescription by exercising his or her independent professional judgment.
   (a) When validating a prescription, neither a person nor a licensee shall interfere with the exercise of the pharmacist's independent professional judgment.
   (b) When validating a prescription, the pharmacist shall ensure that all communication with the patient is not overheard by others.
   (c) When validating a prescription, if at any time the pharmacist determines that in his or her professional judgment, concerns with the validity of the prescription cannot be resolved, the pharmacist shall refuse to fill or dispense the prescription.

4

## CERTIFICATION OF CONFERRAL

Counsel for the undersigned certifies having attempted to confer with counsel for the Defendant; but due to timing prior to hearing, the position of the Defendant was not obtained.

## MEMORANDUM OF LAW

Federal courts will take judicial notice of the Constitution and public laws of each state, without proof required.  *See State of the Union. Mills v. Green*, 159 U.S. 651 (1895).  Florida Statutes give authority to the regulatory agencies to creates rules for regulation of professions under the Florida Administrative Code.  The foregoing statutes and administrative provisions are therefore properly the subject of this court's authority to be judicially noticed.

**WHEREFORE**, Plaintiff requests that judicial notice be taken of the referenced statutes and administrative codes, as deemed just by the court.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via CM/ECF upon counsel on the incorporated service list on this **22** day of **August, 2024.**

**Dated: August 22, 2024**

Respectfully submitted,
/s/*Erica F. Chaplin*
Erica F. Chaplin, Esq.
FLBN: 0048023
Anderson & Welch, LLC
500 S. Australian Avenue, 6th Flr
West Palm Beach, FL 33401
Tel: 561-832-3386; Fax: 561-820-4867
Email: chaplinlaw@gmail.com
Email: andewelch@andersonandwelch.com
*Attorney for Plaintiff, Courtney R. Morgan, M.D*

**SERVICE LIST**
*Courtney Morgan, M.D. v. Walgreen Co.*
**Case No.: 0:24cv61442 – RS**
United States District Court, Southern District of Florida

Erica F. Chaplin, Esq.
FLBN: 0048023
Anderson & Welch, LLC
500 S. Australian Avenue, 6th Flr
West Palm Beach, FL 33401
Tel: 561-832-3386; Fax: 561-820-4867
Email: chaplinlaw@gmail.com
Email: andewelch@andersonandwelch.com
*Attorney for Plaintiff, Courtney R. Morgan, M.D*

Tamara S. Malvin, Esq.
FLBN: 72758
Akerman LP
201 E. Las Olas Boulevard, Suite 1800
Fort Lauderdale, FL 33301
Tel: 954-463-2700; Fax: 954-463-2224
Email: tamara.malvin@akerman.com
*Attorney for Defendant, Walgreens Co.*

6

# TAB 25

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

Case No.: 24-61441-CIV-SMITH

**Courtney Morgan, M.D.**,

      *Plaintiff,*

  v.

**Walgreen Co.**,

      *Defendant.*

_____/

## ORDER GRANTING MOTION
## FOR PRELIMINARY INJUNCTION

Pending before the Court is Plaintiff's Expedited Motion for Temporary Restraining Order and Preliminary Injunction [DE 10], brought pursuant to Rule 65(b) of the Federal Rules of Civil Procedure. The Court previously granted Plaintiff a Temporary Restraining Order, pending the preliminary injunction hearing. A hearing on the Motion for a Preliminary Injunction was held on August 22, 2024, at 1:30 p.m., at which both parties were represented by counsel. The Court heard testimony from Plaintiff and his witnesses, Mitchell Epstein and Christopher Roberts. The Court also reviewed the records and filings herein, including Plaintiff's Expedited Motion for a Temporary Restraining Order and Preliminary Injunction and the exhibits [DE 10], Defendant's Opposition to Plaintiff's Motion along with the Declaration of Alexander Cosimano [DE 16], and Plaintiff's Reply to Defendant's Response and exhibits [DE 19]. Upon consideration of the foregoing, the Court makes the following findings pursuant to Federal Rule of Civil Procedure 65(b).

1

## I.   RELEVANT BACKGROUND

Dr. Morgan is a Florida licensed physician. He is the sole physician who operates his licensed pain management clinic.  When his practice was inspected by the Florida Department of Health ("FL DOH") on May 31, 2024, it was concluded that his medical records demonstrated: complete medical history and physical examination, documented reason for prescribing controlled substances for chronic pain, clear and individualized treatment plan developed, adjustment of drug therapy to the individual needs of each patient, and "complete medical justification for continued treatment with controlled substances."  (DE 10-3.)

On or about June 18, 2024, Dr. Morgan was notified by Walgreens that effective August 16, 2024, and for one full year thereafter, it will not fill prescriptions for controlled substances issued by him.  (DE 10-1.)  Dr. Morgan has over 100 patients who fill their medications at Walgreens.  These patients also received notice that Walgreens would no longer fill the prescriptions for controlled substances issued by Dr. Morgan.  (DE 10-4.)  No explanation accompanied these notices as to the reason for the block.  The block on Dr. Morgan's controlled substance prescriptions was not made by a local pharmacist, but by the corporate office.  (DE 10-1; DE 10-4.)  The letter also indicated that the patient's other prescribers would not be affected, and therefore patients could have their same medications filled if the prescriptions were issued by a different doctor.

Plaintiff's suit against Walgreens alleges a claim for Tortious Interference with Business Relationship and seeks injunctive relief.

## II.   WITNESS TESTIMONY

The Court heard uncontroverted testimony from three witnesses, Mitchell Epstein, Christopher Roberts, and Dr. Morgan.  Defendant did not offer any witnesses and did not cross-

examine any of Plaintiff's witnesses.

### A.    Mitchell Epstein

Mr. Epstein testified that he has been a patient of Dr. Morgan since March of 2021.  One of his diagnoses is quadriplegia.  The Court noted his use of a wheelchair and cane.  Mr. Epstein is presently treated for chronic pain and is prescribed controlled substances by Dr. Morgan.  He testified that he has been doing medically well since being under the care of Dr. Morgan.  Although Mr. Epstein has other medical providers who treat his other chronic ailments, those providers as a policy choose not to treat his chronic pain.  Instead, they have referred him to pain management.  Mr. Epstein has been a patient of his local Walgreens for over ten (10) years.  Mr. Epstein received a letter from Walgreens stating that they would no longer fill Dr. Morgan's prescriptions for controlled substances.  Mr. Epstein was visibly emotional and upset by the possible consequences of Walgreens blocking Dr. Morgan's prescriptions for controlled substances, and how that would affect him.  He also stated that no other medication controls his pain and stressed that it would be very difficult for him if he could not get his medication.  He believes it would be difficult for him to find another pharmacy to fill his medications or another doctor to treat his chronic pain.  Without his medication, he would experience uncontrollable pain, withdrawal symptoms, and debilitation.

### B.    Christopher Roberts

Christopher Roberts testified that he has been in pain management for over 20 years.  He is presently treated for chronic pain and is prescribed controlled substances by Dr. Morgan.  Mr. Roberts left his two previous pain management doctors because he received letters from Walgreens stating that they would no longer honor their prescriptions for controlled substances.  He stated that he has other healthcare providers in other specialties, but they will not treat his chronic pain.  Instead, he was referred to pain management.  If Dr. Morgan's prescriptions were no longer

honored by Walgreens, it would be very difficult for him to find another doctor or pharmacy for treatment of his chronic pain.   The scarcity of licensed pain management clinics and pain management doctors would contribute to the difficulty in altering his current medical care with Dr. Morgan and Walgreens.   Additionally, he believes that his medication regimen alone has deterred physicians from accepting him as a new patient.   While his medical treatment is therapeutic and necessary for his daily function, he has felt judged by both doctors and pharmacists.   He has been taking his medications for chronic pain for many years.   If he was not able to continue his medications, he would not only experience uncontrollable pain and withdrawal symptoms but would also be unable to function physically.   He would not be able to work or take care of himself or his family.

### C.    Dr. Morgan

Dr. Courtney Morgan testified about his licenses, his clinic, his patients, and the effect that Walgreens' decision to block his controlled substances has had, and will continue to have, on him and his patients.

Dr. Morgan holds unrestricted medical and DEA prescribing licenses and is authorized to issue prescriptions for controlled substances.   His licensed pain management clinic, in part, consists of over 100 patients who are also patients of Walgreens, all of whom are treated for chronic pain.   The Florida Department of Health (DOH) conducts annual inspections of his licensed pain management clinic.   These inspections are detailed and intricate, and in part, include assessment of his medical records.   His clinic has passed all inspections with stellar reviews.

Dr. Morgan expressed his concern for the welfare of his patients, and the consequences they would likely suffer if his prescriptions for controlled substances are blocked by Walgreens. Patients would likely struggle to establish care with another doctor or pharmacy, which may not

occur quickly or at all due to general statewide shortage of pain management physicians.  This is especially impactful in the area of pain management, as the actions of pharmacies blocking and blacklisting doctors contribute to shrinkage of the field.  Patients are also profiled based on negative notes contained in the Walgreens' central pharmacy system about their doctors.

Although Dr. Morgan treats patients for chronic pain associated with debilitating diagnoses and terminal illnesses, such as HIV, cancer, neuropathies, amputees, and palliative care, he also treats some patients for other medical issues that require the prescribing of controlled substances, such as seizures, androgen deficiency, COPD (chronic obstructive pulmonary disease) and CHF (congestive heart failure).  Without their medications, patients will suffer from uncontrolled pain and withdrawal symptoms, which can quickly escalate into an urgent or emergency life-or-death situation.  In addition, patients with other serious medical conditions requiring treatment with controlled substances may not be able to receive medical care from Dr. Morgan.  Moreover, this block would impede Dr. Morgan's employment as a physician and his practice of medicine.  He emphatically stressed that controlled substances include not only opioid pain medications, but also non-opioid medications.

Since the notice that Dr. Morgan's prescriptions for controlled substance would be blocked was place in Walgreens' central pharmacy system, Dr. Morgan's patients have experienced difficulties in receiving their medications.  Even after this Court issued its Order Granting Plaintiff's Temporary Restraining, some of Dr. Morgan's patients still had difficulties receiving their medications.  Refusals to fill the medication were all based on non-medical reasons associated with the notice of the block in the Walgreens' central pharmacy system.  Dr. Morgan gave an example of a patient who has uncontrolled diabetes, is blind in both eyes, has a leg amputation, has chronic kidney disease, has had a kidney transplant, and is on dialysis who was refused his

medication by the Walgreens' pharmacist due to the notice of the block.  After Dr. Morgan's insistence and advocacy, the pharmacist finally filled the patient's prescription.  Dr. Morgan stated that only because he has been able to inform pharmacists of this Court's Temporary Restraining Order, and threatened to advise the Court of their non-compliance, would they then fill his prescriptions.

Dr. Morgan stressed the grave health consequences a patient can experience with abrupt discontinuation of their medication.  Even for a period as short as 24-hours, patients can experience an emergency situation, and with continued lack of care may even seek medication outside of a medically controlled environment with the observation of a physician.

Since the notice that Dr. Morgan's prescriptions for controlled substance would be blocked was place in Walgreens' central pharmacy system, Dr. Morgan's reputation has been damaged. He testified that when speaking with Walgreens' pharmacists, they address him with judgment and the assumption of him having improperly prescribed to patients. The pharmacists have spoken to him "nastily," unprofessionally, in a poor manner, and with accusatory statements. The pharmacists have hung up the phone on him and refused to fill his patient's prescription.  On the occasions when Dr. Morgan has had face-to-face encounters with pharmacists in advocacy of his patients, he has sensed being judged due to the notice of block in Walgreens' central system.  His patients have also been profiled and looked upon in a negative light due to the notice of the block on his controlled substance prescriptions.

Dr. Morgan also acknowledged that his colleagues would view him in a negative light upon discovery that Walgreens will not honor his prescriptions for controlled substances.  The conduct implied by the blocking of prescriptions for controlled substances is shameful in the medical community.  When questioned about his employability with the imposition of this restriction, he

6

highlighted that the block is for *all* controlled substances and enforced *nationwide*, and he therefore would not be employable.  He stated that he cannot conceive of how to repair his reputation due to the assumptions that stem from Walgreens' block on his prescriptions for controlled substances.

## III.   LEGAL STANDARD

To grant a preliminary injunction, the Court must consider four factors: (1) whether the plaintiff is likely to succeed on the merits; (2) whether the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) whether the balance of equities tips in the plaintiff's favor; and (4) whether an injunction is in the public interest. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005) (citing *Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir. 1995); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)).

## IV.   ANALYSIS

The elements of tortious interference with a contract or a business relationship are: (1) the existence of either a contract or a business relationship between the plaintiff and a third party, (2) the defendant's knowledge of the contract or business relationship, (3) the defendant's intentional and unjustified interference with the contract or business relationship, and (4) damage to the plaintiff.  *Consistent Funding LLC v. S. Fla. Constr. of Naples, Inc.,* No. 21-CV-22797, 2021 WL 3371902, at *1 (S.D. Fla. Aug. 3, 2021) (*citing Seminole Tribe of Fla. v. Times Publ'g Co.*, 780 So. 2d 310, 315 (Fla. 4th DCA 2001).

### A.   Likelihood of Success on the Merits

The Court finds that Dr. Morgan has demonstrated a substantial likelihood of success on the merits.  Dr. Morgan presented evidence that Walgreens' decision to block his prescriptions for controlled substances is likely to be unjustified and potentially unlawful.  The testimony from Dr. Morgan and his patients, Mitchell Epstein and Christopher Roberts, supports the assertion that

Walgreens' actions are not based on any legitimate concern over the safety or legality of the prescriptions but rather on an internal policy that does not take into account the specific circumstances of Dr. Morgan's practice.

Dr. Morgan holds unrestricted medical and DEA prescribing licenses and operates a state-inspected pain management clinic that has consistently passed detailed inspections by the Florida Department of Health.  There is no evidence that Dr. Morgan has violated any medical or legal standards, and the decision by Walgreens appears to be based on an internal determination for reasons yet to be disclosed.  The patient witnesses, and the letter they received from Walgreens, indicated that if they were prescribed the same medications by another physician, the Defendant would fill those prescriptions, even at the very location that refused to fill Dr. Morgan's prescriptions.  The testimony from Dr. Morgan and his patients illustrates the dire consequences of Walgreens' decision on the patients' health and well-being, suggesting that the block on prescriptions is not only unwarranted but also harmful.  Dr. Morgan testified to the damage his clinic would suffer.  His patients require close monitoring though regular in-person visits every 28 days.  Thus, his patient population is reduced in comparison to a primary care practice.  Walgreens' action would affect approximately half of his patient population and likely create a significant decline in his practice.

**B.      Irreparable Harm**

Furthermore, Dr. Morgan testified that his reputation has already been damaged due to notice of the block in Walgreens' central pharmacy system.  This was evidenced by his account of hostile and accusatory conversations with Walgreens' pharmacists, some of which ended with their abrupt termination of his call.  Dr. Morgan will continue to suffer further damage if the block is made effective.  The continued refusal by Walgreens to honor his prescriptions, even after this

Court issued its Temporary Restraining Order, exacerbates the situation, and constitutes ongoing irreparable harm. The Court is persuaded by his testimony that his professional standing and reputation, employability, and the viability of his clinic are all at risk if the block remains in place.

### C.   Balance of Equities

The balance of equities tips in favor of Dr. Morgan. While Walgreens may argue that it has an interest in maintaining the integrity of its prescription monitoring practices, the Court finds that the harm faced by Dr. Morgan and his patients far outweigh any potential inconvenience to Walgreens. The inability of Dr. Morgan's patients to access their essential medications poses a significant risk to their health and well-being. Furthermore, the continued blocking of Dr. Morgan's prescriptions could jeopardize the operation of his medical practice, despite his compliance with all applicable laws and regulations. Therefore, the equities favor granting the preliminary injunction.

### D.   Public Interest

Finally, the public interest supports granting the injunction. The Court recognizes that ensuring access to necessary medications is a matter of public concern, particularly for vulnerable populations like those served by Dr. Morgan. The testimonies presented underscore the potential public health crisis that could arise if patients are denied access to their pain management medications. Mr. Epstein, a quadriplegic, and Mr. Roberts, a long-term pain management patient, both testified that they would face severe, debilitating, and or life-threatening consequences if they are unable to obtain their prescribed medications. These include uncontrollable pain, withdrawal symptoms, and the potential inability to physically function or maintain employment. The emotional distress and potential physical deterioration described by these patients underscore the urgency of the situation.

Furthermore, the public interest is served by upholding the integrity of the medical profession and ensuring that licensed physicians can operate without unwarranted interference from corporate entities.

Walgreens' actions, as described by the witnesses, contribute to the stigmatization of both patients and healthcare providers in the field of pain management, which could have broader negative implications for public health. The Court is convinced that issuing a preliminary injunction will prevent significant harm and serve the public interest by allowing Dr. Morgan to continue his practice and his patients to receive their essential medications without interruption or delay.

## V.      CONCLUSION

Based on the foregoing analysis, the Court finds that Dr. Morgan has clearly established all four perquisites and has met his burden for the issuance of a preliminary injunction. Accordingly, it is

**ORDERED** that Plaintiff's Motion for a Preliminary Injunction [DE 10] is **GRANTED.** Walgreens Co. is hereby ordered to remove its block and notice of block on Dr. Morgan's prescriptions for controlled substances immediately to ensure that all of his patients receive their prescribed medications without unwarranted opposition and unnecessary delay.

**DONE AND ORDERED** in Ft. Lauderdale, Florida, this 23rd day of August 2024 at 5:08 p.m.

**RODNEY SMITH**
**UNITED STATES DISTRICT JUDGE**

Copies to:
Counsel of Record

# TAB 29

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale

CASE NO. 24-61442-CIV-SMITH

COURTNEY MORGAN, M.D.,

     Plaintiff,

v.

WALGREEN CO.,

     Defendant.

## **NOTICE OF APPEAL**

    Notice is hereby given that Defendant WALGREEN CO. appeals to the United States Court of Appeals for the Eleventh Circuit this Court's ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION [DE:25], signed by the Court on August 23, 2024, but entered on the docket on August 26, 2024. A copy of the Order is attached.

    The Order, which grants a preliminary injunction against Walgreen Co., is immediately appealable pursuant to 28 U.S.C § 1292(a)(1).

1

CASE NO. 24-61442-CIV-SMITH

Respectfully submitted,

Elliot B. Kula
Florida Bar No. 003794
W. Aaron Daniel
Florida Bar No. 99739
KULA & ASSOCIATES, P.A.
11900 Biscayne Boulevard, Suite 310
Miami, Florida 33181
Telephone: (305) 354-3858
Facsimile: (305) 354-3822
eservice@kulalegal.com
elliot@kulalegal.com
aaron@kulalegal.com
*Counsel for Defendant Walgreen Co.*

By:＿＿＿ /s/ Elliot B. Kula＿＿＿＿
Elliot B. Kula

By:＿＿＿ /s/ W. Aaron Daniel＿＿＿
W. Aaron Daniel

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 20, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served on this day by transmission of Notices of Electronic Filing generated by CM/ECF to those parties registered to receive electronic notices of filing in this case as indicated in the below service list.

| | |
|---|---|
| Erica F. Chaplin, Esq. | Tamara S. Malvin, Esq. |
| ANDERSON & WELCH, LLC | AKERMAN LLP |
| 500 S. Australian Avenue, 6th Floor | 201 E. Las Olas Boulevard, Suite 1800 |
| West Palm Beach, Florida 33401 | Fort Lauderdale, Florida 33301 |
| chaplinlaw@gmail.com | tamara.malvin@akerman.com |
| echaplin1@gmail.com | jeanette.martinez@akerman.com |
| andewelch@andersonandwelch.com | kimberly.shinder@akerman.com |
| *Attorneys for Plaintiff Courtney R. Morgan, M.D.* | *Attorneys for Defendant Walgreen Co.* |

/s/ Elliot B. Kula＿＿＿
Elliot B. Kula

2

CASE NO. 24-61442-CIV-SMITH

# ATTACHMENT

## ORDER GRANTING MOTION
## FOR PRELIMINARY INJUNCTION
ENTERED AUGUST 26, 2024

3

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION

Case No.: 24-61441-CIV-SMITH

**Courtney Morgan, M.D.**,

       *Plaintiff,*

  v.

**Walgreen Co.**,

       *Defendant.*

_____/

## ORDER GRANTING MOTION
## FOR PRELIMINARY INJUNCTION

Pending before the Court is Plaintiff's Expedited Motion for Temporary Restraining Order and Preliminary Injunction [DE 10], brought pursuant to Rule 65(b) of the Federal Rules of Civil Procedure. The Court previously granted Plaintiff a Temporary Restraining Order, pending the preliminary injunction hearing. A hearing on the Motion for a Preliminary Injunction was held on August 22, 2024, at 1:30 p.m., at which both parties were represented by counsel. The Court heard testimony from Plaintiff and his witnesses, Mitchell Epstein and Christopher Roberts. The Court also reviewed the records and filings herein, including Plaintiff's Expedited Motion for a Temporary Restraining Order and Preliminary Injunction and the exhibits [DE 10], Defendant's Opposition to Plaintiff's Motion along with the Declaration of Alexander Cosimano [DE 16], and Plaintiff's Reply to Defendant's Response and exhibits [DE 19]. Upon consideration of the foregoing, the Court makes the following findings pursuant to Federal Rule of Civil Procedure 65(b).

1

## I.   RELEVANT BACKGROUND

Dr. Morgan is a Florida licensed physician. He is the sole physician who operates his licensed pain management clinic. When his practice was inspected by the Florida Department of Health ("FL DOH") on May 31, 2024, it was concluded that his medical records demonstrated: complete medical history and physical examination, documented reason for prescribing controlled substances for chronic pain, clear and individualized treatment plan developed, adjustment of drug therapy to the individual needs of each patient, and "complete medical justification for continued treatment with controlled substances." (DE 10-3.)

On or about June 18, 2024, Dr. Morgan was notified by Walgreens that effective August 16, 2024, and for one full year thereafter, it will not fill prescriptions for controlled substances issued by him. (DE 10-1.) Dr. Morgan has over 100 patients who fill their medications at Walgreens. These patients also received notice that Walgreens would no longer fill the prescriptions for controlled substances issued by Dr. Morgan. (DE 10-4.) No explanation accompanied these notices as to the reason for the block. The block on Dr. Morgan's controlled substance prescriptions was not made by a local pharmacist, but by the corporate office. (DE 10-1; DE 10-4.) The letter also indicated that the patient's other prescribers would not be affected, and therefore patients could have their same medications filled if the prescriptions were issued by a different doctor.

Plaintiff's suit against Walgreens alleges a claim for Tortious Interference with Business Relationship and seeks injunctive relief.

## II.   WITNESS TESTIMONY

The Court heard uncontroverted testimony from three witnesses, Mitchell Epstein, Christopher Roberts, and Dr. Morgan. Defendant did not offer any witnesses and did not cross-

examine any of Plaintiff's witnesses.

### A.     Mitchell Epstein

Mr. Epstein testified that he has been a patient of Dr. Morgan since March of 2021. One of his diagnoses is quadriplegia. The Court noted his use of a wheelchair and cane. Mr. Epstein is presently treated for chronic pain and is prescribed controlled substances by Dr. Morgan. He testified that he has been doing medically well since being under the care of Dr. Morgan. Although Mr. Epstein has other medical providers who treat his other chronic ailments, those providers as a policy choose not to treat his chronic pain. Instead, they have referred him to pain management. Mr. Epstein has been a patient of his local Walgreens for over ten (10) years. Mr. Epstein received a letter from Walgreens stating that they would no longer fill Dr. Morgan's prescriptions for controlled substances. Mr. Epstein was visibly emotional and upset by the possible consequences of Walgreens blocking Dr. Morgan's prescriptions for controlled substances, and how that would affect him. He also stated that no other medication controls his pain and stressed that it would be very difficult for him if he could not get his medication. He believes it would be difficult for him to find another pharmacy to fill his medications or another doctor to treat his chronic pain. Without his medication, he would experience uncontrollable pain, withdrawal symptoms, and debilitation.

### B.     Christopher Roberts

Christopher Roberts testified that he has been in pain management for over 20 years. He is presently treated for chronic pain and is prescribed controlled substances by Dr. Morgan. Mr. Roberts left his two previous pain management doctors because he received letters from Walgreens stating that they would no longer honor their prescriptions for controlled substances. He stated that he has other healthcare providers in other specialties, but they will not treat his chronic pain. Instead, he was referred to pain management. If Dr. Morgan's prescriptions were no longer

honored by Walgreens, it would be very difficult for him to find another doctor or pharmacy for treatment of his chronic pain. The scarcity of licensed pain management clinics and pain management doctors would contribute to the difficulty in altering his current medical care with Dr. Morgan and Walgreens. Additionally, he believes that his medication regimen alone has deterred physicians from accepting him as a new patient. While his medical treatment is therapeutic and necessary for his daily function, he has felt judged by both doctors and pharmacists. He has been taking his medications for chronic pain for many years. If he was not able to continue his medications, he would not only experience uncontrollable pain and withdrawal symptoms but would also be unable to function physically. He would not be able to work or take care of himself or his family.

### C.    Dr. Morgan

Dr. Courtney Morgan testified about his licenses, his clinic, his patients, and the effect that Walgreens' decision to block his controlled substances has had, and will continue to have, on him and his patients.

Dr. Morgan holds unrestricted medical and DEA prescribing licenses and is authorized to issue prescriptions for controlled substances. His licensed pain management clinic, in part, consists of over 100 patients who are also patients of Walgreens, all of whom are treated for chronic pain. The Florida Department of Health (DOH) conducts annual inspections of his licensed pain management clinic. These inspections are detailed and intricate, and in part, include assessment of his medical records. His clinic has passed all inspections with stellar reviews.

Dr. Morgan expressed his concern for the welfare of his patients, and the consequences they would likely suffer if his prescriptions for controlled substances are blocked by Walgreens. Patients would likely struggle to establish care with another doctor or pharmacy, which may not

occur quickly or at all due to general statewide shortage of pain management physicians. This is especially impactful in the area of pain management, as the actions of pharmacies blocking and blacklisting doctors contribute to shrinkage of the field. Patients are also profiled based on negative notes contained in the Walgreens' central pharmacy system about their doctors.

Although Dr. Morgan treats patients for chronic pain associated with debilitating diagnoses and terminal illnesses, such as HIV, cancer, neuropathies, amputees, and palliative care, he also treats some patients for other medical issues that require the prescribing of controlled substances, such as seizures, androgen deficiency, COPD (chronic obstructive pulmonary disease) and CHF (congestive heart failure). Without their medications, patients will suffer from uncontrolled pain and withdrawal symptoms, which can quickly escalate into an urgent or emergency life-or-death situation. In addition, patients with other serious medical conditions requiring treatment with controlled substances may not be able to receive medical care from Dr. Morgan. Moreover, this block would impede Dr. Morgan's employment as a physician and his practice of medicine. He emphatically stressed that controlled substances include not only opioid pain medications, but also non-opioid medications.

Since the notice that Dr. Morgan's prescriptions for controlled substance would be blocked was place in Walgreens' central pharmacy system, Dr. Morgan's patients have experienced difficulties in receiving their medications. Even after this Court issued its Order Granting Plaintiff's Temporary Restraining, some of Dr. Morgan's patients still had difficulties receiving their medications. Refusals to fill the medication were all based on non-medical reasons associated with the notice of the block in the Walgreens' central pharmacy system. Dr. Morgan gave an example of a patient who has uncontrolled diabetes, is blind in both eyes, has a leg amputation, has chronic kidney disease, has had a kidney transplant, and is on dialysis who was refused his

medication by the Walgreens' pharmacist due to the notice of the block. After Dr. Morgan's insistence and advocacy, the pharmacist finally filled the patient's prescription. Dr. Morgan stated that only because he has been able to inform pharmacists of this Court's Temporary Restraining Order, and threatened to advise the Court of their non-compliance, would they then fill his prescriptions.

Dr. Morgan stressed the grave health consequences a patient can experience with abrupt discontinuation of their medication. Even for a period as short as 24-hours, patients can experience an emergency situation, and with continued lack of care may even seek medication outside of a medically controlled environment with the observation of a physician.

Since the notice that Dr. Morgan's prescriptions for controlled substance would be blocked was place in Walgreens' central pharmacy system, Dr. Morgan's reputation has been damaged. He testified that when speaking with Walgreens' pharmacists, they address him with judgment and the assumption of him having improperly prescribed to patients. The pharmacists have spoken to him "nastily," unprofessionally, in a poor manner, and with accusatory statements. The pharmacists have hung up the phone on him and refused to fill his patient's prescription. On the occasions when Dr. Morgan has had face-to-face encounters with pharmacists in advocacy of his patients, he has sensed being judged due to the notice of block in Walgreens' central system. His patients have also been profiled and looked upon in a negative light due to the notice of the block on his controlled substance prescriptions.

Dr. Morgan also acknowledged that his colleagues would view him in a negative light upon discovery that Walgreens will not honor his prescriptions for controlled substances. The conduct implied by the blocking of prescriptions for controlled substances is shameful in the medical community. When questioned about his employability with the imposition of this restriction, he

highlighted that the block is for *all* controlled substances and enforced *nationwide*, and he therefore would not be employable. He stated that he cannot conceive of how to repair his reputation due to the assumptions that stem from Walgreens' block on his prescriptions for controlled substances.

## III.    LEGAL STANDARD

To grant a preliminary injunction, the Court must consider four factors: (1) whether the plaintiff is likely to succeed on the merits; (2) whether the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) whether the balance of equities tips in the plaintiff's favor; and (4) whether an injunction is in the public interest. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005) (citing *Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir. 1995); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)).

## IV.    ANALYSIS

The elements of tortious interference with a contract or a business relationship are: (1) the existence of either a contract or a business relationship between the plaintiff and a third party, (2) the defendant's knowledge of the contract or business relationship, (3) the defendant's intentional and unjustified interference with the contract or business relationship, and (4) damage to the plaintiff. *Consistent Funding LLC v. S. Fla. Constr. of Naples, Inc.*, No. 21-CV-22797, 2021 WL 3371902, at *1 (S.D. Fla. Aug. 3, 2021) (*citing Seminole Tribe of Fla. v. Times Publ'g Co.*, 780 So. 2d 310, 315 (Fla. 4th DCA 2001).

### A.    Likelihood of Success on the Merits

The Court finds that Dr. Morgan has demonstrated a substantial likelihood of success on the merits. Dr. Morgan presented evidence that Walgreens' decision to block his prescriptions for controlled substances is likely to be unjustified and potentially unlawful. The testimony from Dr. Morgan and his patients, Mitchell Epstein and Christopher Roberts, supports the assertion that

Walgreens' actions are not based on any legitimate concern over the safety or legality of the prescriptions but rather on an internal policy that does not take into account the specific circumstances of Dr. Morgan's practice.

Dr. Morgan holds unrestricted medical and DEA prescribing licenses and operates a state-inspected pain management clinic that has consistently passed detailed inspections by the Florida Department of Health. There is no evidence that Dr. Morgan has violated any medical or legal standards, and the decision by Walgreens appears to be based on an internal determination for reasons yet to be disclosed. The patient witnesses, and the letter they received from Walgreens, indicated that if they were prescribed the same medications by another physician, the Defendant would fill those prescriptions, even at the very location that refused to fill Dr. Morgan's prescriptions. The testimony from Dr. Morgan and his patients illustrates the dire consequences of Walgreens' decision on the patients' health and well-being, suggesting that the block on prescriptions is not only unwarranted but also harmful. Dr. Morgan testified to the damage his clinic would suffer. His patients require close monitoring though regular in-person visits every 28 days. Thus, his patient population is reduced in comparison to a primary care practice. Walgreens' action would affect approximately half of his patient population and likely create a significant decline in his practice.

**B.        Irreparable Harm**

Furthermore, Dr. Morgan testified that his reputation has already been damaged due to notice of the block in Walgreens' central pharmacy system. This was evidenced by his account of hostile and accusatory conversations with Walgreens' pharmacists, some of which ended with their abrupt termination of his call. Dr. Morgan will continue to suffer further damage if the block is made effective. The continued refusal by Walgreens to honor his prescriptions, even after this

8

Court issued its Temporary Restraining Order, exacerbates the situation, and constitutes ongoing irreparable harm. The Court is persuaded by his testimony that his professional standing and reputation, employability, and the viability of his clinic are all at risk if the block remains in place.

### C.    Balance of Equities

The balance of equities tips in favor of Dr. Morgan. While Walgreens may argue that it has an interest in maintaining the integrity of its prescription monitoring practices, the Court finds that the harm faced by Dr. Morgan and his patients far outweigh any potential inconvenience to Walgreens. The inability of Dr. Morgan's patients to access their essential medications poses a significant risk to their health and well-being. Furthermore, the continued blocking of Dr. Morgan's prescriptions could jeopardize the operation of his medical practice, despite his compliance with all applicable laws and regulations. Therefore, the equities favor granting the preliminary injunction.

### D.    Public Interest

Finally, the public interest supports granting the injunction. The Court recognizes that ensuring access to necessary medications is a matter of public concern, particularly for vulnerable populations like those served by Dr. Morgan. The testimonies presented underscore the potential public health crisis that could arise if patients are denied access to their pain management medications. Mr. Epstein, a quadriplegic, and Mr. Roberts, a long-term pain management patient, both testified that they would face severe, debilitating, and or life-threatening consequences if they are unable to obtain their prescribed medications. These include uncontrollable pain, withdrawal symptoms, and the potential inability to physically function or maintain employment. The emotional distress and potential physical deterioration described by these patients underscore the urgency of the situation.

Furthermore, the public interest is served by upholding the integrity of the medical profession and ensuring that licensed physicians can operate without unwarranted interference from corporate entities.

Walgreens' actions, as described by the witnesses, contribute to the stigmatization of both patients and healthcare providers in the field of pain management, which could have broader negative implications for public health. The Court is convinced that issuing a preliminary injunction will prevent significant harm and serve the public interest by allowing Dr. Morgan to continue his practice and his patients to receive their essential medications without interruption or delay.

## V.   CONCLUSION

Based on the foregoing analysis, the Court finds that Dr. Morgan has clearly established all four perquisites and has met his burden for the issuance of a preliminary injunction. Accordingly, it is

**ORDERED** that Plaintiff's Motion for a Preliminary Injunction [DE 10] is **GRANTED.** Walgreens Co. is hereby ordered to remove its block and notice of block on Dr. Morgan's prescriptions for controlled substances immediately to ensure that all of his patients receive their prescribed medications without unwarranted opposition and unnecessary delay.

**DONE AND ORDERED** in Ft. Lauderdale, Florida, this 23rd day of August 2024 at 5:08 p.m.

RODNEY SMITH
UNITED STATES DISTRICT JUDGE

Copies to:
Counsel of Record